ORIGINAL

FILED

NOV 1 2 2013

CLERK
UNITED STATES BANKRUPTCY COURT
SAN JOSE, CALIFORNIA

1  James M. Kelley
2  14390 Douglass Lane
   Saratoga, CA 95070
   jmadisonkelley@gmail.com
3  Tel:    (408) 402-1915
4  PRO SE

5

6

7        UNITED STATES BANKRUPTCY COURT
8   NORTHERN DISTRICT OF CALIFORNIA – DIVISION 5

| In Re: | Chapter 11 |
|---|---|
| JAMES MADISON KELLEY, | |
| Debtor | Adversary Case No. 10-05245 |
| | |
| JAMES MADISON KELLEY | |
| Plaintiff | |
| v. | ) Request for Judicial Notice of |
| | ) the Deposition of Cynthia Riley |
| JPMORGAN CHASE BANK, NA, | ) taken in the matter of JP Morgan Chase |
| | ) Bank, N.A. v. Eduardo Orazco |
| DOES (1-20) | ) |
| | ) and |
| | ) Declaration of James Madison Kelley |
| | ) in Support of the Request for Judicial |
| | ) Notice |
| | ) |
| | ) (Proof of Service Included) |
| | ) |
| | ) Honorable Arthur S. Weissbrodt |
| | ) Courtroom: 3020 |
| | ) |

Request for Judicial Notice & Declaration          1          Adversary Case  10-05245
Cynthia Riley Deposition                                       Bkr. Case: 08 –55305 ASW

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201, Plaintiff- James Madison Kelley hereby requests that the Court take judicial notice of the following deposition attached hereto as Exhibit 1:

"The Deposition of Cynthia Riley taken in the matter of JP Morgan Chase Bank, N.A. v. Eduardo Orazco, case No: 09-29997 CA (11), Fla. 11th Cir. Ct."

The will be referred to herein as the Riley Deposition. The Plaintiff attests in his Declaration that the Riley Deposition is a true and correct copy of a court certified copy (made by him) that was filed in the JP Morgan Chase Bank, N.A. v. Eduardo Orazco, case No: 09-29997 CA (11), Fla. 11th Cir. Ct.

Under Federal Rule of Evidence 201(d), judicial notice may be taken at any stage of the proceeding, including by an appellate court during the pendency of an appeal. Fed. R. Evid. 201(d); *see also Lowry v. Barnhart*, 329 F.3d 1019, 1024(9th Cir. 2003); *Bryant v. Carleson*, 444 F.2d 353, 357-58 (9th Cir. 1971); Circuit Advisory Committee Note Seven to Ninth Circuit Rule 27-1. "The Court may take judicial notice of any matter not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The Riley Deposition is a proper subject of judicial notice. The Riley Deposition attached hereto is a true and correct from a source whose accuracy can be accurately and readily determined and cannot reasonably be questioned." Fed. R. Evid. 201(b).

"Federal courts may 'take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.'" *CactusCorner, LLC v. U.S. Dept. of Agric.*, 346 F.Supp.2d 1075, 1092 (E.D. Cal.2004) (quoting *United States ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992)).

1        The Riley Deposition shows that Cynthia Riley was laid off and was not a vice

2  president of Washington Mutual Bank or Washington Mutual Bank, FA at the time that

3  blank endorsements in her name would have been made on the loan documents. (See

4  pages 64 and 65)  The blank endorsements on the questioned loan documents produced

5  by Chase could not have been made or authorized by Riley. This is proof that the blank

6  endorsed loan documents submitted to the Plaintiff by Chase are fake. Thus, the Riley

7  Deposition is proof of Plaintiff's claim that Chase lacks standing. Fed. R. Evid. 401(b)

8        The purpose of the Secondary Delivery Operations was to prepare, endorse and

9  deliver loans to Fannie Mae, Freddie Mac, Lehman, Ocwen, Bayview, GMC, and private

10  investors who bought the loans. (see pages 23, 36, 39, 41, 42, 47, and 48) Loans that were

11  sold could not remain the property of Washington Mutual Bank to be passed to Chase by

12  the Receiver. Fed. R. Evid. 401(a)

13        A federal court must take judicial notice of facts "if requested by a party and

14  supplied with the necessary information". Here the necessary information–the Riley

15  Deposition- is attached. Fed. R. Evid. 201(d)

16

17  DATED: November 11, 2013

18

19  Respectfully Submitted by

20

21  *James Madison Kelley*

22  James Madison Kelley

23  Pro Se Plaintiff

24

25

26

27

28  Request for Judicial Notice & Declaration     3     Adversary Case  10-05245
        Cynthia Riley Deposition                    Bkr. Case: 08 –55305 ASW

# DECLARATION OF JAMES MADISON KELLEY

I, James Madison Kelley, declare:

1. I am the Pro Se Plaintiff in the above captioned action. I make this Declaration in support of the Request for Judicial Notice filed herewith. The facts set forth below are within my personal knowledge unless otherwise indicated.

2. I ordered a court certified copy of the Cynthia Riley deposition. I personally copied the court certified copy for this Request.

3. The Document attached as Exhibit 1 hereto is a true and correct copy of the court certified copy filed a Florida court as further specified below:

Exhibit 1:

"The Deposition of Cynthia Riley taken in the matter of JP Morgan Chase Bank, N.A. v. Eduardo Orazco, case No: 09-29997 CA (11), Fla. 11th Cir. Ct."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 11, 2013 at Saratoga, California.

James Madison Kelley

Pro Se Plaintiff

14390 Douglass Lane
Saratoga, CA 95070
(408) 402-1915
jmadisonkelley@gmail.com

# PROOF OF SERVICE

**PROOF OF SERVICE**

I, James Madison Kelley, under penalty of perjury attest that I mailed

"Request for Judicial Notice of the Deposition of Cynthia Riley
taken in the matter of JP Morgan Chase Bank, N.A. v. Eduardo Orazco

and

The Declaration of James Madison Kelley in Support of the Request for Judicial
Notice"

By US mail to the following people:

S. Christopher Yoo, esq.
John M. Sorich, esq.
Thomas Van, esq.

AlvaradoSmith, PC
1 MacArthur Place, #200
Santa Ana, CA 92707

Dated at Saratoga, California, this 11$^{h}$ day of November 2013

By: *James Madison Kelley*

James Madison Kelley

*** FILED: BROWARD COUNTY, FL. HOWARD FORMAN, CLERK 8/7/2013 3:58:00 PM ****

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

JPMorgan Chase Bank, National Association,

CASE No.: 09-001639 (11)

       Plaintiff,

v.

Robert T. Frost a/k/a/ Robert Frost; JPMorgan
Chase Bank,; et.al.

       Defendant(s).

_____/

### NOTICE OF FILING DEPOSITION

The Defendant, Robert Frost, by and through his undersigned counsel pursuant to Fla.R.Civ.P. 1.330(3) and Fla. Stat. 90.804(2)(a) for use in trial hereby files the deposition of Cynthia Riley taken in the matter of *JP Morgan Chase Bank, N.A. v. Eduardo Orazco*, Case No.: 09-29997 CA (11), Fla. 11th Cir. Ct.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via e-mail this 7th day of August, 2013 to Tracy Starasoler, Esq., Shapiro and Fishman, LLP at SFGBocaService@logs.com and Lori Sochin, Esq., Wargo & French, at FLService1@wargofrench.com and FLService2@wargofrench.com.

STATE OF FLORIDA
BROWARD COUNTY
I DO HEREBY CERTIFY the within and foregoing is a true
and correct copy of the original as it appears on record
and file in the office at the Circuit Court Clerk Broward
County, Florida.
WITNESS my hand and Official Seal at Fort Lauderdale
Florida, this the _____ day of _____ 20__
OCT 15 2013
_____
Clerk of the Court
_____
Deputy Clerk

MICHAEL JAY WRUBEL P.A.
Michael Wrubel
4801 South University Drive, Suite 251
Davie, Fl. 33328
MJW@WrubelLaw
Tel.: (954) 434-5353
Fax: (954) 981-2987

/S/  Michael Wrubel
MICHAEL WRUBEL
Florida Bar # 285757

1      IN THE CIRCUIT COURT, 11TH JUDICIAL CIRCUIT
          IN AND FOR MIAMI-DADE COUNTY, FLORIDA

2

3              CASE NO.:  09-29997 CA (11)

4
     JP MORGAN CHASE BANK, N.A.,

5
            Plaintiff,

6
     vs.

7
     EDUARDO OROZCO, et al.,

8
            Defendants.

9

10   ──────────────────────────────────────────────

                          DEPOSITION OF
11                         CINDY RILEY

12

13

          DATE TAKEN:     January 15, 2013

14

          TIME:           10:00 a.m. - 12:23 p.m.

15

          PLACE:          345 East Forsyth Street
16                         Jacksonville, Florida  32202

17

18

19   Examination of the witness taken before:

20
          Samantha Cordova, FPR, Notary Public
21        Hedquist & Associates Reporters, Inc.
              345 East Forsyth Street
22           Jacksonville, Florida  32202

23

24

25
          Hedquist & Associates Reporters, Inc.

```
 1              APPEARANCES FOR THE PLAINTIFF
 2
 3              ROLAND E. SCHWARTZ, Esquire
 4                      GrayRobinson
                401 East Las Olas Boulevard
 5                      Suite 1850
                Fort Lauderdale, Florida  33301
 6
 7
 8              APPEARANCES FOR THE DEFENDANTS
 9
10              MICHAEL J. WRUBEL, Esquire
11              Michael Jay Wrubel, P.A.
                4801 South University Drive
12                      Suite 251
                Davie, Florida  33328
13
14
                APPEARANCES FOR CINDY RILEY
15
16
                JONATHAN WEISS, Esquire
17
                Simpson, Thacher & Bartlett, LLP
18              1999 Avenue of the Stars
                        29th Floor
19              Los Angeles, California  900067
20
21
                        ALSO PRESENT
22
                Eduardo Orozco, Defendant
23
24
25
```

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 8 of 79

1                    I N D E X

2              E X A M I N A T I O N S

WITNESS                                    Page

3    CYNTHIA RILEY                           4

4    DIRECT EXAMINATION BY MR. WRUBEL        4

5    CROSS-EXAMINATION BY MR. SCHWARTZ      77

6

7                  E X H I B I T S

8    FOR IDENTIFICATION                      Page

9          Defendants' Exhibit 1            69

10         Plaintiff's Exhibit 1            83

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 9 of 79

1          MR. SCHWARTZ:  Hi.  My name is Roland Schwartz.

2     I'm with the law firm of GrayRobinson.  We represent

3     Chase.  We also represent Ms. Riley as an employee

4     of the bank.  There was a request by the borrower to

5     record -- audio record this deposition, which was

6     refused.  And the borrower will not be recording

7     this deposition.

