Execution Copy

appraiser (such appraiser, a "Disinterested Appraiser"). If the Parties cannot agree on an appraiser within thirty (30) calendar days, each Party will select an appraiser and the two appraisers shall select a third Disinterested Appraiser who shall perform the Second Appraisal.

If and to the extent that the Second Appraisal demonstrates that the Original Appraisal provided by Company overstated the market value of the subject property as of the date of the Original Appraisal by ten percent (10%) or more, Company shall – subject to the limitations set forth in Sections 8 and 9 hereof - compensate WM for WM's Actual Financial Loss.

5.    **Secondary Market Rejection Claims Process.**

A.    **Notice of Claim.** In the event of WM submitting a claim for damages as a result of a Loan being rejected by the secondary market due either to (i) an error (as defined in Section 5 (A)(i) below) in the Original Appraisal documentation, or (ii) to the fact that the market value in the Original Appraisal Report was overstated as evidenced by a retrospective appraisal obtained by the secondary market investor, WM's notice to Company shall include the following documents and information, if reasonably available:

(i) the reason for rejection of the Loan, which may be either: (a) an error in the Original Appraisal provided by Company (for which purpose an "error" shall be defined as a failure to comply with USPAP standards, FNMA or FHLMC guidelines, or a failure accurately to complete the appropriate appraisal forms for the particular appraisal service at issue), or (b) an overstatement of market value in the Original Appraisal provided by Company, where the secondary market has approved the appraisal type for the Loan submitted;

(ii) Documents evidencing that a secondary market entity rejected the Loan as a result of an error in the Original Appraisal or an inaccurate market value in the Original Appraisal supplied by Company;

(iii) Documents evidencing what the secondary market entity rejecting the Loan believed the market value should have been, if applicable;

(iv) Identification of the mortgagor, mortgagee and secured property;

(v) Copies of documents evidencing and supporting the Original Appraisal market value supplied by Company; and

(vi) Any materials in WM's possession supporting that a valuation error exits, including, but not limited to, a retrospective appraisal of the secured property performed on WM's behalf after the date the Loan was rejected by the secondary market.

B.    **Cure of Rejection.**

(i) If a Loan is rejected by a secondary market entity due to an error in the Original Appraisal provided by Company, and the secondary market entity provides an opportunity to cure such document error, Company will cure the error if possible.

(ii) If a Loan is rejected due to an overstatement of market value in an Original Appraisal provided by Company, and WM is given an opportunity by the secondary market entity to oppose such rejection by defending the Original Appraisal, Company will – upon notice, at WM's

Confidential Treatment Requested

LSI2-0429930

Execution Copy

request, and at Company's expense -- provide WM with assistance in defending the Original Appraisal to oppose rejection of the Loan.

(iii) In the event that either: (a) Company is unable to cure an Original Appraisal error, or (b) Company and WM are unsuccessful in defending the market value in the Original Appraisal, and WM is obligated to repurchase the Loan from the secondary market entity, Company shall -- subject to Section 5 (D) and the limitations set forth in Sections 8 and 9 hereof -- compensate WM for WM's Actual Financial Loss (as defined in 5(C)(iv) below).

C.      Proof of Loss.   WM's proof of loss for a Secondary Market Rejection Claim shall include the following documentation:

(i) Identification of the mortgagor, mortgagee and secured property;

(ii) Documents evidencing the value obtained in the original (rejected) sale of the Loan to the secondary market;

(iii) Documents evidencing the sale of the rejected Loan to the secondary market at a discounted value; and

(iv) Any other documents evidencing the difference between the amount for which the Loan was originally sold in the secondary market and the amount actually received by WM via a discounted sale in the secondary market subsequent to secondary market rejection and WM's repurchase of such Loan (such difference, an "Actual Financial Loss").

NO COVERAGE FOR SECONDARY MARKET REJECTION SHALL BE PROVIDED UNLESS WM HAS SOLD THE LOAN AT A DISCOUNTED RATE TO THE SECONDARY MARKET.

WM shall use commercially reasonable efforts to resell the Loan to the secondary market at the highest price possible within a reasonable time, or shall retain the Loan in its portfolio. In the event WM holds the Loan as an asset, WM may not maintain a Secondary Market Rejection Claim but shall be permitted to assert a Foreclosure/Deed in Lieu Claim under Section 4 if and as applicable.

D.      Company's Dispute of Secondary Market Rejection Claim.   In the case of a claim arising from secondary market rejection due to overstatement of market value in the Original Appraisal as set forth in 5(A)(i)(b), only (as distinct from claims arising from "errors" as set forth in 5(A)(i)(a)), if Company disputes WM's claim of breach, the Parties shall choose a duly licensed or certified mutually acceptable appraiser, at Company's expense, and such appraiser will conduct a Second Appraisal in the manner set forth in Section 4(C). If and to the extent such Second Appraisal demonstrates that the market value of the subject property as of the date of the Original Appraisal was greater than ninety percent (90%) of the market value stated in the Original Appraisal, Company shall have no liability with respect to the Secondary Market Rejection Claim at issue.

6.      Secondary Market Recourse Claims Process.

A.      Notice of Claim. In the event of WM submitting a claim for damages as a result of WM's actual or potential liability arising from or related to a secondary market investor's claim for post-foreclosure recourse due to the fact that the market value in the Original Appraisal was overstated based on a retrospective appraisal obtained by such secondary market investor,

Confidential Treatment Requested

LSI2-0429931

Execution Copy

WM's notice to Company shall include the following documents and information, if reasonably available:

(i) Documents provided to WM by the secondary market investor claiming an inaccurate market value in the Original Appraisal was the cause of loss to the secondary market investor, where the secondary market has approved the Original Appraisal appraisal type for the Loan submitted;

(ii) Documents evidencing what the secondary market entity rejecting the Loan believed the market value should have been, if applicable;

(iii) Identification of the mortgagor, mortgagee and secured property;

(iv) Copies of documents evidencing and supporting the Original Appraisal market value supplied by Company;

(v) Any materials in WM's possession supporting that a valuation error exists, including, but not limited to, a retrospective appraisal of the secured property performed on WM's behalf after the date the Loan was rejected by the secondary market;

(vi) Documents evidencing the secondary market investor's foreclosure on the subject property, including a closing statement, grant deed, trustee's deed, or other documentation establishing that the secondary market investor acquired the residential property by foreclosure or deed in lieu of foreclosure;

(vii) the outstanding principal balance of the Loan as of the foreclosure date or date of acceptance of a deed in lieu of foreclosure; and

(viii) Documents evidencing the gross sales price for the sale of the residential property by the secondary market investor.

**B.      Defense of Secondary Market Recourse Claim.**

(i) If a secondary market investor seeks recourse due to an alleged overstatement of market value in an Original Appraisal provided by Company, Company will – upon notice, at WM's request, and at Company's expense – provide WM with assistance in defending the Original Appraisal to oppose the Secondary Market Recourse Claim.

(ii) In the event that Company and WM are unsuccessful in defending the market value in the Original Appraisal, and WM is obligated to pay sums to the secondary market investor to settle the Secondary Market Recourse Claim asserted by such secondary market investor, Company shall – subject to the limitations set forth in Sections 8 and 9 hereof – compensate WM for WM's Actual Financial Loss (as defined in 6(C)(iv) below).

**C.      Proof of Loss.**   WM's proof of loss for a Secondary Market Recourse Claim shall include the following:

(i) Identification of the mortgagor, mortgagee and secured property;

(ii) Documents evidencing the market value in the Original Appraisal;

**Confidential Treatment Requested**                                    LSI2-0429932

Execution Copy

(iii) Documents evidencing the market value in the retrospective appraisal obtained by the secondary market investor; and

(iv) Documents evidencing WM's payment to the secondary market investor in settlement of the Secondary Market Recourse Claim (such amount, an "Actual Financial Loss.")

7.    **Cooperation.**

A.    WM will provide reasonable cooperation with any investigation conducted by Company and made pursuant to a notice of breach by WM, and will provide Company with information reasonably requested by Company in order to resolve or settle the matter relating to the Original Appraisal.

8.    **Limitation of Liability.**

8.1    **Subjective Nature of Appraisals.**   WM acknowledges that the performance of appraisal services and any opinion of value is inherently subjective in nature and that different appraisers, acting reasonably and competently, may reach disparate conclusions on the value of a parcel of real property. WM agrees that (in addition to the other limitations provided herein) Company shall not be liable under this Appraisal Warranty to WM for WM's direct damages attributable to Original Appraisals in the case of a claim related to or arising from a Foreclosure/Deed in Lieu Claim or Secondary Market Recourse Claim unless the market value of the residential property as set forth in the Second Appraisal is less than the market value of said residential property as set forth in the Original Appraisal multiplied by ninety percent (90%).

8.2    **Limitation on Loss – Foreclosure/Deed in Lieu Claim.**   In the case of a Foreclosure/Deed in Lieu Claim recovery by WM for WM's damages attributable to breach of the Appraisal Warranty shall be limited to the lesser of the following amounts:

A.    The difference between the outstanding principal balance of the Loan as of the date WM takes title to the subject property (or in the case of a Loan factored under negative amortization or reverse mortgage criteria, the original principal balance of such Loan) and the resale price actually realized by WM (inclusive of all expenses that would have been incurred notwithstanding the Original Appraisal, including, without limitation, foreclosure/legal fees, eviction fees, reasonable selling costs and delinquent taxes, less any sales credits, insurance claim payments, holdback amounts and escrow balances held by the lender); OR

B.    The difference between (i) the market value of the residential property as set forth in the Original Appraisal multiplied by ninety percent (90%) and (ii) the market value of the property as established by the Second Appraisal; OR

C.    Thirty percent (30%) of the outstanding principal balance of the Loan as of the date WM takes title to the subject property.