8                    CYNTHIA RILEY,

9     acknowledged having been duly sworn to tell the truth

10    and testified upon her oath as follows:

11         THE WITNESS:  Yes.

12                    DIRECT EXAMINATION

13    BY MR. WRUBEL:

14         Q    Okay.  Could you state your name for the

15    record, please?

16         A    Cynthia Riley.

17         Q    And by whom are you employed?

18         A    JP Morgan Chase.

19         Q    Okay.  And how long have you been employed by

20    them?

21         A    I've been with Chase or Chase affiliates for

22    25 years.

23         Q    Okay.  And when you say Chase affiliates, I

24    take it you're referring to banks that were acquired

25    or --

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 10 of
79

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | -- institutions that were acquired? |
| 3 | A | Correct. |
| 4 | Q | All right.  Before we get into your work |

5   history, have you ever given a deposition before?

| | | |
|---|---|---|
| 6 | A | Yes. |
| 7 | Q | Okay.  Have you ever given a deposition with |

8   reference to your work with either JP Morgan, WaMu, or

9   any of the predecessors?

| | | |
|---|---|---|
| 10 | A | Yes. |
| 11 | Q | How many times have you given a deposition so |

12   far?

| | | |
|---|---|---|
| 13 | A | Twice. |
| 14 | Q | Twice. |
| 15 | A | I think twice. |
| 16 | Q | And when were they? |
| 17 | A | I can't be sure of when they were. |
| 18 | Q | To the best of your ability. |
| 19 | A | I would want to say the last year sometime. |
| 20 | Q | Okay.  And I take it one of them was -- |
| 21 | A | Maybe two years ago. |
| 22 | Q | One of them was in Tavares? |
| 23 | A | Yes. |
| 24 | Q | Okay.  And the other one was where? |
| 25 | A | New York. |

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 11 of 79

1    Q    In New York?

2    A    (Nods head.)

3    Q    Okay.  Do you know what the name of that case

4    was?

5    A    Don't recall.

6    Q    Okay.  Do you recall when you gave the

7    deposition?

8    A    I -- I'm guessing -- I don't really know for

9    sure.

10   Q    Okay.  In any case, this will be your third

11   deposition with reference to this subject matter?

12   A    Correct.

13   Q    All right.  And with reference to your

14   education, how far did you go?

15   A    College.  I went through college.

16        (Brief interruption.)

17        THE WITNESS:  I'm sorry.  My phone is obviously

18   on.

19        MR. WRUBEL:  Take your time.

20        THE WITNESS:  Took care of that.  Thank you.

21        MR. WRUBEL:  No worries.

22        THE WITNESS:  My apologies.

23        MR. WRUBEL:  Things like that happen all the

24   time.

25        THE WITNESS:  Nobody ever calls me.  Okay.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 12 of 79

1   BY MR. WRUBEL:

2       Q   Okay.  You were mentioning you went to college.

3       A   Yes.

4       Q   Where'd you go?

5       A   University of Colorado.

6       Q   And what did you major in?

7       A   Business administration.

8       Q   And did you get a degree in business

9   administration?

10      A   Yes, I did.

11      Q   Did you do any post-college work?

12      A   Some.  Couple of years.

13      Q   Couple years.  Where?

14      A   University of Colorado.

15      Q   In what capacity did you do post-graduate?

16      A   I started out a master's program and left that

17  for a job.

18      Q   Okay.  And what were you trying to get a

19  master's in?

20      A   Accounting.

21      Q   And from the language you're using, I take it

22  that you did not get a master's degree?

23      A   I did not.

24      Q   But you took courses towards it?

25      A   I took some courses in the master's program.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 13 of
79

1    Q    Okay.  Anything else besides accounting that

2    you took courses in master's area?

3    A    No.

4    Q    All right.  Once you -- you said you left

5    because of a job?

6    A    Yes.

7    Q    And what job was that?

8    A    I went to work for Hand Miller & Associates.

9    Q    In what capacity?

10    A    At the time they were called Landman Oil and

11    Gas Industry.

12    Q    Can you spell that, please, Laman?

13    A    Landman.

14    Q    Oh, Landman.

15    A    One word.

16    Q    All right.  So they were in the gas industry?

17    A    They were a contractor providing services to

18    gas industries, yes.

19    Q    And how did you assist them?

20    A    I went out and researched legal records for

21    mineral ownership.

22    Q    And how long did you have that job for?

23    A    Year or two.

24    Q    Okay.  Did you do anything else for them

25    besides research legal records?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 14 of
79

1     A    No.

2     Q    Okay.  Where did you work after that?

3     A    That's a long time ago.

4     Q    Approximately.  Okay.  Well, we know that you

5  go back 25 years in the banking industry from what

6  you've told us so far.

7     A    I think that's when I went to work.

8          MR. SCHWARTZ:  Don't guess if you don't know.

9     A    Yeah.  I don't know the order anymore.

10    Q    Okay.  Without knowing the order, can you tell

11  me where -- if you had any other jobs before you entered

12  the banking industry?

13    A    I worked at JP -- JC- --

14    Q    JCPenny's?

15    A    Penny's.

16    Q    Okay.

17    A    Yes.  I worked at JCPenny's for a little while.

18    Q    In what capacity?

19    A    Sales.

20    Q    And do you know approximately how long you

21  worked for JCPenny?

22    A    Maybe a year.

23    Q    Okay.  And did you have any other jobs before

24  you got into the banking industry?

25    A    Just the normal ones, you know, growing up.  Is

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 15 of 79

1    that what you're interested in?

2         Q    I'll tell you what --

3         A    Sixteen-year-old I was a bus girl.

4         Q    I'm going to let you go for precollege.  We

5    don't need to know that.

6         A    Okay.  All right.

7         Q    Just simply post college.  Anything else before

8    you got into the banking industry?

9         A    No, not that I can think of.

10        Q    Okay.  Before we get into your banking

11   history --

12        A    Excuse me.  I was in the insurance.  I was

13   account executive for a health insurance company right

14   after college, Peak Health.

15        Q    Peak, P-e-a-k?

16        A    Uh-huh.

17        Q    And as an account executive, what were your

18   duties?

19        A    Sales.

20        Q    And was that in Colorado also?

21        A    That was in Colorado.

22        Q    What city?

23        A    Colorado Springs.

24        Q    What about for Hand Miller & Associates?  Where

25   was that located?

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 16 of 79

1    A    That was in Denver, Denver, Colorado.

2    Q    And JP -- JCPenny?

3    A    That was Stockton, California.  That would be

4    the third in the list.

5    Q    Got it.  So we're getting some clarity here.

6         Without telling me what was said, did you

7    prepare for this deposition with anybody?

8    A    I met with Roland and Jonathan yesterday.

9    Q    All right.  And other than meeting with them

10   yesterday, did you meet with anybody?  Was that the

11   first time?

12   A    It was.

13   Q    In preparation for this deposition.

14   A    The first time we met for this deposition, yes.

15   Q    All right.  And approximately how much time did

16   you spend preparing?

17   A    Two hours.

18   Q    Okay.  Did you review any of the documents with

19   reference to Mr. Orozco in your preparation?

20   A    I saw the note.

21   Q    Okay.

22   A    And that's it.

23   Q    All right.  Okay.  Back to your work history.

24   You say that you go back 25 years.  Who was your first

25   job with, if you recall?

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 17 of
79

1     A    American Savings Bank.

2     Q    And where were they located?

3     A    Stockton, California.

4     Q    In what capacity did you start working for

5  them?

6     A    I was in the records area where files were

7  moved in and out of records.

8     Q    And what did you do with regards to the

9  records, if anything?

10     A    I was a supervisor.  I supervised a team of

11  people responsible for tracking files as they were

12  shipped in, as they came in and shipped out.

13     Q    Okay.  And as a supervisor of the team, what

14  types of things would they do?

15     A    They looked at images that came through from

16  the files to make sure that they were quality checked

17  and jacketed them.

18     Q    Right.

19     A    Meaning they cut them, put them into jackets.

20  In terms of the shipping, we would write transmittals of

21  files in boxes and ship them to secure storage.

22     Q    When the files came in, would you make copies

23  of notes and things of that nature and copies of the

24  loan?

25     A    No.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 18 of 79

1    Q    Would there be any records made of the notes as
2    they came in?

3    A    That was not an area I was involved in.  I
4    really can't speak to that.

5    Q    Okay.  So as far as taking care of the files,
6    what would your team do?

7         MR. SCHWARTZ:  I'll object as to relevance,
8         but go ahead.

9    Q    Go ahead.

10   A    They were the credit files.  And they simply --
11   our job was to box them and send them to shipping after
12   the images had been verified and jacketed.

13   Q    Okay.  What images are you referring to?

14   A    Of the loan files.

15   Q    All right.  And so images would be made
16   elsewhere and you would check to make sure that they
17   were accurate?

18        MR. SCHWARTZ:  We make a standing objection as
19        to what specifically she did at that bank so I don't
20        have to interrupt you.

21        MR. WRUBEL:  That's fine.

22   A    Yes.  The files were imaged somewhere.  They
23   came in and rolled the film.  Those rolls of films were
24   reviewed, cut, and jacketed for each borrower.