8.3    **Limitation on Loss – Secondary Market Rejection Claim.**   In the case of a Secondary Market Rejection Claim, recovery by WM for breach of this Appraisal Warranty shall be limited to the lesser of the following amounts:

A.    The difference between the amount for which WM originally sold the Loan in the secondary market and the amount for which WM sold the Loan in the secondary market subsequent to secondary market rejection and WM's repurchase of such Loan; OR

Confidential Treatment Requested

LSI2-0429933

Execution Copy

B.      Thirty percent (30%) of the market value in the Original Appraisal.

**8.4     Limitation on Loss – Secondary Market Recourse Claim.** In the case of a Secondary Market Recourse Claim, recovery by WM for breach of this Appraisal Warranty shall be limited to the lesser of the following amounts:

A.      The amount actually paid by WM to the secondary market investor to settle such investor's claim for post-foreclosure recourse; OR

B.      The difference between the market value in the Original Appraisal multiplied by ninety percent (90%) and the greater of (x) the market value in the retrospective appraisal obtained by the secondary market investor seeking recourse, or (y) the market value as agreed by the parties subsequent to any  proceeding to defend the secondary market investor's claim as described in Section 6(B) above, or (z) the market value as established by the Second Appraisal (as described in Section 4(C)), provided however, that in the case of this Section 8.4(B) a Second Appraisal shall only be performed if invoked by Company and at Company's sole cost and expense; OR

C.      Fifteen percent (15%) of the market value in the Original Appraisal.

**8.5.    Limitation on Loss – Desk Review and Field Review.** Notwithstanding the foregoing limitations, in the case of a Foreclosure/Deed in Lieu Claim or Secondary Market Claim arising from or related to  either a Desk Review or Field Review, recovery by WM for breach of the Appraisal Warranty (a) shall not exceed  ten thousand dollars ($10,000.00) in the circumstance where a Desk Review or Field Review is the only Original Appraisal obtained by WM from Company as in, e.g., a circumstance in which Company reviews an appraisal obtained by WM from a third party appraiser unaffiliated with Company; and (b) shall be limited to the recovery available with respect to the Interior Appraisal or Exterior Appraisal pertaining to the subject property in the circumstance where WM has obtained from Company both (x) a Desk or Field Appraisal and (y) an Interior or Exterior Appraisal. To illustrate, if WM obtains an Interior Appraisal in which the market value of the subject property is stated to be $200,000.00 and subsequently obtains a Field Review in which the market value of the subject property is stated to be $210,000.00, any subsequent claim by WM under this Appraisal Warranty shall be subject to the limitations which would have been applicable hereunder to claims arising from or related to the Interior Appraisal without regard to the subsequent Field Review.

**8.6     Option to Purchase Property.** In lieu of paying WM for a claim under this Appraisal Warranty, Company shall, in its sole discretion and with obligation, have the option of purchasing the subject property from WM as set forth in this Section 8.6.

A.      **Option Exercise.** Company may exercise its option to purchase by delivering written notice to WM no later than ninety (90) calendar days following Company's receipt of a notice of breach hereunder.  The transfer of the property shall occur on the later of thirty (30) calendar days after the date; (i) Company exercises its option, or (ii) the date WM acquires fee title to the subject property. This option shall not exist if and to the extent WM has already resold the property following foreclosure as of the date notice is provided to Company or if the secondary market investor has already resold the property as of the date a Secondary Market Recourse Claim is asserted against WM.

B.      **Purchase Price.** In the event Company elects to exercise the purchase option, the purchase price to be paid shall be: (i) the unpaid principal balance of WM's loan, plus (ii) all accrued

Confidential Treatment Requested                                    LSI2-0429934

Execution Copy

and unpaid interest owing on said loan through the date Company acquires the subject property (at the regular and not default interest rate specified in the applicable loan documents with the borrower).

**C.    Application of Damage Cap:** In the event Company elects to exercise the purchase option under this Section, amounts paid by Company to purchase the property shall not apply to the damages cap set forth in Section 9(B), below.

**9.    ADDITIONAL LIMITATIONS AND MISCELLANEOUS PROVISIONS.**

**A.**    COMPANY SHALL NOT BE LIABLE FOR, AND THIS APPRAISAL WARRANTY WILL NOT APPLY TO, EXTEND TO, OR COVER THE FOLLOWING:

(i)    LOSSES CAUSED BY THE PARTIAL OR COMPLETE DESTRUCTION OR ENVIRONMENTAL CONTAMINATION OF THE SUBJECT PROPERTY SUBSEQUENT TO THE DATE OF THE ORIGINAL APPRAISAL;

(ii)    LOSSES RESULTING FROM RIGHTS OF EMINENT DOMAIN OR FROM ANY LAW, ORDINANCE, OR GOVERNMENTAL REGULATIONS RELATED, BUT NOT LIMITED TO, USE OR OCCUPANCY OF THE SUBJECT PROPERTY SUBSEQUENT TO THE DATE OF THE ORIGINAL APPRAISAL;

(iii)    ANY LOSS CAUSED SOLELY BY ANY DISHONEST OR FRAUDULENT ACT OR OMISSION, OR ANY CRIMINAL ACT OR OMISSION BY ANY DIRECTOR, OFFICER, AGENT, OR EMPLOYEE OF WM; OR

(iv)    ANY LOSS RESULTING SOLELY FROM THE FAILURE OF WM TO COMPLY WITH APPLICABLE LAWS OR REGULATIONS, INCLUDING, BUT NOT LIMITED TO USURY, CONSUMER CREDIT PROTECTION, OR TRUTH-IN-LENDING LAWS.

**B.**    WM AGREES THAT IN NO EVENT SHALL COMPANY'S LIABILITY FOR WM'S DAMAGES ARISING AS A RESULT OF BREACH OF THE APPRAISAL WARRANTY EXCEED THE GREATER OF (i) THE TOTAL AMOUNT PAID BY WM TO COMPANY UNDER THE AGREEMENT DURING THE TWELVE (12) MONTHS PRECEDING THE CLAIM (LESS ANY WARRANTY CLAIMS ALREADY PAID BY COMPANY DURING SUCH PERIOD); OR (ii) $1,000,000.00.    THIS LIMIT IS CUMULATIVE AND ALL PAYMENTS UNDER THE AGREEMENT WILL BE AGGREGATED TO CALCULATE SATISFACTION OF THE LIMIT. THE EXISTENCE OF MULTIPLE CLAIMS WILL NOT ENLARGE THE LIMIT.

**C.**    FOR AVOIDANCE OF AMBIGUITY, LIMITATIONS SET FORTH IN THIS EXHIBIT B APPLY TO WM'S RECOVERY FOR DIRECT DAMAGES ATTRIBUTABLE TO BREACH OF THE APPRAISAL WARRANTY ONLY, AND SHALL NOT HAVE ANY EFFECT ON COMPANY'S OBLIGATIONS IN RESPECT OF THIRD PARTIES UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION COMPANY'S OBLIGATIONS TO INDEMNIFY WM IN RESPECT OF THIRD PARTY CLAIMS AS SET FORTH IN THE AGREEMENT.

**D.**    If and to the extent that WM obtains any recovery from private mortgage or other insurance related to a Loan upon which WM has previously obtained relief from Company under this Appraisal Warranty, WM shall issue a credit to Company in an amount sufficient to eliminate any double recovery by WM on losses attributable to such Loan.

**Confidential Treatment Requested**                    LSI2-0429935

Execution Copy

**E.**     Company shall not be liable under the Appraisal Warranty to the extent losses are attributable to use of the Original Appraisal outside the scope of work as defined in each Original Appraisal (solely for illustrative purposes only and not by way of limitation, e.g., interior damage in the case of an exterior only appraisal, or non-existence of the subject property in the case of a desk review).

**10.     DISPUTE RESOLUTION.**

Any controversy or claim arising out of or relating to this Exhibit B, Appraisal Warranty, or the breach thereof, shall be settled via binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Any proceeding under this Section 10 shall be held before a single arbitrator in Seattle, Washington. The prevailing party shall be entitled to an award of its reasonable expenses (including attorney fees and its share of arbitration fees) incurred in connection with the arbitration.

The arbitrator shall employ comparative fault principles as set forth in the Revised Code of Washington (RCW 4.22.070) if and to the extent that the fault of (a) both WM and Company, or (b) Company and third parties for which it is not responsible under the Agreement, are the proximate cause of a loss to WM which becomes subject of a claim by WM under this Appraisal Warranty.

**Confidential Treatment Requested**

LSI2-0429936

Execution Copy

## EXHIBIT C

## FEE SCHEDULES

a.  Appraisal Fees. Appraisal Fees shall be as follows:

   *See Attachment A to Exhibit C, attached, pages 48-51.*

   NOTE:  The costs of reconsiderations of value are included in the fees paid for
   Services reflected in the table above.

   Corrections of errors in appraisals are included in the Services at no additional cost
   to WM provided Company has caused such errors.

b.  Additional Appraisal Fees. Company shall be able to request additional Fees for
   Appraisals from WM, only for properties that meet one or more of the following
   criteria:

   1.  Hard to reach properties: Properties that require special transportation
       to reach, which include: properties where a 4-wheel drive vehicle must
       be used, and properties which require a ride on a water ferry.

   2.  Complex properties:  Properties that are considered by industry
       standards and the inspecting appraiser to be complex and which WM
       agrees are complex.

   3.  Non-standard addenda are required: WM requests from Company the
       inclusion of a non-standard addendum (e.g. rent schedule, property
       operating income statement) to be included with the appraisal.

   All requests for additional appraisal fees shall be submitted to WM in writing and WM
   will respond to such requests (e.g., acceptance or non-acceptance) in writing,
   through WM's appraisal systems. Acceptance of any additional appraisal fees is at
   the complete discretion of WM. common additional fees that WM will not pay for
   include, but are not limited to:

   1.  Trip fees including fees for when the borrow does not show up for
       appointments;

   2.  Distance fees for properties that are within Company's listed coverage
       area, as set forth in Exhibit A;

   3.  Cancellation fees that do not include documentation of work to date;
       and

   4.  Reconsiderations of appraisal values.

   *If additional fees are not approved by WM, the service will be completed in
   accordance with the established Fee Schedule.*

Confidential Treatment Requested                                      LSI2-0429937

Execution Copy

c.  Upgrading Appraisal Orders. In the event that WM requests an upgrade to an
    appraisal Order, Company shall be entitled to the following compensation:

    The greater of (i) the fee difference between the upgraded appraisal Order and the
    original appraisal Order, or (ii) one hundred dollars ($100.00). Example: The original
    appraisal Order is a 2055 Exterior appraisal at a fee of $200. The upgraded
    appraisal Order is a 1004 without cost analysis appraisal at a fee of $250. In such
    case, Company shall then be compensated $100.00 for the upgraded order, since
    the difference between the upgraded order and the original order is $50.00.

d.  Cancelled Appraisal Orders. In the event that WM cancels an appraisal Order,
    Company shall cease work immediately, and submit all documentation to WM.
    Company shall receive compensation for appraisal work completed to date. Fees
    shall be determined based on completion of appraisal milestone and shall be as
    follows:

    1.  No work completed: 0% of appraisal fees

    2.  Property Inspection Completed: 50% of appraisal fees

    3.  Appraisal Forms Completed: 100% of appraisal fees

    Company shall only receive fees for cancelled Orders, if Company provides
    documentation sufficient for WM to confirm work to date.