25   BY MR. WRUBEL:

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 19 of 79

1    Q    Right.

2    A    And then once that was done, then the credit

3    file is boxed up and shipped out.

4    Q    Okay.  And just so I can be clear, when you say

5    films, are we talking microfilm?

6    A    Yes.

7    Q    And so there would be a microfilm of the note

8    as it came in?

9    A    I don't know if the note was in that or not.

10   Q    I understand.  But it would be loan documents

11   that would be filmed?

12   A    Credit file was -- we dealt with the credit

13   file, and that's what was imaged and that we worked

14   with.

15   Q    All right.  And when you're referring to the

16   credit file, what would normally be in that?

17   A    Everything except the letter.

18   Q    Okay.  But I need to know what everything is.

19   A    Underwriting documents, your -- your loan

20   application, tax forms.

21   Q    Okay.  In other words, records that were

22   provided by the borrower or forms that they filled out

23   in the process of getting the loan?

24   A    Correct.

25   Q    Anything else besides those types of documents?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 20 of 79

1    A    Generally what's in a credit file.

2    Q    Okay.  And I apologize.  I'm just not an expert

3    in this area.

4    A    That's all right.

5    Q    So you're going to have to tell me as we go

6    through this.

7         And how long did you supervise these teams that

8    were doing this work for American Savings?

9    A    Year, year and a half.

10   Q    Okay.  And where were you working at that time?

11   A    Stockton, California.

12   Q    Was that the headquarters of American Savings

13   at the time?

14   A    Yes, it was.

15   Q    All right.  And you mentioned that we go back

16   25 years.  So are we talking about approximately 1987,

17   in that area, 1988?

18   A    Yes.

19   Q    Okay.  What did you do after the year and a

20   half of supervising the team that were reviewing credit

21   files and checking credit files?

22   A    I moved into a group of trainers and became a

23   trainer.

24   Q    All right.  So you actually trained other

25   individuals?

1    A    Yes.

2    Q    In what capacities?

3    A    We were responsible for training of any

4    employee at American Savings Bank, so...

5    Q    Regardless of their responsibilities?

6    A    Right.  We wrote training material from

7    procedures, things like that.  And then we trained new

8    employees.

9    Q    Were you the head of that team as well?

10    A    No.

11    Q    Who was, if you recall?

12    A    Karen Moran.

13    Q    Good memory.

14         And how long did you do training for?

15    A    Maybe a year, year and a half.

16    Q    Okay.  What did you do after you did the

17    training?

18    A    Went to a supervisor in customer service.

19    Q    And what does that job entail?

20    A    That's a call center.  Borrowers calls in, and

21    the team would respond to the questions.

22    Q    For customers?

23    A    Yes.

24    Q    Okay.  How long did you do that for

25    approximately?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 22 of 79

1    A    Couple years.

2    Q    And you're still with American Savings at this

3    point?

4    A    Yes.

5    Q    Okay.  Was American Savings acquired by

6    anybody?

7    A    Later Washington Mutual, yes.

8    Q    What was the next thing that you did for

9    American Savings after you supervised in the customer

10   service center?

11   A    Tax and insurance supervisor.

12   Q    And what does that entail?

13   A    Making sure the tax escrow account, making sure

14   taxes get paid, forced order insurance, dealing with

15   correspondence regarding forced order insurance --

16   Q    Okay.

17   A    -- tracking, placement.

18   Q    And were you doing the physical work, or were

19   you again supervising?

20   A    I'm supervising.  It is work.

21   Q    Pardon me?

22   A    That's work as well.

23   Q    I understand.  We all understand that.

24        And how long did you supervise in the tax and

25   insurance area?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 23 of
79

```
1       A    Probably a couple years.

2       Q    What was your next position with American

3   Savings?

4       A    Purchase servicing.

5       Q    What does purchase servicing do?

6       A    It was a -- a team of individuals that

7   coordinated the service transfers and bringing them on

8   board to the servicing systems.

9       Q    Okay.  When we're talking about service

10  transfers, are we talking about loans that are being

11  serviced by American Savings?

12      A    No.  We're talking about loans serviced by

13  somebody else that American Savings bought the servicing

14  and that American Savings was going to service.

15      Q    So American Savings was doing the servicing

16  work?

17      A    After it was moved on board, yes.

18      Q    Right.

19      A    My job as purchase servicer was to get those

20  loans on board, yes.

21      Q    All right.  And so you would go to other

22  entities to purchase the servicing rights to the loans;

23  am I understanding you correctly?

24      A    I did not.  The bank did that activity where

25  they purchase a servicing of loans and then moved it
```

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 24 of 79

1    over to mark in savings for servicing.

2         Q    Okay.  And your responsibilities would be?

3         A    When the deal was -- was arranged and done, all

4    of the due diligence was done.  My job was coordination

5    of all the departments and the information that had to

6    come in order to make that transfer happen.

7         Q    Okay.  And what types of departments are we

8    talking about that had to be brought on board?

9         A    Every department is affected, so your

10   foreclosures, collections, modifications, payments,

11   customer service.  Every loan servicing department is

12   generally affected by a purchase.

13        Q    Okay.  And, again, just so I'm clear on your

14   responsibilities, they were to make sure that the

15   records were transferred over to you so you could

16   effectively take care of the servicing obligations?

17        A    That's correct.  It could be the records, yes.

18   It's data records.  It could be files.  Uh-huh.

19        Q    All right.  So there'd be physical files that

20   were brought on board as well?

21        A    Yes.

22        Q    What types of physical files would be brought

23   on board?

24        A    The credit file.

25        Q    Okay.

1    A   Collateral files could be part of the deal.

2    Q   And what would be in the collateral files?

3    MR. SCHWARTZ:  Object as to relevance, again,

4   but go ahead.

5    A   Notes, sometimes title policies, deeds.

6    Q   And when notes were brought on board, would

7  they be stored in a central location?

8    MR. WEISS:  Objection to the form of the

9   question.

10    Q   You can answer.

11    A   If they go to a vault.

12    Q   Okay.  And did American Savings have more than

13  one vault that they would go to?

14    A   At that time, no.

15    Q   And where was the vault located?

16    A   In the basement.

17    Q   In Stockton?

18    A   In Stockton.

19    Q   What types of entities was American Savings

20  purchasing servicing rights from?

21    A   I can't really speak to that.  I don't know

22  that.

23    Q   You didn't know where they were coming from,

24  the loans?

25    A   I would know -- at the time I would know the

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 26 of 79

1    servicer we were getting the loans from.

2         Q    Okay.

3         A    Whether -- when you ask the entities, I don't

4    know if you're -- is that asking who owned the loans?  I

5    don't know.  I only know that we would service transfer

6    loans in, and at that time I would have known the

7    companies that we were getting them from.

8         Q    Okay.  I may be confused.  But just so I'm

9    clear on this, would you all be getting the servicing

10   rights from other servicers or from entities that had

11   just freshly issued the loans or both?

12        A    We did both.

13        Q    Okay.  And how long did you do the purchasing

14   of the --

15             MR. WEISS:  I'm going to object, Mike.  We've

16        spent 20 minutes talking about her job

17        responsibilities for a job 25 years ago.  If you

18        want to get to something that's relevant, let's do

19        that, but at this pace we're going to be here all

20        day.

21             MR. SCHWARTZ:  I'll join in that objection.  I

22        mean, I already have a standing objection as to

23        relevance.  We're talking about American Savings

24        Bank, has nothing to do with this case whatsoever.

25        Obviously I can't instruct her not to answer at this

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 27 of
79

1      point; but at some point, you know, if we continue

2      for the next 20 minutes about irrelevant stuff,

3      we'll consider it.  Go ahead.

4              MR. WRUBEL:  It's up to·you.

5      BY MR. WRUBEL:

6      Q     How long did you do purchasing and servicing

7      for?

8      A     I want to say a number of years in that that

9      job would evolve.

10     Q     Okay.

11     A     As -- so I want to say it was probably several

12     years.

13     Q     Okay.  And when you say the job evolved, did

14     the responsibilities change?  Is that what you're

15     referring to?

16     A     Departments changed or grew, absorbed into

17     other departments, things like that.

18     Q     Okay.  And what did you do after the purchasing

19     and servicing?

20     A     Purchase and servicing is more title.  That was

21     really a department and a function that I was then

22     involved in up until November of 2006 then.

23     Q     Okay.  And I take it you're saying that your

24     responsibilities remained in servicing until November of

25     2006?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 28 of 79

1     A    In servicing, that's correct, yes.

2     Q    Okay.  What other responsibilities did you have

3  that we haven't talked about in servicing?

4     A    That's -- that's pretty much the history.  I

5  was in that department.

6     Q    Okay.

7     A    I grew with them.  I did have other

8  responsibilities.

9     Q    That's what I'm trying to understand.  I'd like

10  to know what your history of your responsibilities were

11  in servicing.

12     A    All right.

13     MR. WEISS:  Object to the form of the question.

14  Vague and ambiguous as to the time period.

15     Q    Okay.  Let's take our time, then.

16     A    Okay.

17     Q    We'll take our time, then.  We'll do it

18  chronologically.  Please advise me how your servicing

19  responsibilities evolved from a chronological

20  standpoint.

21     A    Oh, I stayed in a department.  It was -- became

22  secondary delivery operations.  The purchase of

23  servicing and movement of whole loan sales and so on

24  occurred in that department, along with -- and that's

25  what my -- my functions were, related to that.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 29 of 79

1          Then I took on, in Stockton, the note review

2     unit and team and was also involved in special projects

3     outside of those functions.

4          Q     Okay.  What were your responsibilities with

5     regards to the movement of home loan sales?

6          A     Whole loan sales.

7          Q     Whole loan.  I'm sorry.  What does whole loan

8     sales mean?

9          A     The loan file is sold along with the servicing.

10    Again, the -- the files would be collected.  The

11    collateral would be collected and shipped to servicers,

12    purchasers of that.