Confidential Treatment Requested                                    LSI2-0429938

**Execution Copy**

**Attachment A to Exhibit C**
**Appraisal Fees**

| State | 1004 with COST ANALYSIS | 1004 without COST ANALYSIS | 1004d MANUFACTURED HOME | 2055 EXTERIOR | 2-4 UNITS | 2075 INSPECTION | CONDO INTERIOR 1073 | CONDO EXTERIOR 1075 | CO-OP 2090 | DESK REVIEW | FIELD REVIEW | COMPLETION REPORT 1004D | APPRAISAL UPDATE | 1004 Upgrade from 2055 Exterior | LAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AK | 385 | 381 | 381 | 266 | Quote | 124 | Quote | Quote | Quote | Quote | Quote | Quote | Quote | Quote | 242 |
| AL | 385 | 381 | 381 | 280 | 480 | 124 | 385 | 266 | 314 | 195 | 290 | 100 | 147 | 171 | 195 |
| AR | 337 | 314 | 385 | 266 | 480 | 124 | 385 | 290 | 314 | 195 | 242 | 100 | 147 | 171 | 195 |
| AZ | 385 | 381 | 409 | 290 | 575 | 124 | 337 | 290 | 337 | 195 | 266 | 100 | 242 | 171 | 219 |
| CA | 385 | 381 | 337 | 290 | 622 | 124 | 385 | 266 | 361 | 195 | 290 | 100 | 195 | 195 | 385 |
| CO | 337 | 314 | 337 | 271 | 575 | 124 | 337 | 271 | 337 | 171 | 266 | 100 | 242 | 171 | 280 |
| CT | 337 | 314 | 337 | 266 | 527 | 124 | 314 | 276 | 373 | 171 | 266 | 138 | 242 | 138 | 242 |
| DC | 337 | 337 | 337 | 276 | 576 | 124 | 337 | 290 | 361 | 171 | 242 | 100 | 147 | 147 | 290 |
| DE | 318 | 290 | 337 | 228 | 527 | 124 | 314 | 219 | 314 | 195 | 219 | 114 | 147 | 124 | 290 |
| FL | 385 | 381 | 337 | 290 | 480 | 100 | 337 | 290 | 314 | 242 | 266 | 100 | 147 | 100 | 195 |
| GA | 381 | 318 | 385 | 271 | 480 | 124 | 337 | 280 | 337 | 219 | 337 | 124 | 147 | 171 | 195 |
| HI | Quote | Quote | Quote | Quote | Quote | 100 | Quote | Quote | Quote | Quote | Quote | Quote | Quote | Quote | 260 |
| IA | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 290 | 195 | 242 | 100 | 242 | 195 | 280 |
| ID | 385 | 337 | 432 | 290 | 622 | 124 | 385 | 290 | - | 242 | 314 | 100 | 195 | 195 | - |
| IL | 314 | 280 | 337 | 252 | 480 | 124 | 290 | 252 | 337 | 195 | 242 | 124 | 147 | 147 | 385 |
| IN | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 290 | 195 | 242 | 100 | 242 | 195 | 242 |
| KS | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 290 | 195 | 242 | 100 | 242 | 195 | 242 |
| KY | 337 | 314 | 397 | 266 | 604 | 147 | 314 | 266 | 290 | 195 | 242 | 100 | 242 | 195 | - |
| LA | 337 | 314 | 455 | 266 | 604 | 124 | 337 | 290 | 385 | 171 | 242 | 100 | 242 | 195 | 242 |
| MA | 337 | 314 | 337 | 266 | 527 | 234 | 314 | 280 | 337 | 166 | 266 | 100 | 147 | 124 | 266 |

**Confidential Treatment Requested**

LSI2-0429939

Execution Copy

| MD | 337 | 337 | 337 | 337 | 278 | 576 | 124 | 337 | 290 | 361 | 171 | 242 | 100 | 147 | 147 | 242 |
| ME | 365 | 365 | 337 | 361 | 361 | 527 | 124 | 361 | 361 | 385 | 178 | 290 | 100 | 147 | 124 | 219 |

Page 49 of 773

Confidential Treatment Requested

LSI2-0429940

Execution Copy

| State | 1004 with COST ANALYSIS | 1004 without COST ANALYSIS | 1004d MANUFACTURED HOME | 2055 EXTERIOR | 2-4 UNITS | 2075 INSPECTION | CONDO INTERIOR 1073 | CONDO EXTERIOR 1075 | CO-OP 2090 | DESK REVIEW | FIELD REVIEW | COMPLETION REPORT 1004D | APPRAISAL UPDATE | 1004 Upgrade from 2055 Exterior | LAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MI | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 280 | 195 | 242 | 100 | 242 | 195 | 242 |
| MN | 337 | 314 | 337 | 266 | 456 | 124 | 337 | 266 | 361 | 176 | 266 | 100 | 171 | 171 | 242 |
| MO | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 280 | 195 | 242 | 100 | 242 | 195 | 242 |
| MT | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 280 | 195 | 242 | 100 | 242 | 195 | 385 |
| NC | 386 | 361 | 361 | 266 | 527 | 124 | 337 | 266 | 480 | 171 | 266 | 100 | 242 | 171 | 195 |
| ND | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 280 | 195 | 242 | 100 | 242 | 195 | - |
| NE | 337 | 342 | 337 | 266 | 504 | 124 | 314 | 266 | 280 | 185 | 266 | 100 | 242 | 196 | - |
| NH | 361 | 328 | 337 | 266 | 527 | 124 | 314 | 280 | 314 | 171 | 266 | 147 | 147 | 124 | 219 |
| NJ | 337 | 314 | 361 | 266 | 527 | 124 | 337 | 280 | 385 | 204 | 276 | 100 | 147 | 138 | 242 |
| NM | 386 | 409 | 409 | 290 | 522 | 124 | 385 | 280 | 361 | 196 | 280 | 100 | 195 | 171 | 280 |
| NV | 385 | 337 | 385 | 290 | 622 | 124 | 337 | 280 | 385 | 242 | 337 | 100 | 242 | 195 | 219 |
| NY | 361 | 328 | 337 | 271 | 561 | 147 | 337 | 266 | 361 | 195 | 280 | 138 | 147 | 171 | 231 |
| OH | 337 | 314 | 337 | 266 | 504 | 124 | 316 | 266 | 280 | 195 | 242 | 100 | 242 | 195 | 242 |
| OK | 337 | 290 | 361 | 242 | 527 | 124 | 337 | 242 | 480 | 176 | 266 | 100 | 147 | 124 | 242 |
| OR | 432 | 385 | 432 | 290 | 622 | 124 | 432 | 361 | - | 195 | 280 | 100 | 242 | 195 | 386 |
| PA | 337 | 337 | 337 | 280 | 527 | 137 | 314 | 280 | 337 | 195 | 252 | 128 | 147 | 138 | 242 |
| RI | 337 | 328 | 337 | 266 | 527 | 171 | 290 | 266 | 385 | 171 | 242 | 100 | 147 | 124 | 219 |
| SC | 337 | 314 | 361 | 266 | 480 | 124 | 314 | 266 | 386 | 176 | 266 | 100 | 147 | 124 | 196 |
| SD | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 280 | 195 | 242 | 100 | 147 | 195 | - |
| TN | 361 | 337 | 361 | 266 | 480 | 124 | 361 | 290 | 385 | 178 | 242 | 100 | 147 | 124 | 195 |
| TX | 337 | 314 | 466 | 266 | 480 | 124 | 337 | 290 | 385 | 171 | 242 | 100 | 147 | 124 | 266 |
| UT | 361 | 314 | 385 | 266 | 622 | 100 | 361 | 266 | 337 | 195 | 266 | 100 | 242 | 105 | 219 |
| VA | 337 | 337 | 337 | 276 | 575 | 124 | 337 | 280 | 361 | 171 | 242 | 100 | 147 | 147 | 280 |

Confidential Treatment Requested

LSI2-0429941

Execution Copy

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VT | 337 | 280 | 337 | 266 | 522 | 124 | 314 | 290 | -- | 195 | 290 | 147 | 147 | 124 | 219 |
| WA | 432 | 385 | 480 | 290 | 670 | 124 | 432 | 290 | 504 | 195 | 337 | 100 | 247 | 196 | 242 |
| WI | 314 | 280 | 337 | 288 | 456 | 124 | 314 | 266 | 314 | 195 | 266 | 100 | 147 | 124 | 195 |
| WV | 337 | 337 | 337 | 276 | 576 | 124 | 337 | 290 | 361 | 171 | 242 | 100 | 147 | 147 | -- |
| WY | 337 | 314 | 337 | 266 | 504 | 124 | 314 | 266 | 290 | 195 | 242 | 100 | 242 | 195 | 385 |

Manhattan and CA Co-ops

| | |
|---|---|
| 1.5 - 3 million | $800 |
| 3-5 Million | $950 |

Page 61 of 73

Confidential Treatment Requested

LSI2-0429942

Execution Copy

## EXHIBIT D

## INFORMATION SECURITY REQUIREMENTS

**1.  Security Management**

1.a.     Company acknowledges and agrees that it is obligated to comply with the Confidentiality
provisions in the Agreement to which these Information Security Requirements ("ISRs")
are attached (the "Agreement"), or such higher standard as required by law.

1.b.     WM employees will be responsible for determining and specifying all levels of security
for information residing on WM owned and managed systems as well as the
classification and corresponding security controls over WM Information Assets that are
processed and/or stored by Company and that are more fully described in these ISRs.

1.c.     **WM Information Assets:**  "WM Information Assets " shall mean all data and information
that is submitted directly or indirectly to Company for and/or by WM, or obtained, or
learned by Company in connection with the Services provided by Company under the
Agreement.  WM Information Assets are, and shall at all times remain, the property of
WM and shall be protected as prescribed by the Agreement, these ISRs, and all
applicable laws.   WM Information Assets shall be deemed to be the Confidential
Information of WM as that term is defined in the Agreement or Non-Disclosure
Agreement.

1.d.     Company shall maintain full responsibility for ensuring that WM Information Assets are
protected in accordance with the WM requirements described in these ISRs.  If assigned
as permitted in accordance with the Agreement, the Company must be able to determine
that any delegated roles and responsibilities have been discharged correctly.  Company
also agrees to maintain policies or standards appropriate to govern the handling of
Confidential Information, which policies and standards must be provided to and
approved by WM Corporate Information Security.   All WM Information Assets will be
treated as Confidential Information under this Agreement.

1.e.     Company acknowledges and agrees that security requirements will be incrementally
implemented as access to production data by Company becomes more imminent.
Company agrees that such connectivity requires that its security standards meet or
exceed those of WM and that WM Information Assets may only reside within a secure
environment.   Company further agrees to allow WM or a mutually agreed upon
independent third party to perform security assessments based on a schedule
reasonably required by WM.  Company understands that should an assessment reveal
inappropriate or inadequate security, a remediation schedule will be developed, and
appropriate actions will be taken to address and resolve all findings.  WM may, at its sole
discretion, disconnect Company from the WM network and require that all WM
information currently stored by Company be surrendered or destroyed by an
independent document destruction party, or require some other solution, whichever WM
deems as appropriate, until Company satisfactorily complies with the defined security
requirements.

1.f.     WM Information Assets may not be stored at Company's facilities (including any offsite
facilities under its control) until WM's Chief Information Security Officer or his or her
designee has determined to his or her reasonable satisfaction that (i) Company's

**Confidential Treatment Requested**

LSI2-0429943

Execution Copy

policies and standards sufficiently protect such information and, (ii) that Company is in compliance with Company's own security policies and standards.