13         Q     Okay.  And we're saying whole loans -- whole

14    loans were sold.  I presume you're saying that the notes

15    as well as the servicing rights were sold?

16         A     Yes.

17         MR. SCHWARTZ:  Object.  Calls for a legal

18    conclusion.  Go ahead.

19         A     Yes.

20         Q     And these were loans that were originated by

21    American Savings or -- or WaMu?

22         A     It could have been a combination of originated

23    or not originated by American Savings.

24         Q     Okay.  And I think you understand when I say

25    WaMu we're referring to Washington Mutual?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 30 of
79

1      A      Yes.

2      Q      And you also indicated that you were involved

3    in Stockton with note review?

4      A      Yes.

5      Q      And what were your responsibilities with regard

6    to note review?

7      A      I supervised the unit that did note review.

8      Q      And what were their responsibilities with

9    regards to note review?

10     A      They would ensure that the data that came on

11   the note matched what was on our servicing systems.

12     Q      Do you know who would input that data?

13     A      The data was not inputted.  It came from our

14   originations systems and were fed to our servicing

15   systems.

16     Q      Okay.  And, I mean, what I'm trying to

17   understand is was it fed electronically, or was there

18   paper data?

19     A      We got electronic data.

20     Q      Okay.  And --

21     A      And we had the note.

22     Q      And do you know who inputted the electronic

23   data?

24     A      The origination centers.

25     Q      Okay.  And back when you first took over these

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 31 of 79

1  responsibilities, was American Savings located in

2  anywhere besides California?

3       A    I --

4            MR. SCHWARTZ:  If you know.

5       Q    If you know.

6       A    If we're -- if it's American Savings was

7  California only, I -- I don't remember when Washington

8  Mutual would have taken over, and I don't remember when

9  that -- it was seamless to me.  I had the same job

10 functions.

11      Q    Okay.

12      A    So I can't answer that.  I don't know if that

13 was Washington Mutual or American Savings at that

14 particular time.

15      Q    Okay.  I take it what you're saying, then, is

16 when it was American Savings alone, that was only in

17 California; but when WaMu acquired American Savings, it

18 became multi- --

19           MR. WEISS:  Objection.  Misstated her prior

20           testimony.  I think she said she didn't know for

21           sure.

22      A    I -- I don't know for sure that American

23 Savings was only in California.

24      Q    Okay.

25      A    I know for sure that Washington Mutual was

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 32 of
79

1    bigger than California.

2        Q    Got you.

3        A    Okay.

4        Q    And you've indicated you don't know when

5    Washington Mutual acquired American Savings?

6        A    No.

7        Q    I don't want you to guess, but do you have any

8    range or idea?

9            MR. SCHWARTZ:  Asked and answered.  Go ahead.

10       A    I really don't.

11       Q    Okay.

12       A    '89.  I don't know.

13           MR. SCHWARTZ:  Don't guess.

14           THE WITNESS:  Okay.  Thank you.

15   BY MR. WRUBEL:

16       Q    All right.  With reference to the notes that

17   were originated, they would be brought to Stockton?

18           MR. WEISS:  Object to the form.  Vague and

19       ambiguous.

20       A    Yes.

21       Q    Okay.  And let me rephrase the question.  How

22   did -- how were the notes originated that came to

23   Stockton, California, with American Savings?

24       A    I don't understand the question.  Say that

25   again, please.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 33 of 79

1  Q    What entities would originate the notes that

2  would come to Stockton, California, that you would

3  review?

4  A    American Savings.

5  Q    Okay.  Anybody besides American Savings

6  initially?

7  MR. WEISS:  Object to the form.

8  A    I can't -- I don't know for sure.  My unit

9  reviewed American Savings.

10  Q    Okay.  And what things would they review with

11  regards to the notes and the loans?

12  A    The data in the notes, the term, maturity date,

13  borrower name, address, that it's all correct, matching

14  the system.

15  Q    Okay.  Anything that your team would do besides

16  making sure that all the information matched?

17  A    And -- in Stockton?

18  Q    Yes.

19  A    The notes were endorsed, and they were shipped

20  to the custodian.

21  Q    Okay.  And where was the custodian located?

22  A    In the same building.

23  Q    All right.  And when you say that the notes

24  were endorsed, are we going -- approximately what year

25  are we going back to approximately, if you know?

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 34 of
79

1    A    Prior to 2004.

2    Q    Do you know how long before 2004?

3    A    No.

4         MR. WEISS:  Object to the form.  Are you asking

5    her for what period of time were notes endorsed, or

6    are you asking her --

7         MR. WRUBEL:  I'm trying to -- I'm trying to

8    ascertain at what point in time they began endorsing

9    notes when they came into the Stockton facility.

10        MR. WEISS:  Who's they?

11        MR. WRUBEL:  Her team.

12        MR. WEISS:  So you're asking her when she

13   worked in note review, when did people start

14   endorsing notes?

15        MR. WRUBEL:  Effectively yes.

16   A    I don't think that's one and the same.  I

17   did -- I was the supervisor for that unit sometime 2002

18   I would say.

19   BY MR. WRUBEL:

20   Q    Okay.

21   A    We were endorsing the notes at that time.

22   Q    All right.  So you're saying back in 2002 your

23   team that was reviewing the data were also endorsing the

24   notes?

25   A    Yes.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 35 of 79

1    Q   All right.  And do you know if notes were

2 endorsed before 2002 when they came into your --

3    A   I would only be guessing.

4    Q   Okay.  And -- but you are certain that in 2002

5 notes that were being reviewed for data were also being

6 endorsed when they came through your unit --

7    A   Correct.

8    Q   -- as supervisor?

9    A   Correct.

10    Q   Okay.  And how were the notes endorsed?

11    A   They were endorsed with an endorsement stamp.

12    Q   Okay.  And whose signature would be on the

13 endorsement stamp?

14    A   Jess Alamanza.

15    Q   Can you spell that, please?

16    A   A-l-a-m-a-n-z-a.

17    Q   Okay.  And were these blank endorsements, or

18 were they specific endorsements?

19    MR. WEISS:  Object to the form of the question.

20    MR. SCHWARTZ:  I'll join.  It's irrelevant.  Go

21   ahead.

22    A   That was a blank endorsement.

23 BY MR. WRUBEL:

24    Q   Okay.  And you indicated that it was placed

25 there with a stamp?

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 36 of 79

1    A    Yes.

2    Q    Okay.  Jess Alamanza was whom?

3    A    My boss.

4    Q    Okay.  And what was his position?

5    A    VP secondary delivery operations.

6    Q    And was there more than one stamp that was

7    being used?

8    A    No.

9    Q    Do you know how many people were using that

10    stamp?

11    A    I don't remember specifically.

12    Q    Okay.  Do you recall approximately how many

13    people were in the team that you supervised?

14         MR. SCHWARTZ:  I'll object, again.  Relevance.

15         Thirty minutes now we have not talked about

16         Ms. Riley's endorsement or signature.  It's been

17         30 minutes.

18         MR. WRUBEL:  That's fine.

19    BY MR. WRUBEL:

20    Q    You can answer.

21    A    Ten to twelve.

22    Q    And, to your knowledge, would all 10 to 12 be

23    using the endorsement stamp?

24    A    I don't remember if we had 10 to 12 doing the

25    endorsements at that time.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 37 of 79

1     Q     Okay. And the time we're talking about is in

2    2002?

3     A     It is while I supervised that unit.

4     Q     And the time that you supervised that unit was

5    what period of time?

6     A     I'm saying it should be around 2002, 2004 to

7    then.

8     Q     Do you recall the names of anybody in that team

9    that was using the Jess Alamanza stamp?

10     A     No.

11     Q     And you indicated that once the notes were

12    endorsed they'd be sent to the custodian?

13     A     Correct.

14     Q     All right. And I take it the custodian would

15    place the notes in the vault?

16     A     That's correct.

17     Q     Did the custodian have any other

18    responsibilities, to your knowledge?

19           MR. SCHWARTZ: Don't guess.

20     A     I -- I don't know what their responsibilities

21    would be.

22     Q     Okay. Were you yourself endorsing any of

23    the -- any of the notes?

24           MR. WEISS: Object to the form of the question.

25     Q     You can answer.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 38 of 79

1     A    I was not endorsing those notes, no.

2     Q    Okay. And you weren't using the Jess Alamanza

3   stamp to endorse the notes either personally?

4     A    I was not.

5     Q    Okay. While you were in Stockton -- by the

6   way, how long were you in Stockton till?

7     A    2004.

8     Q    Do you know what month?

9     A    June.

10    Q    So until June 2004 the only endorsement stamp

11  that was used in the Stockton area was the Jess Alamanza

12  stamp?

13         MR. SCHWARTZ: Form. Leading.

14    A    The Jess Alamanza stamp was used in Stockton

15  prior to that. Uh-huh.

16    Q    Okay. Did you ever have a stamp that was used

17  in the Stockton area?

18    A    No.

19    Q    What happened in June 2004?

20         MR. WEISS: Object to the form of the question.

21  Vague and ambiguous.

22         MR. SCHWARTZ: I'll join. Many things happened

23  in 2004, but go ahead.

24    A    I moved to Jacksonville, Florida.

25  BY MR. WRUBEL:

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 39 of 79

```
 1        Q    Okay.  As far as moving, were you requested to

 2    make the move?

 3        A    Yes.

 4        Q    By whom?

 5        A    My manager.

 6        Q    And who was your manager?

 7        A    Brenda Brendle.

 8        Q    I'm sorry?

 9        A    Brenda Brendle.

10        Q    And do you know what her title was?

11        A    Vice president, first vice president.

12        Q    Of -- at that time I presume it's WaMu?

13        A    Yes.

14        Q    Okay.  And do you know if she's still with

15    JP Morgan?

16        A    She is not.

17        Q    Do you know where she is at this time?

18        A    She's -- she's in Jacksonville.

19        Q    Do you know if she's working for anyone?

20        A    She's working.

21        Q    For whom?

22        A    I can't think of their name right now.

23        Q    Okay.  Is it a bank or credit agency or --

24        A    It's a mortgage company.

25        Q    Okay.  And so you've indicated that Ms. Brendle
```

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 40 of 79

1    requested that you be transferred?