1.g.   Company shall maintain a security alert process either through the employment of a third party service or by assigning personnel to be responsible for (i) monitoring the development of new threats related to any identified vulnerabilities and, (ii) taking effective corrective action to remediate those threats.   During the implementation of security patches or corrective actions to remediate security risks, WM will be informed of any potential risk to WM Information Assets at the earliest opportunity through the Security Operations Services (SOS) at 888-497-3287 and notified when the threat is removed through remediation measures. For the purposes of these ISRs, "personnel" means employees and independent contractors.

1.h.   For the purposes of these ISRs, an "Incident" includes but is not limited to any of (i) an act which violates an explicit or implied security policy, (ii) an unplanned service outage that prevents the normal operation of business, or (iii) unauthorized access to WM Information Assets or any data held by Company that would be required by law to be disclosed.

During the Term of the Agreement, Company shall maintain an Incident response function with the capabilities to perform activities such as prevention, planning, detection, analysis, containment, investigation, eradication, recovery, and follow-up of Incidents such as root cause analysis and forensic research. In the event of an Incident, Company shall (i) notify WM at CorpInformationSecurity@wamu.net within twenty-four (24) hours and (ii) if a security deficiency has been identified with any information system, coordinate with WM Corporate Information Security through the Security Operations Services (SOS) at 888-497-3287 in the conduct of an investigation within twenty-four (24) hours, (iii) provide a written report within three (3) days of any such notice, and (iv) respond promptly to any reasonable request from WM for detailed information pertaining to any Incident.   Any such notice and report must contain a description of the nature of the Incident, its impact, and any investigative, corrective, or remedial actions taken or planned.   Company further agrees to permit WM, upon request, to review and verify relevant logs and data pertaining to any investigation performed by the Company regarding any Incident for the purposes of protecting WM and its customers' and employees' information. Upon the conclusion of all investigative, corrective, and remedial actions, WM will receive a final report that includes the extent of the Incident; a description of WM Information Assets disclosed, destroyed, or otherwise compromised or altered; all supporting evidence, including system, network, and application logs; a description of all corrective and remedial actions; and an assessment of the security impact to WM.

1.i.   If an Incident occurs, Company will promptly take all necessary steps to prevent any further damage to/exposure of WM Information Assets as well as any future Incidents and will provide WM with the relevant details of the steps taken to remediate against any further Incidents within three (3) business days. Further, Company will, within the time period prescribed by law, take all actions required by law to notify the affected WM customers, that an Incident involving a breach of security may have caused their personal information to be disclosed to unauthorized persons, provided, however, that any notification must first be approved by WM's Chief Information Security Officer or his or her designee.

Confidential Treatment Requested

LSI2-0429944

Execution Copy

1.j.     Company acknowledges and agrees that WM Information Assets may only be used in
         connection with the provision of Services to WM as contemplated in the Agreement.
         Company also acknowledges that relevant governing or regulatory agencies may,
         according to their respective charter and/or as required by law, request an audit of
         Company's business practices when WM's or its customer's non-public information is
         held or protected by Company as though it were an extension of WM.

## 2.  Personnel Security

2.a.     Company certifies that its employees, independent contractors and subcontractors are of
         good standing and trustworthy and that Company has no knowledge of any person
         employed by it in connection with any Services under the Agreement who has a prior
         felony charge or conviction for embezzlement, fraud, antitrust, breach of trust or fiduciary
         duties, securities or financial related crime, perjury, breach of trust, money laundering, or
         larceny.    If Company's employees, independent contractors or subcontractors are
         convicted of a felony, or Company learns of a prior conviction during the term of the
         Agreement, it will inform WM of the conviction and remove the employee, independent
         contractor, or subcontractor from performing any Services for WM if requested by WM.

2.b.     Company certifies that its employees, independent contractors, and subcontractors are
         insured.

2.c.     Company certifies that its employees, independent contractors, and subcontractors have
         been provided with a clear understanding of the necessary procedures and controls to
         comply with the security requirements set forth in these ISRs. Company also agrees to
         maintain a vendor security process that ensures appropriate due diligence is conducted
         prior to utilizing other vendors or subcontractors to provide any Services in support of the
         Agreement, and that the security capabilities of any such vendors or subcontractors are
         monitored on an ongoing basis.  The due diligence and monitoring elements of this
         process must provide for the identification and resolution of significant security issues
         prior to engaging a vendor or subcontractor, and for the continuous identification and
         resolution of additional security issues over the term of the Agreement.

## 3.  Physical Security

The physical security processes in this section apply to all primary and secondary facilities used
to provide the services, or facilities used by Company (the "Company Premises") to operate,
store, maintain or protect any and all WM Information Assets and physical connections,
equipment and any other materials owned by WM that are used by Company to provide the
Services (collectively, the "WM Properties").

3.a.     Company shall restrict, control, and monitor all physical areas in Company's Premises
         that contain WM Information Assets, including any servers, switches, or other equipment
         that processes or stores WM Information Assets (the "Secure Area").  Access to any
         equipment used to deliver Services will be secured and monitored on a 24 hours per
         day, 7 days per week ("24/7") basis.

3.b.     Company will develop a documented authorization process for all those Company
         personnel maintaining or viewing WM's Properties. Company's card access program will
         address documentation and logging of all persons whose duties require them to enter or

**Confidential Treatment Requested**                                LSI2-0429945

support space storing the aforementioned WM Properties.  This process should also
include details addressing site visitor protocol including the following:

   i.  Company will provide WM, upon request, badge reports detailing all access to
areas storing WM Information Assets and Properties.

   ii.  Company will regularly test its physical protection methods.  Reports of tests will
be made available for WM's review upon request.

   iii.  Upon request, and when applicable, Company will provide WM with access to
facility log-in records on WM's personnel and any other persons having access to
each Secure Area with their identities and dates and times of access.

   iv.  Company will not allow outside support services personnel to access WM Secure
Areas unless accompanied by authorized Company personnel.

   v.  Company Access Systems will be capable of monitoring and logging door
alarms.

   vi.  Company will maintain active service agreements with card access and close-
circuit television (CCTV) support vendors.

   vii.  Company CCTV equipment and processes will support the following, unless
otherwise approved by WM: all images will be recorded at "real time" settings; all
image records will be retained for a minimum of one hundred twenty (120) days;
and all images related to questionable activity or known incidents or
investigations will be retained indefinitely or until Company receives notification
from WM that the information is no longer needed.

   viii.  Company will maintain 24/7 physical security presence at all WM Properties.

   ix.  Company will control all access to Company areas or cabinets that house phone
and other "data transmission lines" or equipment as follows:  access must be
controlled by badge reader at one or more entrance points; doors used only as
exit points must have "one-way" doorknobs or crash bar exit devices installed; all
doors must be equipped with door alarms contacts; all exit doors will have CCTV
coverage; and all Card Access and CCTV systems will be tied into generator or
UPS back-up systems.

   x.  Company will not allow outside support-services personnel to access secure
areas unless accompanied at all times by Company's pre-approved staff.

**4.  Access Control**

4.a.  Company certifies that its employs access control mechanisms to prevent unauthorized
access to WM Information Assets and to limit access to authorized personnel with a
business need-to-know.  Such mechanisms shall have the capability of detecting,
logging, and reporting attempts to breach security.  Additionally, all elements of
Company's implementation that allow end user access must be capable of distinguishing
access privileges, at a minimum, to the following separate categories:

Confidential Treatment Requested                                          LSI2-0429946

Execution Copy

- End user of services;

- WM employees and independent contractors; and

- Company employees, independent contractors, and subcontractors.

4.b.   Company security systems will be configured and maintained to provide reasonable and effective levels of security pursuant to the sensitivity of the data being held, which levels may be determined by WM and in accordance with all applicable laws including laws pertaining to WM's obligations.

4.c.   Company will limit systems access and use of resources solely to those of its employees, independent contractors, and subcontractors needed to perform specific responsibilities or functions in support of the services under the Agreement. Each person must have an individual account that authenticates that individual's access to WM Information Assets.

4.d.   Company will maintain a process to review access controls regularly, but at least quarterly, for all systems containing WM's Information Assets including any system that can connect to a system on which WM Information Assets are stored via any form of communication interface. This process shall at all times during the Term of the Agreement (i) be in compliance with Company's Policies and Standards as provided to WM, and (ii) include documenting all systems access authorizations, which include procedures to disable or delete accounts following employment transfers, terminations, and account inactivity. Such reviews may be audited by WM or its third party auditor upon request and with reasonable notice.

5.   Systems Development & Maintenance

5.a.   Company agrees that there will be no access from platforms or use of protocols other than those in the current configuration presented to WM by Company.

5.b.   Company shall establish and maintain all application and system logs under its domain and further agrees that a copy of all logs shall be provided to WM upon request in the event a security incident occurs or is believed to have occurred.

5.c.   Company shall employ an effective, documented change management program with respect to the services under the Agreement as an integral part of its security profile. WM reserves the right to review the change management reports upon reasonable notice and may require remedial action if any deficiencies are identified.

6.   Telecommunication & Network Security

6.a.   Company shall employ security practices and equipment sufficient to ensure that its end of the telecommunications connection will not allow unauthorized traffic to pass into WM networks through the common Internet connection. WM reserves the right to disconnect the Company service without notice if unauthorized access is discovered. Such disconnection, if it occurs, will not, however, relieve Company of its commitment to perform under the Agreement. Company will be obligated to provide either onsite servicing or another workaround acceptable to WM until the inappropriate access can be investigated and resolved to WM's satisfaction.

Confidential Treatment Requested

LSI2-0429947

Execution Copy

6.b.    *Company shall notify WM in writing as to the identity of each employee, independent contractor, or subcontractor (including name and purpose(s) of access) for whom access is requested for connectivity to WM networks or systems, and shall notify WM within one (1) business day of any status change, including new hire, termination, or transfer.*

6.c.    *Company agrees to review and update (for accuracy and any status changes) WM network and system access reports supplied by WM, and to return the reports to WM with any changes or updates within five (5) business days.*

6.d.    *Company agrees that any remote server access required by the Company will be in a READ only mode, without prior written approval of a security plan for more intrusive access.*

## 7.  Storage, Handling, and Disposal

Company shall separate and segregate WM Information Assets from other client data. Company shall encrypt WM Confidential Information that is in electronic form while In-Transit (also known as "in-motion" or "en-route"). "In-Transit" means information moving over wired and wireless local and/or wide area networks and the Internet. Company shall ensure all WM Confidential Information while In-Storage (also known as "at-rest") is placed in secure areas with commercially reasonable controls to prevent unauthorized access (which shall include encryption not later than one (1) year after the Effective Date). "In-Storage" means information stored in databases, file systems, and on various forms of online and offline media (DASD, tape, etc.). Unless directed otherwise by WM, Confidential Information should be properly disposed of in accordance with federal and state requirements or as mandated by WM, provided that such destruction occurs only on the date specified by WM or requested in writing by WM. At WM's request, Company will certify in writing that all WM Information Assets have been returned or destroyed as required in this subsection. Company shall comply with any security requirements of WM regarding the storage, handling and disposal of WM Confidential Information that is in physical form.