2        A    I was offered a relocation package.

3        Q    Okay.  Was Stockton closing or --

4        A    Yes, Stockton closed.

5        Q    Okay.  And when did Stockton close?

6        A    January 2004, that -- that's when we were

7    notified that they were going to be shutting down.

8        Q    Okay.  And when did they actually shut down?

9        A    Later 2004 I would...

10        Q    And what was the relocation offer that was made

11    to you by Ms. Brendle?

12            MR. SCHWARTZ:  Object.  Proprietary

13        information.

14            MR. WEISS:  Object to the form of the question.

15        Object on --

16            MR. SCHWARTZ:  Confidential.

17            MR. WEISS:  -- privacy grounds.

18            MR. SCHWARTZ:  Exactly.  Join.

19    BY MR. WRUBEL:

20        Q    Were you told what your duties would be with

21    respect to your relocation?

22        A    I was promoted and --

23        Q    Okay.

24        A    -- and took over the responsibilities of

25    secondary delivery operations in Jacksonville.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 41 of 79

1    Q    When you say you were promoted, can you tell me

2    what part of the promotion was?  I mean, was it title?

3    Was it money?

4            MR. WEISS:  Object to the form of the question.

5            Objection on privacy grounds.

6            MR. SCHWARTZ:  Privacy.  Proprietary

7    information.  Confidential.  Go ahead.

8    A    I was promoted to a vice president and became

9    the department manager for secondary delivery operations

10   in Jacksonville, Florida.

11   BY MR. WRUBEL:

12   Q    And when did this promotion become effective?

13   A    Effective date I don't know.

14   Q    Okay.  Do you know if it was while you're still

15   in Stockton, California, or Jacksonville?

16   A    I was making a transition between January and

17   June of 2004.  I was offered that job, travelled back

18   and forth, and moved here in June 2004.

19   Q    And would June of 2004 or couple months before

20   then be the first time that you were ever a vice

21   president with the bank?

22   A    Correct.

23   Q    Are you still a vice president with the bank?

24   A    I am not.

25   Q    When did you cease being a vice president with

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 42 of 79

1    the bank?

2         A    2008.

3         Q    Do you know what month?

4         A    January I would guess.

5              MR. SCHWARTZ:  Don't guess.

6         A    January 2008.

7         Q    As a vice president did you have greater

8    authority than you had before they made you vice

9    president?

10             MR. WEISS:  Object to the form of the question.

11        Vague and ambiguous.

12             MR. SCHWARTZ:  Join.

13   BY MR. WRUBEL:

14        Q    You can answer.

15        A    I was managing a department as a vice president

16   versus leading a team.  Responsibilities were different.

17        Q    Okay.  Briefly can you tell me what the

18   difference is between managing a team and leading a

19   team?

20        A    Managing a department and leading a team?

21        Q    Yes, please.

22        A    The team is one piece of the department.  The

23   department encompassed other responsibilities --

24        Q    Okay.

25        A    -- than my responsibility in note review as it

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 43 of 79

1    was as a team leader.

2    Q    Okay.  I recognize that it may vary.  But when

3    you're managing a department, approximately how many

4    employees would be under your supervision?

5          MR. WEISS:  Object to the form of the question.

6        Vague and ambiguous.

7          MR. SCHWARTZ:  Overly broad as to what time

8        we're talking about.

9    A    Thirty -- thirty to forty people.

10    BY MR. WRUBEL:

11    Q    Okay.  Did you manage any other departments

12    besides secondary delivery?

13    A    No.

14    Q    Okay.  And how long did you manage secondary

15    delivery for?

16    A    Till 11 of 2006.

17    Q    And I take it you're saying you managed

18    secondary delivery approximately from June of 2004 to

19    November of 2006?

20    A    Correct.

21    Q    And during that period of time you had

22    approximately 30 to 40 employees under your supervision?

23    A    Yes.

24    Q    And tell us please what is secondary delivery?

25    A    Secondary delivery operations, it was the name

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 44 of 79

1    of the department.

2        Q    Okay.

3        A    Secondary -- sorry.  It's the name of the

4    department, but we delivered on the deals that were made

5    by secondary marketing.

6        Q    Okay.  And when you say you delivered on the

7    deals that were made in secondary marketing, are we

8    talking about the fact that notes were sold to other

9    entities from American Savings?

10            MR. WEISS:  Object to the form of the question.

11       Q    You can answer.

12       A    That, yes.

13       Q    And other things?

14       A    Loans sold to Freddie and Fannie.

15       Q    Do you know what percentage of Washington

16   Mutual's loans were sold to Fannie and Freddie between

17   June of 2004 and November of 2006?

18            MR. WEISS:  Objection.  Object to the form of

19       the question.  You're asking her what percentage of

20       WaMu originated loans were sold to Fannie and

21       Freddie?  How is she possibly going to be able to

22       answer that question?

23            MR. WRUBEL:  I don't know.  If she can't answer

24       it, she can't answer that.

25       A    I don't know that percentage.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 45 of
79

1       MR. SCHWARTZ: My issue is it's been 40 minutes

2   now. We haven't spoken about the note or the --

3       MR. WRUBEL: I don't care that we haven't

4   spoken about the note. I've got a right to take a

5   deposition, and I'm going to take it.

6       MR. WEISS: You have a right to take a

7   deposition.

8       MR. WRUBEL: I don't care about 30, 40 minutes.

9   And you guys can keep interrupting if you want, but

10   we're 30, 40 minutes. And if this takes all day,

11   it's going to take all day.

12       MR. SCHWARTZ: Well --

13       MR. WRUBEL: But I absolutely have a right to

14   get background and everything that I'm getting.

15       MR. SCHWARTZ: Background -- background is one

16   thing, and I didn't object as to background. But

17   when you started talking about what specifically was

18   done at American Savings by whom, what relevance

19   does it have to this case? I'm just struggling with

20   that.

21       MR. WRUBEL: I'm trying to learn what her

22   background was. All right. We're beyond that. So

23   if you want to keep talking about that and wasting

24   time, then you can object to it.

25       MR. SCHWARTZ: No, I won't, but --

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 46 of 79

1          MR. WRUBEL:  We're --

2          MR. SCHWARTZ:  -- I have a right to object, and

3     I will.

4          MR. WRUBEL:  -- into the note.  We're into the

5     note.  We're into endorsements.  And I intend to

6     thoroughly explore the area.

7          MR. SCHWARTZ:  I told you what my objection is.

8     Go ahead.

9          MR. WRUBEL:  Okay.

10     A     Was there a question?

11 BY MR. WRUBEL:

12     Q     Yes.  I'll rephrase the question.  You were

13 passing loans to the secondary market, and you've

14 indicated that Freddie and Fannie included some of

15 the --

16          MR. WEISS:  Object to the form of the question.

17     Vague and ambiguous as respects passing loans.

18     A     We -- we sold loans for Freddie and Fannie.

19 The actual percentage I have -- I do not know.  The bulk

20 of our work was sold to Freddie and Fannie.

21     Q     Okay.  And that's where my question goes.  As

22 far as the bulk of your work going to Freddie and

23 Fannie, were there also private investors besides

24 Freddie and Fannie that were buying loans in the

25 secondary market?

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 47 of 79

1   A   Yes.

2   Q   Okay.  And those entities would be entities

3   such as?

4   A   Lehman comes to mind, Ocwen comes to mind,

5   Bayview.

6   Q   Deutsche Bank, Goldman Sachs.

7   A   GMC.  I don't remember Deutsche Bank.  I

8   don't -- I don't know Sachs.

9   Q   Okay.  All right.  And my question to you is

10  with regards to Washington Mutual, if you know:  Of all

11  the loans that were being sold on the secondary

12  delivery, you said that the bulk of them went to Fannie

13  and Freddie; is that correct?

14          MR. WEISS:  Object --

15          MR. SCHWARTZ:  Form.

16          MR. WEISS:  -- to the form of the question.

17      You're asking her about when she was working in the

18      secondary delivery operations department from June

19      2004 until November of 2006 if she knew that the

20      bulk of the loans that came in through that

21      department went to Fannie and Freddie.

22          MR. WRUBEL:  That's what she testified to.

23          MR. WEISS:  I just want to be clear, she's not

24      talking about WaMu originated the loan --

25          MR. WRUBEL:  No.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 48 of 79

1          MR. WEISS:  -- generally.

2          MR. WRUBEL:  No.  I'm just talking about --

3          MR. WEISS:  That's the way you asked the

4     question.

5     A    The bulk of the loans were sold to Freddie and

6     Fannie.

7     BY MR. WRUBEL:

8     Q    And when you say the bulk of the loans,

9     approximately what percentage are you talking about?

10    A    I can't speak to percentage.  I don't know

11    that.

12    Q    All right.  When you say the bulk, you know if

13    we're talking more than 50 percent or less than 50

14    percent?

15         MR. SCHWARTZ:  Form.  Speculative.  Asked and

16    answered.  Go ahead.

17    A    I don't know that.

18    Q    Okay.  Did you review any screens with regards

19    to Mr. Orozco's loan before --

20         MR. SCHWARTZ:  Form.

21    Q    -- coming into this deposition?

22         MR. SCHWARTZ:  Vague and ambiguous.  Go ahead.

23    A    Are you -- if I personally?

24    Q    Yeah.  Yes.

25    A    No, I did not.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 49 of 79

1    Q    All right.  And you understand when I say

2  screen, I'm talking about computer screens?

3    A    Yes.

4    Q    Okay.  And you indicated you personally did not

5  for this deposition; correct?

6    A    I did not review that note personally to a

7  screen.

8    Q    Okay.  You only reviewed the note?

9    A    I didn't review the note.

10       MR. WEISS:  Objection.  Are you talking about

11       contemporaneously with the origination of the loan,

12       or are you talking about since then?