## 8.  Disaster Recovery and Business Continuity

Company shall provide WM with documentation of its disaster recovery strategy and/or capability. The description will address actions to be taken in the event of an extended outage of service. (Such an outage could be caused by a number of events ranging from technical hardware/software/network related malfunctions to a catastrophic disaster.)   Prior to the Effective Date of the Agreement, Company will deliver to WM a copy of its disaster recovery and business continuity plan (the "Plan") dated not more than twelve (12) months old. Company will use commercially reasonable efforts to ensure that the Plan will address the following requirements:

8.a.    <u>Content</u> - Company will describe in the Plan the actions and resources required to provide for the continuous operation, and, in the event of an interruption, the recovery of the functions required in the Agreement, including all Agreement-required systems, hardware, software and data that support these functions, within a recovery time objective sufficient to sustain contracted levels of service.   If WM raises issues or concerns regarding the Plan, Company will use reasonable efforts in good faith to address them.

*Confidential Treatment Requested*

LSI2-0429948

Execution Copy

8.b.   Updates - Company will update and resubmit the Plan to WM whenever there are significant or material changes in the Agreement-required systems, recovery strategies, recovery resources, actions described in the Plan, or other information affecting the recovery of Agreement-required functions, but at least once in every twelve (12) month period starting with the Effective Date.

8.c.   Resources - Company will ensure that all continuity and recovery resources, including without limitation systems, facilities, equipment, and personnel as described in the Plan and as needed to perform the Agreement-required services or functions, remain available in sufficient quantities throughout the term of this Agreement.

8.d.   Disaster Reporting - Within two (2) hours of an interruption of an Agreement-required function, Company will provide to the WM designated representative an initial report that includes the nature of the interruption and an estimate of the time it will take to return to Agreement-required service levels.

8.e.   Recovery - Following restoration of Agreement-required functions to normal, Company will provide to the WM designated representative a complete report within ten (10) days of such restoration, including a description of each Agreement-required function interrupted, the time required for recovery and return to Agreement-required service levels, Agreement-required products or services that were not provided or only partially provided as a result of the interruption, the specific corrective action taken, the material effect, if any, on WM and whether or not the Plan was adhered to and, if not, what changes will be made to the Plan.

8.f.   Continuity - Company will continue to meet the terms and requirements of this Agreement through alternative means until the Agreement-required functions are recovered.

8.g.   Plan Testing - Company will test the Plan each time the Plan is revised, but not less than once every twelve (12) months, by using any of several industry-standard testing methods.

8.h.   Reporting - Company will report in writing the results of each Plan test and deliver the test results, certified by Company's authorized officer, to WM within thirty (30) days following completion of the test.  The report must include all errors, omissions, inaccuracies, and outdated information discovered in the Plan, corrective action planned for these errors, omissions, inaccuracies, and outdated information and the date by which corrective actions will be completed.

8.i.   WM's Participation - Company will notify WM at least thirty (30) days in advance of any Plan testing that requires WM's participation. WM will have the option to decide upon the nature and extent of its participation, including the opportunity to participate in the planning and scope of the test.

Confidential Treatment Requested

LSI2-0429949

Execution Copy

EXHIBIT E

KEY PERSONNEL

| Last Name | First Name | Phone Number | Cell Phone | Email Address | Dept/Title | Level of Dedication to WM |
|---|---|---|---|---|---|---|
| Getty | Bob | 412-299-4294 | | rgetty@lsi.fnf.com | Business Development | 100% |
| Janicki | Pat | 412-299-4646 | | pjanicki@lsi.fnf.com | Client Service Mgr | 100% |
| Lemashane | Diane | 412-299-4000 | | dlemashane@lsi.fnf.com | Appraisal Supervisor | 100% |
| Manz | Bonnie | 412-299-4383 | 412-716-7439 | bmanz@lsi.fnf.com | Appraisal Ops | 100% |
| McSheehy | Brian | 412-299-4000 | | bmcsheehy@lsi.fnf.com | Client Service Supervisor | 100% |
| McVay | Suzy | 412-299-4000 | | smcvay@lsi.fnf.com | Appraisal Manager | 100% |
| Prosser | Rick | 412-299-4000 | | rprosser@lsi.fnf.com | Appraisal Trainer | 100% |
| Schneider | Leslie | 412-299-4000 | | lschneider@lsi.fnf.com | Appraisal Team Lead | 100% |
| Jackle | Carlucci | 412-299-4517 | | jcarlucci@lsi.fnf.com | QA Ops Manager | 100% |
| Borowski | Keri | 412-299-4616 | 618-980-5642 | kborowski@lsi.fnf.com | Appraiser Liaison | 80% |
| Alcorn | Bethany | 412-299-4082 | | balcorn@lsi.fnf.com | IT Integration | 50% |
| Cranton | Shane | 949-422-3582 | 714-366-6424 | scranton@lsi.fnf.com | Project Manager | 50% |
| Greve | Joe | 216-328-2055 | 216-374-1866 | jgreve@lsi.fnf.com | Sales Exec | 40% |
| Java | Donna | 412-299-4522 | | djava@lsi.fnf.com | Project Manager | 50% |
| Johnson | Mark | 949-622-4640 | 628-255-1309 | mjohnson@lsi.fnf.com | COO | 20% |
| Meier | MJ | 412-299-4212 | | mimeier@lsi.fnf.com | Quality Assurance | 20% |
| Rice | Kate | 412-299-4312 | 412-716-1279 | krice@lsi.fnf.com | Appraisal Ops | 20% |
| Sanderson | Jeff | 949-622-4614 | | jsanderson@lsi.fnf.com | CTO | 20% |
| Vann | George | 412-299-4000 | 412-716-1534 | gvann@lsi.fnf.com | Chief Appraiser | 20% |
| Pizga | Greg | 412-299-4146 | 412-716-9029 | gpizga@lsi.fnf.com | Legal Counsel | 20% |
| Reid | Bill | 800-756-3524 | | bbreid@lsi.fnf.com | Accounting | 20% |

Page 69 of 73

Confidential Treatment Requested

LSI2-0429950

Execution Copy

## Priority Service Providers

| Last Name | First Name | Phone Number | Cell Phone | Email Address | Dept/Title | Level of Dedication to WM |
|-----------|------------|--------------|------------|---------------|------------|---------------------------|
| Chmielewski | Marci | 412-299-4789 | | machmielewski@lsi.fnf.com | Client Service Supervisor | 100% |
| DelBianco | Sharon | 412-299-4000 | | sdelbianco@lsi.fnf.com | Performance Engineer | 100% |
| Hollick | Dave | 412-299-4000 | | dhollick@lsi.fnf.com | Performance Engineer | 100% |
| Irion | Heather | 412-299-4000 | | hirion@lsi.fnf.com | Client Service Supervisor | 100% |

Page 60 of 73

Confidential Treatment Requested

LSI2-0429951

Execution Copy

## EXHIBIT F

### COMPANY SOFTWARE

As of the Effective Date, there is no Company Software to which WM will be provided access.

Confidential Treatment Requested

LSI2-0429952

Execution Copy

## EXHIBIT G

## GOVERNANCE

No term of this Exhibit G shall relieve the Parties of any obligations under this Agreement. For purposes of this Exhibit G, a subcontractor of Company is not considered another "service provider" of WM separate and apart from Company.

**1.     Purpose of the Governance Model**

The purpose of the Governance Model is to provide Company and WM with a governing document to guide management of the day-to-day relationship between Company and WM with regard to the Services under this Agreement and to encourage Company and WM to work together effectively. However, neither the provisions of the Governance Model, nor the duties of any of the teams created herein, will limit or in any way preclude WM or Company from exercising any of the rights or remedies granted to either of them under this Agreement or at law or in equity, or excuse either Party from performing its other obligations under this Agreement.

**2.     Teams**

The following three teams will operate the Governance Model:

> **Delivery Management Team** (the "DMT", whose roles and responsibilities are detailed in Section 3)

> **Relationship Management Team** (the "RMT", whose roles and responsibilities are detailed in Section 4)

> **Executive Review Team** (the "ERT", whose roles and responsibilities are detailed in Section 5).

**3.     Delivery Management Team**

**3.1 DMT Members** - The Delivery Management Team ("DMT") will be comprised of the following Operations Managers and their successors as appointed from time to time by written notice from the Party replacing its Operations Manager.

> **WM** – Bruce Marshak – FVP, Loan Servicing Strategic Support

> **LSI** –  Bonnie Manz – VP Appraisal Operations

**3.2 Specialist Teams** - If Company utilizes Specialist Teams (e.g. during transition periods or as part of a particular Project or New Service implementation by WM) (the "Specialist Teams"), such Specialist Teams will report to the DMT.

**3.3 DMT Objectives** – The DMT will actively encourage operations and Specialist Team personnel at both the Company and WM to take responsibility for all aspects of the Company's delivery, and WM's efficient use, of the Service(s) assigned to the DMT and to operate as a single operations team. WM's Service needs will be their highest priority. DMT members and operations personnel at both the Company and WM will cooperate to this end.

**Confidential Treatment Requested**                                                                LSI2-0429953

Execution Copy

**3.4 DMT Responsibilities** - Each DMT member will refer any relationship or contractual issue to their respective organization's Relationship Manager, and will not attempt to resolve such issue within the DMT. The DMT is responsible for the following:

A. Manage all operational aspects of Service delivery and supervise Company's delivery of the Services in accordance with this Agreement, including day-to-day responsibility for monitoring compliance with contractual obligations (e.g., compliance with Service Levels, procedures manuals and WM Policies).

B. Monitor the progress of each Specialist Team and provide guidance when necessary.

C. Identify, from a technical and business delivery perspective, Projects within the scope of Services, potential or actual changes to the Services or New Services being planned or considered by the RMT. Ensure that all issues relating to any such change are identified and fully addressed (e.g., transition issues and additional management needed to manage Projects) in a manner protective of WM's operations, and WM's financial and business interests.

D. Integrate Services with services provided by WM or third-party suppliers.

E. Review all incident reports in which Service availability and compliance with Service Levels are implicated or concerned. Determine when a root cause analysis of a Service failure is appropriate. Perform any root cause analysis, including any analysis involving another service provider when appropriate in accordance with Attachment B of this Exhibit, and supervise Company's remediation of all failures involving a Service or that result in/implicate Company's failure to meet the Service Levels.

F. Consider any advisable (and feasible) change (including a change to the Services, or any people, process or technology used to deliver the Services, as a result of, and to address problems or concerns identified through, a root cause analysis, and advise the RMT of same.

G. Prioritize remedial actions based on the importance of affected WM operations and operational impact of lost functionality within the WM environment or any Company environment.