13       MR. SCHWARTZ:  Yeah.  I'm confused.  Are you

14       talking in preparation for deposition?  Can you put

15       some time frame on it?

16       MR. WRUBEL:  I asked -- if you want her to read

17       it back -- the question was --

18       MR. SCHWARTZ:  Yeah, please, because I'm

19       confused.

20       MR. WRUBEL:  Well, the question was --

21       THE WITNESS:  I'm confused now.

22       MR. WRUBEL:  The question was before -- I mean,

23       you guys can keep interrupting, but the question was

24       for the deposition.  And if you want her to read it

25       back, she can.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 50 of 79

1          MR. SCHWARTZ:  Oh, she already answered that at

2      the beginning of the --

3      A     In the beginning I saw the note.  Yesterday I

4  did not review it.

5  BY MR. WRUBEL:

6      Q     Okay.  And I asked about screens.  And I did

7  not ask about screen before.

8          MR. WRUBEL:  But if you guys want to keep

9      interrupting, just go ahead.

10          MR. WEISS:  Mike --

11          MR. WRUBEL:  We can take this deposition as

12      long as we want.

13          MR. WEISS:  It's not about interrupting.  You

14      can read back the record if you want.  What you said

15      was very unclear.  You asked if she'd seen any

16      screens in connection with the note.  We made

17      objections as to form because it was vague and

18      ambiguous.  You later asked a follow-on question

19      where you said in preparation for this deposition.

20          MR. WRUBEL:  Yeah.

21          MR. WEISS:  It's absolutely unclear if you were

22      talking about contemporaneously with the origination

23      with the loan if she viewed any screens that

24      reflected any information about the note or if in

25      the context of preparing for deposition she viewed a

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 51 of 79

1        screen that reflected any information about this

2        note.  So let's make it clear.

3               MR. WRUBEL:  Well, the record speaks for

4        itself.

5               MR. WEISS:  That's right.  It's absolutely

6        unclear.

7               MR. SCHWARTZ:  And we've objected, so go ahead.

8        BY MR. WRUBEL:

9        Q     All right.  With regards to your work here in

10       Jacksonville between June of 2004 and November of 2006,

11       what types of things would you supervise being done in

12       order for loans to be sold to the secondary market?

13              MR. WEISS:  Object to the form of the question.

14       A     The unit -- I managed one of the units related

15       to the notes that -- the notes comes in the door.  It's

16       reviewed for accuracy and moved to the custodian.  It's

17       endorsed and moved to the custodian.  That was one of

18       the units in secondary delivery operations.

19       Q     Is there a name for that unit?

20       A     The note review unit.

21       Q     Okay.  Were there other things that were done?

22       A     Done to what?

23       Q     In order to process the loans so they could be

24       sold on a secondary market.

25       A     We cured loans that -- something was wrong with

1    the note, for example.  We cured that.

2         Q    Okay.

3         A    I had a unit that would find a cure for that.

4         Q    And when you say cure, can you elaborate on

5    what you mean?

6         A    The borrower may not have signed.  They signed

7    the note different from the typed name on the note.

8    That would be corrected.

9         Q    Okay.

10        A    Is an example.

11        Q    Any other examples?

12        A    Not coming to mind.

13        Q    What other things were done in order to process

14   the loan so that they could be sold on the secondary

15   market that you would supervise or manage?

16        A    That would be the answer to that question.  We

17   did the note review.  We ensured the accuracy and sent

18   them to the custodian.

19        Q    Okay.  And would anything be done to the notes

20   while they were in your unit or in your department?

21        A    Anything --

22             MR. SCHWARTZ:  Form.  Asked and answered.

23        A    -- else?

24             MR. SCHWARTZ:  Go ahead.

25        Q    Yes.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 53 of 79

1    A    They were reviewed.  They were reviewed.  They

2    were checked to the system for accuracy.  They were

3    moved to the custodian.  And they were endorsed.

4    Q    Okay.  So they were endorsed when they were in

5    your department as well?

6    A    That's correct.

7    Q    Okay.  And who were they endorsed by?

8    A    It was a facsimile signature stamp that was

9    used for the endorsements on the note.

10   Q    Okay.  But who would be the ones that would be

11   using the facsimile stamp?

12   A    My staff.

13   Q    All right.  And how many people were in your

14   staff that were endorsing notes?

15   A    Ten to twelve.

16   Q    Do you remember the names of any of those

17   people?

18   A    Not particularly that were endorsing the notes,

19   no.

20   Q    Okay.  What was the name of the -- the name of

21   the unit if I were to try to acquire the names of the

22   people that were in this unit?

23   A    Note review unit.

24   Q    Okay.  And would all 10 to 12 people that were

25   in the note review unit have authority -- or strike

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 54 of 79

1    that.

2          Would all 10 to 12 people that were in the unit

3    be using that facsimile stamp?

4          MR. WEISS:  Object to the form of the question.

5    Vague and ambiguous.

6      A    They certainly could in doing their job would

7    use that stamp.  That's right.

8      Q    Okay.

9      A    They were a note reviewer.  They would use that

10   stamp in their note review process.

11     Q    All right.  And I -- you're saying that stamp.

12   There's only one stamp?

13     A    No.  There was multiple stamps, nine to ten

14   stamps.

15     Q    And the stamps had your name on it?

16     A    Yes, my signature.

17     Q    Do you know when the stamps were made?

18     A    Not exactly.

19     Q    I take it would have been sometime after

20   June 2004?

21     A    Sometime in that range, yes.  I don't know that

22   it was after June 2004.

23     Q    Okay.  And with regards to the stamp, did you

24   provide a signature for the stamps?

25     A    Yes, I did.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 55 of 79

1  Q  Did you provide more than one signature for the

2  stamps?

3  A  I don't remember that process, whether I signed

4  multiple times or once.  I don't know what the creator

5  of stamps needs.

6  Q  Do you know if the stamps were secured when

7  they were not being used?

8  A  We had full procedures around the security of

9  those stamps, and they were in a secured location

10  requiring card access only by the collateral note review

11  people.

12  Q  And when you say that you had full security and

13  procedures, can you elaborate on what those were?

14  A  The procedures, they were in a locked cabinet.

15  The lead manager of that unit would unlock the cabinets.

16  In the morning the stamps would be checked out on a log.

17  They would be used as the representative needed to do

18  during the day.  At the end of the night they were

19  checked back in and logged back in to the secured

20  cabinet.  And, again, the room that the note review

21  occurred in was a secured access only.

22  Q  Was there more than one lead manager to this

23  team?

24  A  I had a manager over that team.  She had a

25  lead.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 56 of 79

1    Q    Okay.  And what -- who is that manager?

2    A    Pat Eyles.

3    Q    Can you spell the last name, please?

4    A    E-y-l-e-s.

5    Q    And is Pat male or female?

6    A    Female.

7    Q    Is she still with JP Morgan?

8    A    Yes.

9    Q    Here in Jacksonville?

10   A    Yes.

11   Q    And you've indicated that there was a secure

12   room where the note review would take place; is that

13   correct?

14   A    Yes.

15   Q    Can you elaborate on what -- how that was set

16   up?

17   A    It's a partitioned off area, work area, that we

18   were in, and the doors to that were secured.  You had to

19   have special card access to get in.

20   Q    Again, was this a blank -- strike that.

21        With regards to the endorsement stamp, was it a

22   blank endorsement?

23   A    Yes, it was.

24   Q    To your knowledge, were the stamps always the

25   same as far as the facsimile signature of yours?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 57 of 79

1          MR. WEISS:  Object to the form of the question.

2          MR. SCHWARTZ:  I join.  What time period are we

3    talking about?

4          MR. WRUBEL:  We're always talking about from

5    June -- June 2004 to November of 2006 right now.

6     A     The stamps -- I don't know if they were always

7    the same.  The facsimile signature, I don't have any

8    reason to think that they wouldn't have been the same on

9    a facsimile signature stamp.

10   BY MR. WRUBEL:

11    Q     Okay.  Excuse me one sec.

12          With regards to the notes once they were

13   endorsed, where would they go after they left that room?

14    A     To the custodian.

15    Q     And do you know what the custodian would do

16   with the notes?

17    A     Put them in the vault.

18    Q     Okay.  And was there more than one vault that

19   they would be put in?

20    A     The notes that came through Jacksonville,

21   Florida, they were -- there were different custodial

22   vaults at that time.

23    Q     Right.

24    A     Our notes went -- continued to go to Stockton.

25    Q     Okay.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 58 of
79

1     A     Until Stockton was shipped out, and I don't

2   remember when that was.

3     Q     Okay.  So I think what you're telling me is

4   that Stockton did continue to function for a short

5   period of time after you left.

6     A     Yes.

7     Q     And when you first came to Jacksonville, were

8   the notes always shipped back to Stockton initially?

9     A     Yes.

10    Q     Okay.  And then were there other locations

11  where the notes were shipped to?

12    A     There was a location in Vernon Hills.

13    Q     Vernon Hills where?  What state?

14    A     In Illinois.

15    Q     And during what period of time were they

16  shipped to Vernon Hills, Illinois, if you know?

17    A     I don't know.

18    Q     Were they shipped anywhere else besides Vernon

19  Hills and Stockton?

20    A     I can't be certain of that.

21    Q     Okay.  Were there any other vaults that WaMu

22  had besides in Vernon Hills and Stockton?

23    A     A vault was built in Florence, South Carolina.

24    Q     You know when that was built?

25    A     No, not exactly.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 59 of 79

1    Q    Approximately?

2    A    I would --

3         MR. SCHWARTZ:  Don't guess.

4    Q    I mean, are we talking in the 1990s?  Was it in

5    2000, 2005?

6    A    2008.  I don't know that it was in 2008.  Let's

7    be clear.  I don't know that it was 2008.

8    Q    Okay.  It was not in the 1990s?

9    A    It was not in 1990s.

10   Q    I'd like to just go back to the endorsements a

11   little bit.  You'd indicated that there were nine to ten

12   stamps that were made; is that correct?