H. Develop rectification and maintain plans and disaster recovery plans and ensure that they are implemented in accordance with the terms of this Agreement.

I. Prioritize the identification, resolution, and escalation of Service Level defaults.

J. Review Company's performance of the Services and prepare reports as directed by the RMT for the RMT quarterly meetings.

K. Escalate major operational and technical problems, issues and risks that cannot be resolved promptly at the DMT level.

**4.   Relationship Management Team**

Confidential Treatment Requested

LSI2-0429954

Execution Copy

**4.1 Members** - The Relationship Management Team (RMT) will be comprised of the following individuals, representing WM and Company, respectively:

    WM – Sushuma Bull – FVP, Home Loans Risk Management

    LSI – Kate Rice - SVP, Title and Appraisal Operations

**4.2    Responsibilities** - The RMT will be principally responsible for the following:

A. Ensure that the actual relationship between the Parties reflects as closely as possible each Party's intentions and achieves the business objectives.

B. Manage the process for changes to the Services, this Agreement, Projects and New Services and any changes to the Governance Model.

C. Review, on at least a quarterly basis, Company's performance, compliance with WM's audit, security and business recovery requirements; all performance reports; and overall customer satisfaction.

D. Supervise any fault analysis, taking into account the results of any root cause analysis (see Attachment B), including any multi-party analysis required for multi-party issues. However, all Company affiliates and any other service providers associated with the issue must agree to first attempt to resolve any issues between themselves without WM's involvement so that WM is not expected to adjudicate between its service providers in the case of a dispute.

E. Ensure compliance with all procedures for changing the Services, or any part of the environment used to deliver the Services, including as a result of any root cause or fault analysis.

F. Resolve any relationship and contractual issues escalated to the RMT, and only escalate any such issue to the ERT after all realistic avenues for resolving the issue have been thoroughly and cooperatively exhausted.

G. Ensure Company is informed of, and understands, the evolving needs of WM's business and keep WM advised of developments in the areas of the outsourced services and technology applicable thereto.

H. Ensure that each Party complies with the Governance Model and does not attempt to manage around it.

5.  **Executive Review Team**

**5.1 – ERT Members** - The Executive Review Team (ERT) will be comprised of the following individuals:

    WM – Joe Healan – SVP, Home Loans Strategic Operations

    LSI – Mark R. Johnson – COO LSI Appraisal, LLC

**Confidential Treatment Requested**

LSI2-0429955

Execution Copy

**5.2 – ERT Responsibilities** – The ERT will be principally responsible for the following:

A.  Create a forum that will enable Company to understand WM's business strategy evolving business needs and give Company an opportunity to contribute to that strategy by providing high-level insight on emerging business trends relevant to WM. Ensure that each Party complies with Governance Model and does not attempt to manage around it.

B.  Meet at least semi-annually for the first twelve (12) months of this Agreement and at least annually thereafter.

C.  Provide guidance and leadership to the relationship as a whole.

D.  Provide the final escalation level on technical, contractual and relationship issues from the DMT and RMT.

## 6. Appointment and Removal of Team Members

As the output, vigor and usefulness of the teams will largely be determined by the commitment, ability and availability of their members, appointment and removal of Company's team members will be governed by the following requirements:

A.  Company will consider the appointment of each Company team member carefully.

B.  Company will maintain similar executive level positions within each team to ensure an appropriate focus and direction is provided to the other.

C.  WM will be entitled to approve (and require removal and replacement of) Company team members. WM will, whenever reasonably practicable, give Company one (1) month written notice in the event it wishes to change a Company team member, unless Company team member violates the WM Code of Conduct whereby removal of the Company team member may be, at WM's discretion, immediate.

## 7. Decisions of Teams

All team decisions will be made in accordance with this Agreement. If this Agreement specifies that an issue will only take effect if agreed between the Parties, then the resolution will only be passed if representatives of both Parties agree. If this Agreement specifies that WM has an approval right or the discretion or this Agreement is silent on a matter, then Company representatives can make suggestions but cannot prevent WM from making a particular decision or force WM to make a particular decision.

## 8. Change Control Procedures

Within seventy-five (75) calendar days after the Effective Date, Company will deliver to WM, in the form and scope agreed upon by WM and Company, a draft of the change control procedures ("Change Control Procedures"), which will be finalized, including by obtaining WM's approval, no later than one hundred twenty (120) calendar days after the Effective Date. On an ongoing basis throughout the Term, Company will update the Change Control Procedures as appropriate or upon WM's request, with WM's review and right to approve any updates to the Change Control Procedures. Company will adhere to the Change Control Procedures in effect

Confidential Treatment Requested                                                         LSI2-0429956

Execution Copy

and documented at the time. WM and Company agree that the Change Control Procedures shall provide, at a minimum, that:

    A. no operational change shall be implemented without WM's prior written approval unless otherwise expressly provided in the Change Control Procedures;

    B. with respect to all operational changes, Company shall: (i) schedule operational changes so as not to unreasonably interrupt WM's business operations, (ii) each month, prepare and deliver to WM a rolling schedule for ongoing and planned operational changes for the next 90-day period, (iii) promptly notify WM of any schedule or impact to the operational changes, and (iv) monitor the status of operational changes against the applicable schedule; and

    C. Company shall update the Change Control Procedures as necessary and shall provide such updated Change Control Procedures to WM for its approval.

**9. Attachments to the Governance Model**

There are several exhibits to this Governance Model. Each Party agrees that it will comply with each of the following Attachments:

    Attachment A – Project Managers' Scope

    Attachment B – Root Cause and Fault Analysis Procedure

    Attachment C – Approvals Procedure

**10. Dispute Resolution**

10.1 In accordance with this Agreement, the Parties shall use commercially reasonable efforts to resolve, promptly and in good faith, any and all disputes that may arise under, or in the course of the administration of, this Agreement.

10.2 It is the intent of WM and Company to resolve disputes and other issues in a constructive manner that reflects the concerns and commercial interests of each Party. Each team or committee shall work in good faith to promptly and fully resolve all disputes or issues submitted for their review. It is also the Parties' intention to have the disputes or issues resolved by the appropriate levels of authority without the need for escalation. From time to time, however, disputes may arise that cannot be resolved despite the best efforts of the members of the applicable team or committee. In such cases, the following steps are to be followed in escalating disputes between the Parties.

10.3 Either Party may decide that escalation is appropriate when resolution of an issue appears unachievable within two (2) business days at the operational level or at the DMT or RMT level if the problem originates at the DMT or RMT level.

10.4 **Escalation Mechanics:** If a resolution is not reached in accordance with Section 10.3 above, the issue will be escalated. If an issue is escalated:

Page 66 of 73

**Confidential Treatment Requested**　　　　　　　　LSI2-0429957

Case: 10-05245    Doc# 373-1    Filed: 02/03/14    Entered: 02/05/14 10:53:25    Page 28 of 44

Execution Copy

    A. **Documentation.** The Parties will jointly develop a short briefing document called 'Statement of Issue for Escalation' that describes the dispute, relevant impact of the dispute, and the position of each Party.

    B. **DMT Authority.** If the issue arises at the operation level, the DMT shall be the initial point of escalation if the dispute involves or relates to Service quality, Deliverable quality, timely performance or other performance-related matters.

    C. **RMT Authority.** If the issue arises at the operational level, the RMT shall be the initial point of escalation if the dispute involves or relates to the Parties' business relationship, such as disputes regarding the scope of Services, billing or payment or personnel.

10.5 **Escalation.**

    A. If the issue is escalated from the operational level, a meeting will be scheduled with the DMT or RMT, as applicable within two (2) business days. Such meeting may be carried out by telephone or video conference. The Statement of Issue for Escalation will be sent in advance to the participants. If, for any reason, including the failure to meet or communicate, the DMT or RMT, as applicable, is not able to resolve the dispute or issue within five (5) business days after initial escalation to such team, the dispute or issue shall be escalated to the ERT.

    B. If the issue arises at the DMT or RMT level and is not resolved in accordance with Subsection 10.4 above, the issue shall be escalated directly to the ERT.

10.6 **Final Resolution.** A meeting will be scheduled with the ERT as promptly as possible. The Statement of Issue for Escalation will be sent in advance to the ERT. If, for any reason, including failure to meet or communicate, the members of the ERT (or any other representatives of the Parties) are unable to resolve a dispute within ten (10) business days after the dispute is first escalated, either Party may proceed to pursue any rights and remedies not prohibited by this Agreement.

10.7 **Documentation.** Upon the resolution of a dispute at any level of escalation, the Parties' decision or resolution thereof shall be documented and the documentation provided to the Relationship Managers of both Parties.

11. **Withheld Fees**

If a dispute arises regarding fees, such dispute shall be immediately referred to the DMT for resolution in accordance with Section 10 of this Exhibit G above.

**Confidential Treatment Requested**

LSI2-0429958

Execution Copy

**Attachment A to Exhibit G**
**Project Managers' Scope**

**Monitoring Compliance with Agreement**

The Project Managers are the delegates of each of Company and WM representatives on the RMT. They are responsible for monitoring day to day compliance with the Agreement. Those issues include the following (and will be updated to reflect any changes to this Agreement):

1. **Performance measurement**

   - Reviewing compliance with the performance requirements

   - Reviewing compliance with cost reduction and efficiency improvement obligations

   - Reviewing status of individual existing or planned Projects

   - Benchmarking

   - Reviewing customer satisfaction survey results

2. **Financial**

   - Reviewing compliance including reviewing invoices against backup documentation

   - Approving Projects and managing adherence to project documents

   - Evaluation and approval of New Services requests

   - Business development monitoring

   - Approve business proposals.

3. **Approvals**

   - Ensuring compliance with approval requirements and facilitating approvals where necessary

   - Implementing processes to ensure approvals are obtained in a timely manner

4. **Reporting and auditing**

   - Reviewing Company compliance with reporting requirements as set out in this Agreement including audit and benchmarking activities

5. **Issue Management**

   - Approving rectification plans and reviewing compliance with those plans

**Confidential Treatment Requested**          LSI2-0429959

Execution Copy

- Identifying and raising issues of concern under this Agreement
- Managing Root Cause and Fault Analysis (see Exhibit B)
- Supervising performance credit regime
- Supervising disaster recovery
- Initiating the dispute resolution process

**Confidential Treatment Requested**                                        LSI2-0429960

Execution Copy

### Attachment B to Exhibit G
### Root Cause and Fault Analysis

1. This procedure describes how the Parties will address any problems and faults affecting Company's performance of the Services in the WM environment, including any failure by Company to provide the Services in conformance with applicable Service Levels ("Problems"). Company agrees to comply fully with this procedure and to deal with issues as they arise.

2. The key principle is that LSI must first work to fix the Problem and only conduct any root cause or fault analysis once the Problem is fixed. Company will utilize the "Management By Fact" process ("MBF") when identifying root causes and implementing countermeasures. With the MBF, the data is researched and analyzed, the performance deficiencies are identified, scoped out, compared to previous months and the Service Levels. After identifying the root causes, procedural changes are implemented centered on the identified countermeasures.