13   A    Correct.

14   Q    All right.  And, to the best of your knowledge,

15   were they all made at the same time approximately?

16   A    Yes.

17   Q    Okay.  So they all came back in from whoever

18   made them to WaMu at the same time, to your knowledge?

19   A    Yes.

20   Q    Do you know who made them?

21   A    No.

22   Q    Okay.  And you've indicated that you have no

23   reason to think that the signatures were different on

24   any of the stamps; correct?

25        MR. WEISS:  Object to the form of the question.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 60 of
79

1     Q     You can answer.

2          MR. WEISS:  Objection.  She testified that she

3     didn't know how the process exactly worked with

4     respect to getting the signature from her sample

5     signatures that she provided to the stamp.  She

6     testified that she didn't know if -- what the

7     process was that captured her --

8          MR. WRUBEL:  Mr. Weiss, just object to the

9     form.  You don't have to coach the witness any

10    further.  She testified --

11         MR. WEISS:  I'm not coaching the witness.

12         MR. WRUBEL:  And I'm instructing you not --

13         MR. WEISS:  I'm not coaching the witness.

14         MR. WRUBEL:  I'm telling you --

15         MR. WEISS:  I'm trying to clarify a question.

16         MR. WRUBEL:  You don't need to clarify,

17    Mr. Weiss.

18         MR. WEISS:  The testimony that --

19         MR. WRUBEL:  I don't want you coaching the

20    witness.

21         THE REPORTER:  One at a time, please.

22         MR. WRUBEL:  You got an objection to the form?

23         MR. WEISS:  I've made my objection for the

24    record.  I've stated it for the record.

25    BY MR. WRUBEL:

Case: 10-05245     Doc# 330     Filed: 11/12/13     Entered: 11/12/13 16:05:05     Page 61 of
79

1    Q    Now, as I was saying, you indicated earlier you

2  had no reason -- these are your words:  You have no

3  reason to think that the signatures were different on

4  any of the stamps; is that correct?

5    A    What I said was exactly that I don't know what

6  the process was to make those stamps, whether or not I

7  signed several times and they took one of those

8  signatures or not.  I don't know what that process was.

9    Q    Okay.  But as far as you know you never saw any

10  differences with regards to the signatures on the

11  stamps?

12         MR. WEISS:  Objection.  Object to the form of

13      the question.

14    Q    You can answer.

15    A    I never inspected the stamps to ensure that the

16  signatures were all exactly the same.

17    Q    Okay.  All right.  Now, you've indicated that

18  the notes were initially shipped to Stockton and then to

19  Vernon Hills?

20         MR. WEISS:  Objection.  Misstates prior

21      testimony.

22    A    We were -- we shipped the notes to the

23  custodian.

24    Q    Okay.

25    A    And at the time frames from when that custodian

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 62 of 79

1   was in Stockton or Vernon Hills I can't speak to that.

2       Q    Okay.  Did you ship to any other custodians in

3   any locations other than Vernon Hills and Stockton?

4           MR. SCHWARTZ:  Asked and answered.  Form.  Go

5       ahead.

6       A    I just don't know at what time frames we were

7   shipping to some place other than those two.

8       Q    Okay.  Did there come a point in time that you

9   shipped to Florence, South Carolina?

10      A    When the vault was built -- I don't know if

11  that -- I can't answer that.

12          MR. SCHWARTZ:  If you don't know, say you don't

13      know.

14      A    I left the department.

15      Q    Okay.  When did you leave the department?

16      A    In November of 2006.

17          MR. SCHWARTZ:  You need a break?

18          THE WITNESS:  I think that would be nice if we

19      did.

20          MR. SCHWARTZ:  You mind if she takes a break?

21          MR. WRUBEL:  No.

22          (Break taken.)

23  BY MR. WRUBEL:

24      Q    You've indicated that it was your team that did

25  the endorsements of the stamps in Jacksonville.  Did you

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 63 of 79

1    yourself ever endorse any of the notes?

2         A    No.

3         Q    Never?

4         A    I never put an endorsement stamp on the notes.

5         Q    Okay.  How many notes a day were coming into

6    the Jacksonville area, if you know, approximately?

7         A    2- to 3,000.

8         Q    Assuming you only had 10, not 12, just if we

9    can get through the question, am I correct then that

10   your team would be each reviewing approximately 200 to

11   300 notes a day?

12              MR. SCHWARTZ:  Form.  Speculating.  Go ahead.

13        A    That sounds reasonable.

14        Q    And they would be checking the notes and the

15   data for the loans -- strike that.

16              Each individual that was on the team would be

17   checking the notes as well as the data with regards to

18   the loans approximately 2- to 300 a day?

19        A    They compared the data -- certain data on the

20   note to what was on the system.

21        Q    Would they be comparing any other data besides

22   the data on the note to the system when they would go

23   through the system?

24        A    Other data like what?

25        Q    Information from the mortgage perhaps.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 64 of 79

1     A    They have a note.  The notes is all they had.

2     Q    That was the only information?

3     A    Yeah, note review.

4     Q    Okay.  I'm curious.  Being the supervisor or

5 the manager of the unit -- you've indicated that the

6 team leader was Pat Eyles; correct?

7     A    Yes.

8     Q    Okay.  Would they have ever come to you with

9 problems with regards to the note review unit?

10    A    Problems like what?

11    Q    I don't know.  I mean, I'm just kind of curious

12 as to what type of things you would be managing with

13 regards to the unit during this two-year period.

14    A    Productivity is what we managed to.

15    Q    Okay.

16    A    We tracked how well each individual did

17 their -- did their job.

18    Q    Okay.  So your responsibilities were basically

19 to make sure the unit was working efficiently?

20           MR. WEISS:  Object to the form of the question.

21    A    I oversaw that unit, that we were following the

22 procedures that we did our quality checks on, the

23 results of those quality checks, and personnel.

24    Q    Okay.  Did you ever find that there were

25 problems with regards to the quality of the work that

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 65 of 79

1    the unit did from time to time?

2        A    Yes.

3        Q    What types of problems were they having?

4        A    When we did a QC check, we might see that they

5    didn't properly check a -- a data element or that it

6    needed a correction.  It could be that they -- live

7    signature versus a copy signature on a note.

8        Q    Okay.  And when you say QC, I take it you're

9    referring to quality control?

10       A    Correct.

11       Q    Okay.  Who would be the individual or

12   individuals who would be doing the review of the work?

13       A    The lead or the manager of the unit.

14       Q    Okay.  And in the case of the note review unit,

15   that would have been Pat Eyles?

16       A    Pat or her lead.

17       Q    Who was her lead?

18       A    Karen Woodward.

19       Q    Can you spell Woodward, please?

20       A    Woodward, W-o-o-d-w-a-r-d.

21       Q    To your knowledge, is she still with JP Morgan?

22       A    Yes.

23       Q    Here in Jacksonville?

24       A    Yes.

25       Q    Okay.  With respect to your responsibilities,

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 66 of 79

1    what happened in November of 2006?  What changed?

2              MR. WEISS:  Object to the form of the question.

3         Vague and ambiguous.

4         A     The department was closed and moved to the --

5    the Florence, South Carolina, office.

6         Q     And when you say the department, we're talking

7    about which department?

8         A     Secondary delivery operations.

9         Q     Did you move to Florence, South Carolina, also?

10        A     No.

11        Q     Where did you stay?

12        A     Jacksonville.

13        Q     Okay.  I'm going to go back just before we come

14   into this area.  No, we can go to this area.  What

15   responsibilities did you take on after June 2006,

16   immediately thereafter?

17        A     After June of 2000- --

18        Q     I'm sorry.  November of 2006.

19        A     I did project management work for about

20   12 months.

21        Q     What type of project management?

22        A     At that time we were moving -- the project that

23   I was involved with was helping to move the custodial

24   vault from Stockton to Florence, South Carolina.

25        Q     I'm a little bit confused.  I thought Stockton

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 67 of
79

closed somewhere between 2004?

A No.

Q It continued to operate?

A Yes.

Q Okay. When did the Stockton plant close down?

A That's what I can't be specific about. The custodial vault was still there when I moved to Jacksonville.

Q And, to your knowledge, you continued to ship notes back to Stockton and Vernon Hills during the period -- although you're not exactly sure when it ended, somewhere between the period of June 2004 and November of 2006?

MR. SCHWARTZ: Form. Compound question. Go ahead.

A Yes. We would have been shipping to the custodial vault in one of those two locations.

Q And come November of 2006 you got involved with the project of doing exactly what?

A I project managed for about the next 12 months. One of the projects was the movement of the vault from Stockton to Florence, South Carolina.

Q What types of things would you have to do during this period of time to oversee or help move the vault from Stockton to Florence, South Carolina?

1    A    I coordinated, you know, meetings, meetings and

2    the activities.  Generally we'd have a weekly meeting of

3    what needed to be done, progress.  A building was built.

4    So I helped on the project management side.

5    Q    Okay.  And during this period of time you've

6    indicated that the secondary...

7    A    Delivery operations.

8    Q    Thank you.  Secondary delivery operations was

9    shut down in November of 2006?

10   A    Jacksonville -- secondary delivery operations

11   was shut down in Jacksonville.  The Florence, South

12   Carolina, office was a -- part of it was a -- we had

13   secondary delivery operations in two locations.  That

14   location continued.  The Jacksonville office shut down.

15   Q    Okay.  And I take it you're saying that

16   Florence, South Carolina, secondary delivery operations

17   picked up around November of 2006, December 2006?

18   A    No, that's not correct.  They were in parallel

19   with Jacksonville --

20   Q    Okay.

21   A    -- for sometime --

22   Q    Okay.

23   A    -- prior.

24   Q    All right.  So they started up before November

25   of 2006?

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 69 of 79

1      A    Yeah.

2      Q    When I say they, I'm referring to Florence,

3  South Carolina.

4      A    They were in existence before November of 2006.

5      Q    Okay.  Do you know approximately how long

6  before November of 2006, approximately?