3. As soon as Company becomes aware of a Problem (either because the WM team notifies Company, or as a result of Company monitoring its environment), Company must take responsibility for diagnosing and rectifying the Problem by utilizing the MBF document or other Six Sigma tools.

4. Company will have fulfilled its responsibility to fix the Problem if:

   a. another organization (including possibly WM) that Company reasonably believes will be able to fix the Problem to Company's satisfaction has taken responsibility for the issue ("Third Party Fixer"); and

   b. the Third Party Fixer has undertaken to fix the Problem within a period of time that does not result in any additional material adverse effect on WM and to report regularly to Company on progress for fixing the Problem.

5. However, if at any stage it becomes apparent that the Third Party Fixer will not be able to fix the Problem as required under point 4, Company will again assume responsibility for fixing the Problem from the time at which that becomes apparent.

6. The DMT, with the RMT's supervision, will conduct a root cause analysis, utilizing the MBF document, and procedural changes will be implemented based upon the corresponding countermeasures.

7. If the root cause analysis does not result in a clear picture of the party responsible for the root cause(s), and more than one third-party supplier is involved, the suppliers must agree to first attempt to resolve the issue between them without WM's involvement. WM will not adjudicate between its suppliers in the case of a dispute.

8. If (and only if) the suppliers are not able to resolve the issue under paragraph 7, or if the only parties involved are one supplier and WM, the RMT will conduct fault analysis to determine to what extent each supplier to WM (and possibly WM itself) is or are contractually responsible for the root cause(s). If the parties involved in the root cause analysis or fault analysis do not agree on its outcome, WM's determination will be final.

Confidential Treatment Requested

LSI2-0429961

Execution Copy

9. If Company spends time working on the Problem but the root cause analysis (or fault analysis if conducted) shows that Company was not responsible for the Problem, then:

   a. Company can charge the party who was responsible for the Problem (to the extent of that party's responsibility determined by root cause or fault analysis);

   b. The rate at which Company can charge that party will be based on the skill level of the person or people who worked on the Problem and at the applicable rates for that skill level determined in accordance with this Agreement;

   c. Company will be excused from any resulting breach of Service Levels; and

   d. WM will reimburse Company's charges on behalf of the other party.

10. This same procedure will be contained in WM's agreements with its telecommunications supplier and any other supplier that will provide key services to WM that need to work seamlessly with Company's Services to WM ("Key Supplier"), so that Company can count on those suppliers also being bound to work on fixing Problems first and dealing with root cause and fault analysis later.

11. Company agrees that if any root cause or fault analysis results in Company being responsible for a Problem that another Key Supplier has worked on fixing, then to the extent of Company's responsibility for that Problem, it must pay that Key Supplier for work completing in fixing the Problem.

12. The DMT and /or RMT may look at steps that can be taken to minimize the likelihood of the Problem occurring again.

13. If root cause analysis determines that Company was responsible for the Problem, Company must take any reasonable steps determined during the root cause analysis or as a result of any subsequent recommendation by the DMT or RMT to prevent any recurrence of the Problem occurring again.

Confidential Treatment Requested

LSI2-0429962

Execution Copy

**Attachment C to Exhibit G**
**Approvals Procedure**

A.   If Company is required to obtain WM's approval in relation to any matter, it must comply with the following procedure:

   (1)   **Approving Officer** – If this Agreement or any Exhibit or Attachment to it (such as the procedures manual or scope of Services) specifies the WM person who is authorized to give the approval, Company must obtain that person's approval. In any other case, Company must obtain the consent of the, SVP, Loan Services Support. That person may delegate that approval right to other WM Management from time to time as deemed appropriate.

   (2)   **Escalation** – If Company has used reasonable efforts to seek WM's approval and the approving officer has not responded within the time specified in this Agreement (or, if no time is specified, a reasonable time given the nature and urgency of the matter that requires approval), Company must escalate the matter and seek approval from the SVP, Loan Services Support.

   (3)   **Action** – If, having escalated the matter for approval as required above, Company has not received a response from WM, Company must:

   •   make an assessment of whether acting as if the approval has been given or rejected would be in WM's better interest;

   •   take the action determined above to be in WM's better interest;

   •   use its commercially reasonable efforts to mitigate any loss to WM arising as a result of Company taking the action referred to above; and

   •   notify the WM Senior Vice President, immediately of the action taken.

   Provided Company complies with the procedure set out above, Company will not be liable to WM for any breach of any performance requirement or other breach of this Agreement caused solely by the fact that WM did not give the approval sought by Company.

**Confidential Treatment Requested**          LSI2-0429963

Execution Copy

## EXHIBIT H

### WM POLICIES AND PROCEDURES

This Exhibit H consists of the following two WM policies: Vendor Code of Conduct; and Working
with WaMu, provided as separate documents and incorporated by this reference.

Confidential Treatment Requested                                LSI2-0429964

First Amendment to Appraisal Outsourcing Services Agreement
between
WaMu
and
LSI Appraisal, LLC

This First Amendment (this "First Amendment") to the Appraisal Outsourcing Services Agreement is entered into by and between WaMu (as defined in the signature block below) and LSI Appraisal, LLC ("Company") effective as of June 29, 2007 (the "First Amendment Effective Date").

## BACKGROUND

A.     The Parties have entered into the Agreement having an effective date of October 16, 2006 (the "Agreement") pursuant to which Company performs certain services, for and on behalf of WaMu in connection with residential mortgage loans made by WaMu.

B.     The Parties now desire to amend the Agreement to provide for correcting the Initial Term.

Now, therefore, in consideration of the mutual promises and covenants contained in this Amendment, the Parties hereby agree to amend the Agreement as follows:

## TERMS AND CONDITIONS

1.     In Section 9.1, in the second line, change the word "first" to "second".

2.     All capitalized terms used in this First Amendment that are not defined herein shall have the meaning given to them in the Agreement. Except as expressly set forth above, all terms of the Agreement remain unmodified and in full force and effect. In the event of a conflict between the terms and conditions of the Agreement and this First Amendment, the terms and conditions of this First Amendment shall govern. The Agreement, as amended by this [First] Amendment, constitutes the complete and entire understanding of the Parties with respect to the subject matter hereof.

Each of the Parties has executed this First Amendment by its duly authorized representative.

**WaMu**
Washington Mutual Bank, a federal savings association

By: _____
Name: J Gorzalski
Title: CPC

**Company**
LSI Appraisal, LLC

By: _____
Name: _____
Title: Chief _____

**Confidential Treatment Requested**                    LSI2-0406630

**EXHIBIT B**

# EXHIBIT

# "B"

Execution Copy

## PERFORMANCE GUARANTY AGREEMENT

THIS PERFORMANCE GUARANTY AGREEMENT is made and entered into as of the 16th day of October, 2006 ("Effective Date"), by and between FIDELITY NATIONAL TAX SERVICE, INC., a California corporation ("Guarantor"), and WASHINGTON MUTUAL BANK, a federal savings association ("WM").

### WITNESSETH:

WHEREAS, WM and LSI Appraisal, LLC ("LSI") are entering into that certain Appraisal Outsourcing Services Agreement of even date herewith (the "Agreement") for LSI to provide certain services to WM. The defined term "Agreement" shall include any amendments, modifications, change orders, statements of work, extensions of time, supplements, and exhibits (along with all documents of like type or effect and all documents referenced therein) to the Agreement;

WHEREAS, Guarantor is the corporate parent company of LSI;

WHEREAS, as a condition to the execution of the Agreement, WM has required that Guarantor execute this Performance Guaranty Agreement; and

WHEREAS, Guarantor is willing to guarantee to WM the performance of LSI to include all obligations and undertakings by LSI as the same may be amended from time to time under the Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.      Guarantor hereby unconditionally and irrevocably guarantees to WM due performance of all obligations undertaken by LSI in connection with the Agreement, and all obligations undertaken by LSI in the Agreement are incorporated herein by reference, the same as if set forth herein in full.

2.      This Performance Guaranty Agreement shall continue in full force and effect until the Agreement has been fully performed and shall include all obligations under the Agreement.

3.      This Performance Guaranty Agreement shall be one of guaranty as well as one of performance. WM shall be required to first pursue remedies against LSI before involving the benefits of this Performance Guaranty Agreement.

4.      This Performance Guaranty Agreement shall be a continuing guaranty and (whether or not Guarantor shall have notice or knowledge of any of the following, notice of such being hereby expressly waived) the liability and obligation of Guarantor hereunder shall be absolute and unconditional and shall remain in full force and effect

DOCSSEA/141347.3A

1

Confidential Treatment Requested

LSI2-0429889

Execution Copy

without regard to, and shall not be released, discharged, diminished, limited, or in any way impaired by:

(a)   any amendment, modification, change order, extension of time, or supplement to the Agreement duly executed by LSI, unless LSI is no longer owned by Guarantor, or one of its affiliates, at the time of the amendment, modification, change order, extension of time, or supplement to the Agreement;

(b)   any exercise or nonexercise of any right, power, remedy, or privilege under or in respect of the Agreement or other contract documents or this Performance Guaranty Agreement or any other indulgences, forbearances, or extensions of time for performance or observance allowed to LSI except that, to the extent such is a defense for LSI, such shall also be a defense for Guarantor; or

(c)   any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation, or similar proceeding relating to LSI or its properties or creditors.

5.   This Performance Guaranty Agreement shall be binding upon Guarantor, its successors and assigns, and shall inure to the benefit of WM and its respective successors and assigns.   Guarantor may not assign its obligations under this Performance Guaranty Agreement, by operation of law or otherwise, without the advance written consent of WM.

6.   Notwithstanding anything contained herein to the contrary, the obligations of Guarantor hereunder shall not be construed to be broader than the obligations of LSI pursuant to the Agreement, and all defenses, excuses, and limitations, including, but not limited to, limitations of liability and damages, and other rights of LSI with respect to LSI's obligations available to LSI under the Agreement, shall also be available to the Guarantor, except for bankruptcy or insolvency of LSI.   All payments made by LSI to WM under the Agreement and by Guarantor under this Performance Guaranty Agreement shall be aggregated for purposes of liability limitations applicable to LSI under the Agreement.

7.   This writing is intended by the parties as the final, complete, and exclusive statement of the terms of this Performance Guaranty Agreement.   No course of dealing between the parties, no usage of the trade, and no parol or extrinsic evidence of any nature shall be used or be relevant to supplement, explain, or modify any term used herein.   If any provision of this Performance Guaranty Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Performance Guaranty Agreement shall not be affected.

8.   This Performance Guaranty Agreement may not be amended, changed, or discharged without the written approval, expressly referring to this Performance Guaranty Agreement, of both WM and Guarantor, and no such amendment, change, or discharge shall extend to, affect, or impair any right with respect to any liability or obligation that is not expressly dealt with therein.   The terms and conditions of this

DOCSSEA\141347.3A

2

Confidential Treatment Requested

LSI2-0429890

Execution Copy

Performance Guaranty Agreement shall be effective only and automatically upon the
Effective Date.