7      A    They were in existence prior to 2004.

8      Q    Okay.  Did they have a vault there before 2004?

9      A    Yes.

10          MR. SCHWARTZ:  Form.

11     Q    And there I'm referring to Florence, South

12  Carolina.

13     A    Yes.

14     Q    Okay.  Are you clear that Jacksonville's

15  operation, as far as secondary delivery operations,

16  closed down in November of 2006?

17          MR. WEISS:  Object to the form of the question.

18     A    We were laid off the end of that year.

19     Q    Okay.  And so is your answer yes, there was --

20  strike that.

21          Is it your answer that there were no secondary

22  delivery operations going on in Jacksonville by the end

23  of 2006?

24     A    Correct.

25     Q    And when you say you were laid off, you were

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 70 of 79

1    laid off from that department.  You continued to work

2    for JP Morgan; correct?

3                MR. SCHWARTZ:  Form.

4        A    I was laid off and subsequently got a job back

5    with JP Morgan in January.

6        Q    January of what year?

7        A    2009.

8        Q    And when were you laid off?

9        A    It had to have been 11, November.

10       Q    Okay.  When you came back in January 2009, what

11   did you do?

12       A    I went to work in MIS, management information

13   systems, in the default division.

14       Q    And I take it you no longer had the title of

15   vice president?

16       A    That's correct.

17       Q    And would I be correct in -- strike that.

18            With regards to defaults and management

19   information systems, what were your responsibilities

20   there?

21       A    Management information systems, I provided

22   information to the auditing agencies.

23       Q    What types of auditing -- auditing entities are

24   we talking about?

25       A    Moody's, S&P, Fitch.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 71 of 79

1    Q    Did MIS provide any information to anyone

2    besides Moody's, S&P, Fitch?  Was the --

3    A    I'm sure they did.

4    Q    Was the information used for other purposes, I

5    guess is my question?

6    A    Other purposes like what?

7    Q    I don't know.  But, I mean, you're saying that

8    the name of the unit was management information systems.

9    Was it strictly for auditing purposes?

10    A    Wait a minute.  I was speaking of my

11    responsibilities at MIS.

12    Q    Okay.

13    A    And your question is those responsibilities?

14    Q    Right.

15    A    Okay.  My responsibilities, I provided data for

16    the auditing.

17    Q    Okay.  And I take it you're implying that

18    management information system was used for other

19    purposes, but that was not your responsibility?

20         MR. SCHWARTZ:  Form.

21         MR. WEISS:  Object to the form of the question.

22    A    That was one function in MIS.

23    BY MR. WRUBEL:

24    Q    Okay.  What were the other functions?

25    A    They provide reporting to all the departments.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 72 of
79

1       Q    And how long did you provide the information

2    for auditing purposes?

3            MR. WEISS:  Object to the form.  Vague and

4       ambiguous.

5       A    I'm still at MIS with other responsibilities.

6       Q    Okay.  What types of responsibilities do you

7    have now?

8       A    I'm doing reporting for our borrowers' systems

9    groups.

10      Q    What are you referring to as borrowers' systems

11   groups?  I'm not sure I understand the term.

12      A    Customers that call in looking for assistance.

13      Q    Okay.  And you also mentioned that you were

14   involved with defaults when you came back on board?

15      A    Originally MIS was a default under the default

16   umbrella.

17      Q    Is it still under the default umbrella?

18           MR. SCHWARTZ:  If you don't --

19      A    I don't know.

20      Q    Okay.  When you said originally, I thought

21   things may have changed.

22           Have you worked in any other units besides MIS

23   since you came back in 2009?

24      A    No.  Any other departments --

25      Q    Yes.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 73 of 79

1    A    -- at MIS?  No.

2    Q    Were there any other projects that you worked

3  on besides helping transfer everything to the Florence,

4  South Carolina, vault?

5    A    Yes.

6    Q    During that 12-month period that you referred

7  to after November of 2006.

8    A    Yes, there were other projects that I worked

9  on.

10    Q    Okay.  What other types of projects?

11    A    They were like a Z state -- I want to call

12  it -- where you're -- process improvement.

13    Q    Process?

14    A    Improvement.

15    Q    Okay.  What does that entail?

16    A    We looked at -- we helped implement projects in

17  departments where they saw improvements and needed to

18  make changes.

19    Q    Any other projects besides project improvements

20  and working on the vault during that 12-month period?

21    A    No.  Unh-unh.

22    Q    Okay.  And at the end of that 12-month period

23  that's when you were laid off?

24    A    That was -- I was laid off and went to the job

25  in MIS.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 74 of 79

1     Q    Okay.

2     A    I applied and got a new job in MIS, yes.

3     Q    Okay.  Did you ever supervise any of the

4  employees in Florence, South Carolina?

5     A    I did not.

6     Q    And none of them were under your authority?

7          MR. WEISS:  Object to the form of the question.

8          MR. SCHWARTZ:  Join.

9  BY MR. WRUBEL:

10    Q    None of the employees in Florence, South

11 Carolina, were ever under your direction?

12    A    They were not.

13    Q    Or your supervision?

14    A    They were not.

15         MR. WRUBEL:  I take it you have seen this note?

16         MR. SCHWARTZ:  Which one is it?  I don't know.

17         MR. WRUBEL:  It's the only one relevant to this

18    litigation.

19         Mark this as Defense Exhibit 1.

20         (Defendants' Exhibit 1 was marked for

21    identification.)

22 BY MR. WRUBEL:

23    Q    Ms. Riley, I'm showing you what's been marked

24 as Defense Exhibit 1.  And I'll ask you if you've ever

25 seen a copy or -- of this document.

Case: 10-05245    Doc# 330    Filed: 11/12/13    Entered: 11/12/13 16:05:05    Page 75 of 79

1      A     Yesterday.

2      Q     That was the first time?

3      A     I believe so.

4      Q     Okay.  And with reference to the endorsement,

5   which is on the last page, does that appear to be your

6   signature?

7      A     Yes, my signature.

8      Q     Okay.  And does that appear to be similar to

9   the facsimile stamps that were used during your time

10  when you managed the -- the secondary delivery unit?

11            MR. WEISS:  Object to the form of the question.

12            MR. SCHWARTZ:  I'll join.  Calls for

13  speculation.  Lacks predicate.  Lacks foundation.

14  Go ahead.

15     A     Say the question, again.  Would you, please?

16  BY MR. WRUBEL:

17     Q     I'll be glad to.  Does the signature that

18  appears there appear similar to the -- to the facsimile

19  stamps that were used during your tenure between June of

20  2004 and November of 2006?

21     A     This is my signature, yes.

22     Q     Okay.  And does your signature vary materially

23  at any time?

24            MR. SCHWARTZ:  Objection.  Calls for

25  speculation.

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 76 of 79

1          MR. WRUBEL:  You can just say form.

2          MR. SCHWARTZ:  Lack of predicate.  Lack of

3     foundation.

4          MR. WRUBEL:  You can say form.

5     A    My signature's certainly over time made

6     changes.

7     BY MR. WRUBEL:

8     Q    Okay.

9          MR. WRUBEL:  I'd like to take a break for a

10    couple of minutes.

11         (Break taken.)

12    BY MR. WRUBEL:

13    Q    Ms. Riley, I don't know if you're aware of it

14    or not, but some of the attorneys moved for a protective

15    order before we took this deposition.  Is there any

16    reason that you're concerned about any of the testimony

17    that you've provided here that may be confidential, or

18    do you have other concerns with regard to your

19    testimony?

20    A    Well, I'm not sure about the protective order

21    that you're talking about, but yes, I have concerns on

22    where it ends up and where it's going.

23    Q    Okay.

24    A    Yes.

25    Q    Okay.  And can you elaborate on what your

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 77 of 79

1    concerns are?

2         A    Well, I've seen things on the Internet that has

3    gone way beyond, that has -- frankly, there's phrases in

4    there that are threatening.  Going to run me down, run

5    me out of breath.  That sounds pretty threatening.  So

6    yes, I have concerns about where this kind of

7    information ends up.

8         Q    Okay.  Is there any other concerns that you

9    have besides that it may end up on the Internet that

10   you're aware of or that you --

11        A    You're saying it may end up on the Internet?

12        Q    It won't.  It won't.  I can assure you it

13   won't.

14        A    Okay.  I have no concerns about what I told you

15   today.

16        Q    Right.

17        A    I have -- I can't speak to specific dates that

18   you've asked about.

19        Q    Right.

20        A    But what we've -- I've told you what I know.

21        Q    No.  No.  And just so you're clear on it, there

22   already is a protective order in place which says that

23   it's not to go on the Internet.  So I just want you to

24   be aware of that and seems to be -- but you're saying

25   other than that you really don't have any other concerns

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 78 of
79

```
 1    with any of the other --
 2              MR. SCHWARTZ:  Form.
 3         A    I don't have concerns about what I said today.
 4         Q    Okay.
 5              MR. WEISS:  Objection to the form of the
 6    question.  Just to clarify, I'm -- you're asking her
 7    if -- she seems to be responding to, Do you have any
 8    concerns what you've testified about?  You're asking
 9    her, Do you have any concerns about this deposition?
10              MR. WRUBEL:  I'm asking her both.
11              MR. SCHWARTZ:  Let's be clear.  She's not a
12    lawyer.  The legal concerns are not under her
13    purview.
14              MR. WRUBEL:  I understand.
15              MR. SCHWARTZ:  She's talking about the facts.
16              MR. WRUBEL:  Right.  She's concerned from her
17    own personal standpoint about it going on the
18    Internet, and I'm assuring her it will not.
19              MR. WEISS:  So are you asking -- but are you
20    asking her does she have any other concerns about it
21    being publicly disseminated?
22              MR. WRUBEL:  I've asked her what I've asked
23    her.  That's it.
24              MR. SCHWARTZ:  All right.
25              MR. WEISS:  All right.
```

Case: 10-05245   Doc# 330   Filed: 11/12/13   Entered: 11/12/13 16:05:05   Page 79 of 79