  9.    This Performance Guaranty Agreement shall be construed and governed
in accordance with the laws of the State of New York without reference to the conflicts
of laws principles thereof.

  10.   GUARANTOR AND WM IRREVOCABLY WAIVE ALL RIGHT TO A
TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR
AGAINST GUARANTOR OR WM IN RESPECT OF THIS PERFORMANCE
GUARANTY AGREEMENT OR ARISING OUT THE LIABILITIES GUARANTIED BY
THIS PERFORMANCE GUARANTY AGREEMENT.

  IN WITNESS WHEREOF, Guarantor and WM have caused this Performance
Guaranty Agreement to be signed and delivered by their duly authorized officers, all as
of the Effective Date.

FIDELITY NATIONAL TAX SERVICE, INC.

By: _____
Name: RON FRAZIER
Title: SVP

WASHINGTON MUTUAL BANK

By: _____
Name: _____
Title: _____

DOCSSEA/141347.3A                                                       3

Confidential Treatment Requested                            LSI2-0429891

EXHIBIT C

# EXHIBIT

## "C"

| ID NUMBER | ORIG LOAN AMT | LOSS AMOUNT | PROPERTY ADDRESS | LOAN DATE | CITY NAME | ST | APPRAISER | MAJOR APPRAISAL DEFICIENCIES |
|---|---|---|---|---|---|---|---|---|
| 3062776079 | $2,475,000.00 | $542,957.68 | 23768 DARKHORSE DR | 7/11/2006 | AUBURN | CA | Martin B. Carle; David Brinkman | 4, 6, 7, 11 |
| 3061501508 | $685,000.00 | $406,417.11 | | 7/31/2006 | RANCHO MIRAGE | CA | Bernard J Crawford | 3, 4, 7, 8, 11 |
| 3011096666 | $1,880,000.00 | $1,530,626.05 | 1331 BRICKELL BAY DR | 9/15/2006 | MIAMI | FL | Guillermo Pina | 2, 3, 8, 11 |
| 651844201 | $420,000.00 | $412,665.68 | 6741 E MOCKINGBIRD LN | 9/15/2006 | PARADISE VALLEY | AZ | Nathan D Bennett | 2, 3, 4, 7, 8, 9, 11 |
| 3010595886 | $1,690,000.00 | $524,791.56 | 1190 TERRACE CT | 9/18/2006 | GLENCOE | CA | Alan E Gross | 2, 4, 8 |
| 3010377292 | $2,940,000.00 | $1,133,186.96 | 845 UNITED NATIONS PLAZA | 9/21/2006 | NEW YORK | NY | Robert Fuller | 2, 4, 7 |
| 688161181 | $496,500.00 / $2,000,000.00 | $497,403.53 | 11239 SKYVIEW LN | 9/26/2006 | RANCHO CUCAMONGA | IL | John Boscok; Thomas D. Mullins | 3, 4, 7, 8, 11 |
| 3010613390 | $125,000.00 / $596,000.00 | $1,203,669.72 | 471 BAYSHORE DR | 9/27/2006 | NOKOMIS | FL | Naji Hakim | 3, 4, 9 |
| 729550625 | $149,000.00 | $267,795.12 | 444 ARLINGTON HEIGHTS RD | 9/27/2006 | ARLINGTON HEIGHTS | IL | Vlad Shneyderman | 2, 4, 8, 11 |
| 752112597 | $470,503.00 | $468,848.94 | 5724 TAMPA AVE | 9/29/2006 | TARZANA | CA | Christopher C. Sotree | 1, 3, 4, 5, 7, 8 |
| 3011107855 | $1,425,500.00 | $617,342.75 | 312 BONAIR WAY | 9/29/2006 | LA JOLLA | CA | Judy E. Vieira-Rea | 2, 3, 4 |
| 713046027 | $750,000.00 | $744,603.86 | 61 SUMMER HOUSE | 10/10/2006 | IRVINE | CA | John French | 1, 2, 3, 4, 6, 9 |
| 3011331521 | $1,500,000.00 | $545,256.44 | CIRCLE LAKE TRAIL | 10/18/2006 | FARIBAULT | MN | Gerald M Otre | 1, 4, 7, 8, 9 |
| 670638303 | $725,000.00 | $725,000.00 | 221 CHABOYA HILLS CT | 10/20/2006 | San Jose | CA | Jack A. LaVerde | 1, 4, 7, 8 |
| 3011682857 | $2,020,000.00 | $841,860.40 | 5831 MARINER ST | 10/23/2006 | TAMPA | FL | Colleen E Millott | 2, 3, 4, 7, 11 |
| 3011612119 | $1,312,500.00 | $550,749.76 | 17874 LAKE AZURE WAY | 10/26/2006 | BOCA RATON | FL | George J Sanchez Sr. | 1, 2, 3, 4, 7, 11 |
| 3010977104 | $2,340,000.00 | $1,014,467.69 | 1685 MAIN ST | 10/27/2006 | EAST MARION | NY | Sumit Rajpal | 2, 4, 8, 9 |
| 3011637923 | $1,464,500.00 | $863,914.73 | 101408 SCENIC HWY 30A | 10/31/2006 | SANTA ROSA BEACH | FL | Marcia Corcora Robert | 1, 2, 4, 5, 8 |
| 3011615345 | $1,150,000.00 | $537,245.63 | 2289 TRAVILAH RD | 11/1/2006 | POTOMAC | MD | Kuldeep S Gill | 1, 2, 4, 5 |
| 728950783 | $700,000.00 | $688,212.57 | 808 BRICKELL KEY DR APT 304 | 11/2/2006 | MIAMI | CA | Anthony Chang | 2, 3, 4, 7, 11 |
| 729677948 | $960,000.00 / $240,000.00 | $223,651.19 | 2651 REDLANDS DR | 11/3/2006 | COSTA MESA | CA | Edward Ptacek; Elsyeth Eisele | 2, 3, 4, 7, 8, 11 |
| 3011789296 | $1,440,000.00 / $1,680,000.00 / $207,500.00 | $592,756.78 | 1824 CLEVELAND RD | 11/6/2006 | MIAMI BEACH | FL | Gonzalo G. Ruiz; Suvin Decastro | 1, 7, 8 |
| 3011682626 | $937,500.00 / $186,250.00 | $682,996.39 | 6044 KINGSMILL TERRACE | 11/6/2006 | DUBLIN | CA | Robert Mitchell | 1, 2, 3, 4, 11 |
| 3011792755 | $538,850.00 | $470,343.08 | 3467 COLLONADE DR | 11/7/2006 | WELLINGTON | FL | Guillermo Pina | 2, 3, 4 |
| 729684191 | $417,500.00 | $330,887.68 | 1002 SW MIAMI | 11/8/2006 | SOUTH MIAMI | FL | Diego R. Lopez | 1, 2, 3, 4, 11 |
| 3017731167 | $1,520,000.00 | $803,045.30 | 7820 HAWTHORNE AVE | 11/8/2006 | MIAMI BEACH | FL | Gonzalo G. Ruiz | 1, 2, 3, 8, 9, 11 |
| 3011744815 | $1,650,000.00 | $1,090,776.95 | 200 MASANABO LN | 11/8/2006 | FORT MYERS | FL | Michael A. Long | 3, 7, 8 |
| 3011466783 | $645,000.00 | $239,228.59 | 4912 99TH ST | 11/13/2006 | CORONA | NY | Margaret Young | 3, 4, 8 |
| 3011101577 | $2,080,000.00 | $902,926.66 | 6948 WOODROW WILSON DR | 11/13/2006 | LOS ANGELES | CA | Sean R. Copeland | 2, 3, 4, 5, 7, 8 |
| 742673309 | $490,000.00 | $474,767.03 | 515 ACACIA AVE | 11/17/2006 | CORONA DEL MAR | CA | Paul H. Ghaffari | 2, 4, 7, 8, 11 |
| 3011356344 | $920,000.00 | $684,903.75 | 9427 HIGHLAND CT | 11/20/2006 | DAVISON | MI | David B. Juhl | 2, 3, 4, 7, 8, 11 |
| 3010957249 | $1,722,500.00 | $587,007.69 | 25 FOUR COLUMNS DR | 11/20/2006 | MARLBORO | NJ | Barry McBriar | 2, 3, 4, 5, 7, 8 |
| 3011875584 | $3,750,000.00 | $2,853,725.63 | 796 REEF RD | 11/22/2006 | VERO BEACH | FL | Michael Bottalico | 2, 3, 4, 5, 11 |
| 3012208991 | $1,575,000.00 | $746,329.49 | 74 BLACK ROCK TURNPIKE | 11/27/2006 | REDDING | CT | Ronald McInerrrey Jr | 1, 2, 3, 4, 8 |
| 743056052 | $565,000.00 | $486,255.60 | 14 LANDMARK DR | 11/28/2006 | BRIDGEWATER | CT | Arthur Parrish | 3, 4, 7, 8 |
| 3012254185 | $500,000.00 | $478,242.08 | 11335 NW 18TH CT | 11/28/2006 | PLANTATION | FL | Mc.Scott Cooley | 2, 3, 4 |
| 3011876711 | $2,512,500.00 | $1,112,856.94 | 1331 BRICKELL BAY DR | 11/29/2006 | MIAMI | FL | Bryan Regueiro | 2, 3, 8 |
| 736654443 | $2,640,000.00 | $1,150,945.26 | 5434 WATER WAY | 11/29/2006 | MIAMI BEACH | FL | Johnathan M Tejeda | 2, 3, 4 |
| 743639138 | $3,000,000.00 | $2,353,960.64 | 335 S VAN NESS AVE | 11/30/2006 | PASADENA | CA | Shavon Rose | 1, 3, 4, 7, 8, 11 |
| 691476010 | $720,000.00 | $497,608.15 | 1489 SAN PASQUAL | 12/7/2006 | LOS ANGELES | CA | Paul Roy | 2, 3, 4, 7, 8, 11 |
| 735904219 | $250,000.00 | $716,710.49 | 501 PALACIO DE AVILA | 12/8/2006 | TAMPA | FL | Karen Jay | 3, 4, 8 |
| 3011730607 | $1,980,000.00 | $432,171.51 | 41 STOWE | 12/8/2006 | IRVINE | CA | Deena Clem | 2, 4, 7, 8, 11 |
| 3011394270 | $4,000,000.00 | $696,663.05 | 2579 BRIDLE PATH DR | 12/12/2006 | GILROY | CA | Merdad Sanjideh; Kian Sanejideh | 3, 4, 7, 8, 11 |
| | | $1,750,468.51 | 9212 NIGHTINGALLE DR | 12/13/2006 | LOS ANGELES | CA | Ed Schaar Jr. | 1, 2, 3, 4, 8 |