e.  The Commonwealth's Department of Financial Institutions ("DFI"), to assist
       in regulatory and educational efforts targeting financial services institutions
       subject to DFI's jurisdictional oversight, and consumers purchasing products
       and services from such institutions;

   f.  The Commonwealth's Department of Public Health, to support and maintain
       consumer safety and injury prevention programs, including but not limited to,
       lead abatement programs affecting low income individuals or communities;
       and

   g.  Within the discretion of the Attorney General, any other organization or entity
       substantially able to implement, manage, develop or support any program
       consistent with the aims of this settlement.

Funds directed to any agency, organization or entity by the Attorney General pursuant to
the terms of this paragraph shall be appropriated, administered and expended consistent
with the terms of KRS Chapter 48, as applicable.

## LOUISIANA

Said payment shall be payable to the Louisiana Department of Justice Consumer
Enforcement Fund and shall be used for investigation of mortgage and foreclosure
matters, consumer protection law enforcement and education, litigation funds, public
protection, reimbursement of costs and fees associated with the investigation of this
matter, ensuring compliance under the terms of this agreement, federal, and state
regulations,  or for any other purpose, at the direction of the Attorney General, as
permitted by state law.

## MARYLAND

The settlement amount of $59,697,470.00 shall be paid for the benefit of the citizens of
the State of Maryland, of which the maximum of 10%, or $5,969,747.00, shall be paid to
the Office of the Attorney General of Maryland as a civil penalty to be deposited in the
General Fund of the State of Maryland.  The balance of $53,727,723.00 shall be held in
trust pursuant to paragraph 1.b. of Exhibit B to the Consent Order, to be disbursed only as
directed by the Office of the Attorney General of Maryland and to be used only for
housing and foreclosure-relief purposes and for related investigations and enforcement
activities.  These purposes and activities may include, but are not limited to, the provision
of housing counseling, legal assistance, criminal or civil investigations of fraud related to
housing and the securitization of mortgage loans, enforcement activities, foreclosure
prevention, foreclosure remediation, restitution, and programs to address community
blight or to fund other programs reasonably targeted to benefit persons harmed by
mortgage fraud.

B2-10

## MASSACHUSETTS

Payment to Massachusetts ("the Payment") shall be payable to the Commonwealth of Massachusetts and directed to the Office of the Attorney General, and shall be used, consistent with this paragraph, to provide consumer and community relief to remedy the alleged unfair and deceptive acts and practices that gave rise to this Consent Decree, allocated as follows:

a) $4.4 million shall be paid as a civil penalty pursuant to G.L. c. 93A, § 4;

b) $1.0 million shall be paid as costs and attorneys fees pursuant to G.L. c. 93A, § 4;

c) $1.5 million shall be used for the administration of the terms of this Consent Judgment, monitoring compliance with the terms of this Consent Judgment and enforcing the terms of this Consent Judgment, assisting in the implementation of the relief programs and servicing standards as described in this Consent Judgment, and supporting the Attorney General's continuing investigation into misconduct in the origination, servicing, and securitization of residential mortgage loans; and

d) the remainder of the Payment shall be used to establish the Consumer and Community Foreclosure Relief Fund ("the Fund") which shall be used, in the sole discretion of the Attorney General, to fund or assist in funding programs intended to avoid preventable foreclosures, mitigate the effects of foreclosures on borrowers and communities, provide compensation to borrowers, other persons and communities arising out of alleged unfair or deceptive acts or practices that gave rise to the Consent Decree, and/or enhance law enforcement efforts to prevent and prosecute financial fraud or unfair or deceptive acts or practices. The Fund may further be used to provide consumer education, outreach, local consumer aid funds, consumer protection enforcement funds, and public protection funds or for other uses permitted by state law.

## MAINE

Funds paid to the Maine Bureau of Consumer Credit Protection shall be deposited in the nonlapsing, dedicated account authorized to accept funds from any public or private source as described in 14 MRS § 6112(4) to fund the Bureau's foreclosure prevention program. Amounts paid to the Maine Attorney General shall be used to fund foreclosure diversion programs including the Bureau of Consumer Credit Protection's foreclosure prevention program and to legal aid organizations for direct legal services to consumers in support of foreclosure prevention efforts, to defray the costs of the inquiry leading hereto or for other uses permitted by state law at the sole discretion of the Attorney General

## MICHIGAN

Payment shall be forwarded at the direction of the Michigan Attorney General.  Said payment shall be used for attorneys' fees and other costs of the inquiry leading hereto, and other uses as are consistent with state law and this consent judgment.

## MINNESOTA

The State of Minnesota shall use the funds paid pursuant to Exhibit B-1 ("Minnesota Direct Payment Funds") to provide restitution to Minnesota residents who were harmed by Defendant's origination, servicing, or foreclosure practices.  The Minnesota Direct Payment Funds shall be deposited into an interest-bearing escrow account.  The reasonable expenses of the escrow account and for developing, administering, and implementing the restitution plan, including the expenses of settlement administration and independent claims review, may be paid with Minnesota Direct Payment Funds.  After full and fair restitution has been paid to individuals harmed by Defendant's practices as set forth above, any amount remaining shall be deposited into the State of Minnesota General Fund.  Defendant shall provide to the settlement administrator retained by the Minnesota Attorney General to administer the Minnesota Direct Payment Funds (the "Settlement Administrator") all information already in its possession and readily available that is reasonably necessary for the administration of the Minnesota Direct Payment Funds, within a reasonable time after receipt of the request for the information.   Information pertaining to individual borrowers who may be eligible for payments under the Minnesota Direct Payment Funds, including names and other identifying information and information necessary to verify or corroborate claims for restitution of Minnesota borrowers, shall be provided to Minnesota so long as such information is used solely for the purpose of contacting eligible borrowers, responding to inquiries from borrowers regarding their eligibility for Minnesota Direct Payment Funds, and/or complying with tax reporting and withholding obligations, if any.  Appropriate information security protocols, including prior borrower authorization where applicable, shall be utilized to ensure the privacy of borrower information and compliance with all applicable privacy laws.

## MISSISSIPPI

The settlement payment for the State of Mississippi in the amount of $13,580.374.00 shall be distributed to the Mississippi Attorney General for disbursements in accordance with the terms of the Consent Judgment to which this Exhibit refers.

## MISSOURI

The Escrow Agent shall pay $39,583,212 to the State of Missouri:

a.  $38,583,212 to the State of Missouri Office of the Attorney General and
b.  $1,000,000 to the state of Missouri Office of the Attorney General to the credit  of the Merchandising Practices Revolving Fund for advocacy of consumers

impacted by the practices addressed in this Consent Judgment, for the investigation and prosecution of persons involved in unfair, deceptive and fraudulent practices related to financial services, and for such other purposes as authorized by law.

## MONTANA

Pursuant to ¶ 1(b) of Exhibit B to the foregoing Consent Judgment, the sum of $4,858,276 shall be distributed to the state consumer protection account for the Montana Department of Justice, according to wire transfer instructions to be provided by the Montana Attorney General's Office to the Trustee.

The sum of $450,000 shall be for civil fines, costs and fees pursuant to Mont. Code Ann. § 30-14-143.

The remaining funds shall be used, at the sole discretion of the Attorney General of Montana, for purposes intended to avoid preventable foreclosures, to ameliorate the effects of the foreclosure crisis, and to enhance law enforcement efforts to prevent and prosecute financial fraud, or unfair or deceptive acts or practices. These purposes include but are not limited to, funding for housing counselors, state and local foreclosure assistance services, state and local foreclosure mediation programs, legal assistance, and funding for training and staffing of financial fraud or consumer protection enforcement efforts.

## NEBRASKA

The Nebraska Attorney General, on behalf of the State of Nebraska, directs that Nebraska's portion of the Direct Payment Settlement Amount, pursuant to Exhibit B, Paragraph (1)(b) of the attached Consent Judgment, be distributed to the following, to be used for any purpose(s) allowed pursuant to said Consent Judgment: State of Nebraska-Cash Reserve Fund (11000).

## NEVADA

Funds shall be directed to the Nevada Attorney General to be deposited into an account and used for the following purposes: avoiding preventable foreclosure, ameliorating the effects of the mortgage and foreclosure crisis in Nevada, enhance consumer protection and legal aid efforts, enhance consumer financial and housing counseling assistance including economic education and/or instruction on financial literacy for the benefit of Nevada residents, enhance law enforcement efforts to investigate, prosecute and prevent financial fraud or unfair or deceptive acts or practices at the sole discretion of the Attorney General. The aforementioned account shall be interest bearing and all accrued interest shall stay with the account for the above enumerated purposes.

## NEW HAMPSHIRE

B2-13

The funds received by the New Hampshire Attorney General pursuant to this agreement shall be deposited in the consumer escrow account at the Department of Justice and used at the sole discretion of the New Hampshire Attorney General for the protection of consumers in the State of New Hampshire. The permissible purposes for allocation of the funds include, but are not limited to, funding for housing counselors, state and local foreclosure assistance programs, state and local foreclosure mediation programs, legal assistance, funding for training and staffing of financial fraud and/or consumer protection enforcement efforts, supplementing the amounts paid to state homeowners under the Borrower Payment Fund, and civil penalties.

## NEW JERSEY

New Jersey plans to apply its share of the settlement proceeds for its attorneys' fees, investigation costs and other expenses related to the investigation and resolution of this matter as well as on one or more of the following programs: Affordable Housing, Local Planning Services, Developmental Disabilities Residential Services, State Rental Assistance Program, Homelessness Prevention, Shelter Assistance, Community Based Senior Programs, Mental Health Residential Programs, Social Services for the Homeless, and/or Temporary Assistance for Needy Families

## NEW YORK

The State Payment Settlement Amount for New York, set forth in Exhibit B-1 to this Consent Judgment ("New York Settlement"), will be paid to the Office of the Attorney General of the State of New York ("NYOAG") by certified check payable to the State of New York, Department of Law and deposited by the NYOAG in an account that may be used, as determined by the NYOAG, to address matters relating to housing, lending, mortgage defaults, foreclosures, or the mortgage crisis, including without limitation consumer assistance, investigation, enforcement operations, litigation, public protection, consumer education, or local consumer aid, and for penalties, costs, fees, or any other use permitted under law. The New York Settlement shall be disbursed by the NYOAG in its sole discretion and at its direction consistent with the terms of this Consent Judgment. The certified check shall be delivered to:

> New York State Office of the Attorney General
> 120 Broadway, 25th Floor
> New York, New York 10271-0332
> Attn.: Scott Wilson, Senior Advisor and Special Counsel

## NEW MEXICO

Funds allocated to the Attorney General of the State of New Mexico shall be expended, in the sole discretion of the Attorney General, primarily for programs to avoid preventable foreclosures and ameliorate the effects on homeowners of the foreclosure crisis, including without limitation, funding for housing counselors, establishment of a state foreclosure assistance hotline, state and local foreclosure mediation programs, legal

Case: 10-05245   Doc# 374-3   Filed: 02/06/14   Entered: 02/07/14 12:52:43   Page 5 of 55

assistance for homeowners facing foreclosure, funding for administrative oversight for and coordination of funded programs by the Attorney General, and to enhance law enforcement efforts to prevent and prosecute financial fraud or unfair or deceptive acts or practices.

## **NORTH CAROLINA**

For the payment of settlement funds pursuant to Paragraph III (3) of the Consent Judgment and in accordance with the provisions of Paragraph 1 (b) of Exhibit B to the Consent Judgment, North Carolina Attorney General Roy Cooper sets forth the following funding allocations for the State of North Carolina's settlement payment and directs the Escrow Agent to pay said funds as follows:

- $5.74 million to be allocated as civil penalties payable to the Civil Penalty and Forfeiture Fund pursuant to N.C. Gen. Stat. § 115C-457.2 and Article 9, Section 7 of the North Carolina Constitution;

- $30.60 million to the North Carolina Housing Finance Agency for distribution as follows: (a) $19.12 million to be allocated to housing counseling providers to ensure that North Carolina homeowners receive the benefits due under this Consent Judgment, and to ensure the availability of homeownership and foreclosure prevention counseling services in North Carolina; (b) $11.47 million to be allocated to legal services providers in North Carolina for legal representation and assistance to North Carolinians in foreclosure or other housing or lending-related matters;

- $6.69 million to the Conference of District Attorneys of the North Carolina Administrative Office of the Courts to administer a program of grants among the prosecutorial districts in North Carolina for the purpose of expanding prosecution of lending and financial crimes, and expanding prosecution and investigative abilities in those areas, and obtaining training relating to lending and financial crimes;

- $2.87 million to the North Carolina State Bureau of Investigation to expand its accounting and financial investigative ability and its expertise to investigate financial and lending crimes;

- $4.78 million to the North Carolina Department of Justice to enable its Consumer Protection Division to hire attorneys, investigators, financial accountants and other specialists and staff as needed in order to increase its efforts to investigate and pursue cases related to financial fraud and unfair or deceptive trade practices in mortgage lending and financial services, and to assure public awareness of consumers' eligibility for relief under the Consent Judgment and address consumer need for information;

Case: 10-05245    Doc# 374-3    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 6 of 55

- $8.6 million to the general fund of the State of North Carolina as compensation for costs and economic losses sustained by the State due to mortgage fraud and foreclosure misconduct.   (It is anticipated that an additional $1 million will be paid to the general fund of the State of North Carolina in the form of attorneys fees.)

To the extent there are funds remaining or unallocated under the allocations set forth above, the Escrow Agent is directed to distribute such funds to the North Carolina Housing Finance Agency for it to distribute consistent with the purposes outlined above. If North Carolina's settlement payment amount is reduced for unanticipated reasons, the individual allocations set forth above will each be reduced by the corresponding percentage amount.

## **NORTH DAKOTA**

The settlement payment to the State of North Dakota shall be paid to the North Dakota Attorney General, and shall be used, in the Attorney General's discretion, to fund housing remediation projects designed to create more affordable and available housing or lodging in areas where more housing or lodging is needed, including creating available housing or lodging for personnel in law enforcement, emergency response, *et cetera*, and to compensate the state for attorney's fees and costs resulting from the alleged unlawful conduct of the Defendants.

## **OHIO**

Ohio's share of the Direct Payment Settlement Amount shall be distributed and delivered to the office of the Ohio Attorney General, and shall be placed in the following two funds:

1. $90,783,033.00 in the Attorney General Court Order Fund pursuant to section 109.111 of the Ohio Revised Code. The funds shall be transferred, distributed, disbursed, or allocated for the purposes described in Paragraph 1(b)(i) of Exhibit B of the Consent Judgment, including the costs of the Ohio Attorney General in administering this settlement and fund. Interest or other income earned on this account shall also be transferred, distributed, disbursed, or allocated for the purposes described in Paragraph 1(b)(i) of Exhibit B of the Consent Judgment and for the costs of the Ohio Attorney General in administering this settlement and fund.

2. $2,000,000.00 shall be placed in the Consumer Protection Enforcement Fund created pursuant to section 1345.51 of the Ohio Revised Code. The funds shall be used for the purposes described in section 1345.51.

## **OREGON**

B2-16

1.1    Payment.  Servicers shall make available a total sum of Twenty-Nine Million
Two Hundred Fifty-Three Thousand One Hundred Ninety Dollars ($29,253,190) for
payment to the State of Oregon, allocated as follows:

   (a) Four Million Dollars ($4,000,000) shall be deposited into the Oregon Department
       of Justice Operating Account established pursuant to ORS 180.180.

   (b) Twenty-Five Million Two Hundred Fifty-Three Thousand One Hundred Ninety
       Dollars ($25,253,190) shall be deposited into the General Fund with a
       recommendation to the Oregon Legislative Assembly that such funds be used for
       housing and foreclosure relief and mitigation as set forth in this Consent
       Judgment.

## PENNSYLVANIA

The Attorney General of the Commonwealth of Pennsylvania ("Attorney General")
directs that the State Payment Settlement Amount, as that term is used in Exhibit B of
this Consent Judgment ("Settlement Amount"), be distributed to the Office of Attorney
General, to be allocated by the Attorney General, at her sole discretion, to the Office of
Attorney General and the Pennsylvania Department of Banking to further their respective
educational and law enforcement purposes; and the balance to be allocated by the
Attorney General, at her sole discretion, to appropriate programs that help Pennsylvania
homeowners avoid foreclosure. The amount, timing, and manner of the allocation of the
Settlement Amount shall be at the sole discretion of the Attorney General.

## RHODE ISLAND

The Rhode Island Attorney General shall receive all state government designated funds
paid under this agreement. Said funds shall be held in separate accounts and must be used
solely for mortgage foreclosure related issues and/or consumer education, outreach,
training or related consumer issues as determined by the Rhode Island Attorney General

## SOUTH CAROLINA

With respect to the State of South Carolina's payment, said payment shall be used by the
South Carolina Attorney General for a consumer protection enforcement fund, consumer
education fund, consumer litigation fund, local consumer aid fund, or revolving fund; for
consumer restitution, including the administrative costs thereof; for attorneys' fees and
other costs of investigation and litigation; for reimbursement of state agencies; for cy pres
purposes; or for any other uses not prohibited by law.  The South Carolina Attorney
General shall have sole discretion over the distribution of the funds.

## SOUTH DAKOTA

Said payment shall be used by the Attorneys General for attorney fees and other costs of
investigation and litigation, or to be placed in, or applied to, the consumer protection

Case: 10-05245    Doc# 374-3    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 8
of 55

enforcement fund, consumer education or litigation, to defray the costs of the inquiry leading hereto, or may be used to fund or assist in funding housing counselor programs, foreclosure assistance personnel, foreclosure mediation programs, legal assistance and funding for training and staffing of financial fraud or consumer protection enforcement efforts, civil penalties or for other uses permitted by state law, at the sole discretion of the Attorney General

## TENNESSEE

The settlement amount of $41,207,810.00 shall be paid for the benefit of the citizens of the State of Tennessee, of which the maximum of 10%, or $4,120,781.00, shall be paid to the general fund of the State of Tennessee as a civil penalty. The remaining $37,087,029.00 shall be paid to the Office of the Attorney General of Tennessee and shall be used for purposes consistent with applicable provisions of the consent judgment as directed by the Office of the Attorney General, including funding foreclosure prevention counseling, other housing and legal assistance programs, related compliance, investigative, enforcement, and education purposes, or to fund other programs reasonably targeted to housing or tenant issues.

## TEXAS

Said payment to the State of Texas in the amount of One Hundred Thirty-Four Million, Six Hundred Twenty-Eight Thousand, Four Hundred Eighty-Nine Dollars ($134,628,489.00) shall be allocated as follows:

A. Ten Million Dollars ($10,000,000.00) for civil penalties pursuant to Tex. Bus. & Com. Code §17.47(c) paid to the State of Texas for deposit to the judicial fund pursuant to Texas Government Code §402.007;

B. One Hundred Twenty-Four Million, Six Hundred Twenty-Eight Thousand, Four Hundred Eighty-Nine Dollars ($124,628,489.00) paid to the State of Texas for deposit into the General Revenue Fund pursuant to Texas Government Code §404.094(b) and §404.097(c).

## UTAH

The Attorney General of the State of Utah directs that the Utah portion of the State Payment Settlement Amounts, as that term is used in Exhibit B of this Consent Judgment, be distributed to the State of Utah to be further allocated as determined by the Utah State Legislature.

## VERMONT

The state funds may be used for housing-related or other purposes.

## VIRGINIA

B2-18

The State Payment Settlement Amount for Virginia totaling $66,525,233 shall be provided to the Virginia Attorney General for deposit to the Attorney General's Regulatory, Consumer Advocacy, Litigation and Enforcement Revolving Trust Fund (the "Revolving Fund"). Amounts deposited to the Revolving Fund may be used for costs of the Attorney General associated with his consumer protection advocacy and enforcement efforts and other delineated purposes permitted by State law.

## WASHINGTON

The State of Washington will use its share of the State Payment Settlement Amount, as follows:

1.  Ten percent will be designated as a civil penalty.

2.  No more than $5 million will be used to compensate the State for its costs and fees to date, for costs of monitoring and enforcing the terms of the settlement, and for enforcing RCW 19.86, the Consumer Protection Act.

3.  The remaining amount will be used for purposes intended to avoid preventable foreclosures or ameliorate the effects of the foreclosure crisis. As permitted by the Consent Judgment, such uses may include

    a.  supplementing the amounts paid to state homeowners under the Borrower Payment Fund;

    b.  funding for housing counselors;

    c.  funding for state and local foreclosure assistance hotlines;

    d.  funding for state and local foreclosure mediation programs;

    e.  funding for civil legal assistance; or

    f.  funding for housing remediation and anti-blight projects.

The State of Washington will convene a committee of public and private stakeholders who are experienced in foreclosure assistance, mortgage lending, civil legal services or housing related issues to determine how best to use the funds. As required by the Consent Judgment, the Attorney General will exercise his discretion over the final disposition of the funds in accordance with the purposes as set forth in the Consent Judgment and will provide instructions to the Escrow Agent accordingly.

## WEST VIRGINIA

B2-19

Settlement payments to the State of West Virginia in the amount of $5,748,915.00 shall be placed in trust and used at the discretion of the Attorney General solely for consumer protection purposes, including but not limited to, direct payments, restitution, consumer education, legal services, credit or bankruptcy counseling and education, housing counseling, conflict resolution programs, and costs associated with implementing court orders.

## WISCONSIN

Money owed to the State of Wisconsin shall be made payable to 'Attorney General, State of Wisconsin,' and may be used for any purpose permitted under the Consent Judgment, as solely determined and directed by the Attorney General.

## WYOMING

The Escrow Agent shall distribute the amount constituting the State Payment Settlement Amount for the State of Wyoming to the Attorney General of the State of Wyoming, as trustee, to hold and distribute such amount, pursuant to Wyoming Statute § 9-1-639(a)(i), exclusively for the purpose of addressing mortgage and foreclosure matters in the State of Wyoming, by providing grants or other aid to agencies and organizations approved by the Attorney General of the State of Wyoming for mortgage and housing related consumer assistance, consumer education, credit counseling, mediation programs, legal assistance, training, or staffing.

B2-20

# EXHIBIT C

## BORROWER PAYMENT AMOUNT

1.      The Borrower Payment Amount shall be administered under the direction and control of the State members of the Monitoring Committee in the following manner.

2.      Within ninety (90) days of the Effective Date of this Consent Judgment, the State members of the Monitoring Committee shall choose and retain a Settlement Administrator ("the Administrator") to administer the distribution of cash payments to individual borrowers under this and all similar Consent Judgments with other servicers concerning the Covered Conduct (the "Related Consent Judgments"). All costs and expenses of the Administrator, including taxes, shall be paid from the Borrower Payment Amount.

3.      Defendant shall provide to the Administrator all information already in its possession and readily available that is reasonably necessary for the administration of this and the Related Consent Judgments, within a reasonable time after receipt of the request for information. Defendant is ordered herein to provide such information under 15 U.S.C. § 6802(e)(1)(A), (5) and (8) of the Gramm-Leach-Bliley Act. Such information pertaining to individual eligible Borrowers, including names and other identifying information, may be provided to individual states, but only if the information is used solely for the purpose of contacting eligible Borrowers, responding to inquiries from Borrowers regarding their eligibility or concerning the award of borrower payments under this Consent Judgment, and/or complying with tax reporting and withholding obligations, if any. The Administrator shall utilize appropriate information security protocols to ensure the privacy of Borrower information and otherwise comply with all applicable privacy laws. After the completion of the Borrower Payment process, the Administrator shall provide a report to each Defendant identifying which borrowers have received payment. In addition, Defendant may request from the Administrator

such interim reports as may be deemed reasonable by the State Members of the Monitoring Committee. Interim reports necessary to insure that Borrowers will not receive duplicate payments by virtue of litigation, the foreclosure review required by federal banking agencies or otherwise hereby are deemed reasonable. Defendant shall warrant to the State Members of the Monitoring Committee at the time of supplying information to the Administrator that the information is complete and accurate to the best of its knowledge and capability.

4.     The Administrator shall permit reasonable onsite inspection by the State members of the Monitoring Committee on the premises of the Administrator to monitor administration of this and all Related Consent Judgments.

5.     As a condition to receipt of any payments pursuant to this process, borrowers must agree that such payment shall offset and operate to reduce any other obligation Defendant has to the borrowers to provide compensation or other payments. However, borrowers shall not be required to release or waive any other right or legal claim as a condition of receiving such payments.

6.     Any cash payment to individual borrowers awarded under the terms of this Consent Judgment is not and shall not be considered as forgiven debt.

7.     The purposes of the payments described in this Exhibit C are remedial and relate to the reduction in the proceeds deemed realized by borrowers for tax purposes from the foreclosure sale of residential properties owned by the borrowers allegedly resulting from the allegedly unlawful conduct of the Defendants.

Case: 10-05245    Doc# 374-3    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 14 of 55

# EXHIBIT D

## Consumer Relief Requirements

Any Servicer as defined in the Servicing Standards set forth in Exhibit A to this Consent Judgment (hereinafter "Servicer" or "Participating Servicer") agrees that it will not implement any of the Consumer Relief Requirements described herein through policies that are intended to (i) disfavor a specific geography within or among states that are a party to the Consent Judgment or (ii) discriminate against any protected class of borrowers. This provision shall not preclude the implementation of pilot programs in particular geographic areas.

Any discussion of property in these Consumer Relief Requirements, including any discussion in Table 1 or other documents attached hereto, refers to a 1-4 unit single-family property (hereinafter, "Property" or collectively, "Properties").

Any consumer relief guidelines or requirements that are found in Table 1 or other documents attached hereto, are hereby incorporated into these Consumer Relief Requirements and shall be afforded the same deference as if they were written in the text below.

For the avoidance of doubt, subject to the Consumer Relief Requirements described below, Servicer shall receive credit for consumer relief activities with respect to loans insured or guaranteed by the U.S. Department of Housing and Urban Development, U.S. Department of Veterans Affairs, or the U.S. Department of Agriculture in accordance with the terms and conditions herein, provided that nothing herein shall be deemed to in any way relieve Servicer of the obligation to comply with the requirements of the U.S. Department of Housing and Urban Development, U.S. Department of Veterans Affairs, and the U.S. Department of Agriculture with respect to the servicing of such loans.

Servicer shall not, in the ordinary course, require a borrower to waive or release legal claims and defenses as a condition of approval for loss mitigation activities under these Consumer Relief Requirements. However, nothing herein shall preclude Servicer from requiring a waiver or release of legal claims and defenses with respect to a Consumer Relief activity offered in connection with the resolution of a contested claim, when the borrower would not otherwise have received as favorable terms or when the borrower receives additional consideration.

Programmatic exceptions to the crediting available for the Consumer Relief Requirements listed below may be granted by the Monitoring Committee on a case-by-case basis.

To the extent a Servicer is responsible for the servicing of a mortgage loan to which these Consumer Relief Requirements may apply, the Servicer shall receive credit for all consumer relief and refinancing activities undertaken in connection with such

mortgage loan by any of its subservicers to the same extent as if Servicer had undertaken such activities itself.[*]

1.  First Lien Mortgage Modifications

    a.  Servicer will receive credit under Table 1, Section 1, for first-lien mortgage loan modifications made in accordance with the guidelines set forth in this Section 1.

    b.  First liens on occupied[1] Properties with an unpaid principal balance ("UPB") prior to capitalization at or below the highest GSE conforming loan limit cap as of January 1, 2010 shall constitute at least 85% of the eligible credits for first liens (the "Applicable Limits").

    c.  Eligible borrowers must be at least 30 days delinquent or otherwise qualify as being at imminent risk of default due to borrower's financial situation.

    d.  Eligible borrowers' pre-modification loan-to-value ratio ("LTV") is greater than 100%.

    e.  Post-modification payment should target a debt-to-income ratio ("DTI")[2] of 31% (or an affordability measurement consistent with HAMP guidelines) and a modified LTV[3] of no greater than 120%, provided that eligible borrowers receive a modification that meets the following terms:

        i.  Payment of principal and interest must be reduced by at least 10%.

        ii.  Where LTV exceeds 120% at a DTI of 31%, principal shall be reduced to a LTV of 120%, subject to a minimum DTI of 25% (which minimum may be waived by Servicer at Servicer's sole

---

[*]  If a Servicer holds a mortgage loan but does not service or control the servicing rights for such loan (either through its own servicing operations or a subservicer), then no credit shall be granted to that Servicer for consumer relief and refinancing activities related to that loan.

[1]  Servicer may rely on a borrower's statement, at the time of the modification evaluation, that a Property is occupied or that the borrower intends to rent or re-occupy the property.

[2]  Consistent with HAMP, DTI is based on first-lien mortgage debt only. For non-owner-occupied properties, Servicer shall consider other appropriate measures of affordability.

[3]  For the purposes of these guidelines, LTV may be determined in accordance with HAMP PRA.

discretion), provided that for investor-owned loans, the LTV and DTI need not be reduced to a level that would convert the modification to net present value ("NPV") negative.

f.   DTI requirements may be waived for first lien mortgages that are 180 days or more delinquent as long as payment of principal and interest is reduced by at least 20% and LTV is reduced to at least 120%.

g.   Servicer shall also be entitled to credit for any amounts of principal reduction which lower LTV below 120%.

h.   When Servicer reduces principal on a first lien mortgage via its proprietary modification process, and a Participating Servicer owns the second lien mortgage, the second lien shall be modified by the second lien owning Participating Servicer in accordance with Section 2.c.i below, provided that any Participating Servicer other than the five largest servicers shall be given a reasonable amount of time, as determined by the Monitor, after that Participating Servicer's Start Date to make system changes necessary to participate in and implement this requirement. Credit for such second lien mortgage write-downs shall be credited in accordance with the second lien percentages and cap described in Table 1, Section 2.

i.   In the event that, in the first 6 months after Servicer's Start Date (as defined below), Servicer temporarily provides forbearance or conditional forgiveness to an eligible borrower as the Servicer ramps up use of principal reduction, Servicer shall receive credit for principal reduction on such modifications provided that (i) Servicer may not receive credit for both the forbearance and the subsequent principal reduction and (ii) Servicer will only receive the credit for the principal reduction  once the principal is actually forgiven in accordance with these Consumer Relief Requirements and Table 1.

j.   Eligible modifications include any modification that is made on or after Servicer's Start Date, including:

  i.   Write-offs made to allow for refinancing under the FHA Short Refinance Program;

  ii.   Modifications under the Making Home Affordable Program (including the Home Affordable Modification Program ("HAMP") Tier 1 or Tier 2) or the Housing Finance Agency Hardest Hit Fund ("HFA Hardest Hit Fund") (or any other federal program) where principal is forgiven, except to the extent that state or federal funds paid to Servicer in its capacity as an investor are the source of a Servicer's credit claim.

D-3

        iii.   Modifications under other proprietary or other government modification programs, provided that such modifications meet the guidelines set forth herein.[4]

2.  Second Lien Portfolio Modifications

    a.  Servicer is required to adhere to these guidelines in order to receive credit under Table 1, Section 2.

    b.  A write-down of a second lien mortgage will be creditable where such write-down facilitates either (a) a first lien modification that involves an occupied Property for which the borrower is 30 days delinquent or otherwise at imminent risk of default due to the borrower's financial situation; or (b) a second lien modification that involves an occupied Property with a second lien which is at least 30 days delinquent or otherwise at imminent risk of default due to the borrower's financial situation.

---

[4]   Two examples are hereby provided. Example 1: on a mortgage loan at 175% LTV, when a Servicer (in its capacity as an investor) extinguishes $75 of principal through the HAMP Principal Reduction Alternative ("PRA") modification in order to bring the LTV down to 100%, if the Servicer receives $28.10 in PRA principal reduction incentive payments from the U.S. Department of the Treasury for that extinguishment, then the Servicer may claim $46.90 of principal reduction for credit under these Consumer Relief Requirements:

| LTV Reduction Band: | HAMP-PRA Incentive Amount Received: | Allowable Settlement Credit: |
|---|---|---|
| 175% LTV to 140% LTV | $10.50 (35% LTV * $0.30) | $24.50 ((35% LTV-$10.50) * $1.00) |
| 140% LTV to 115% LTV | $11.30 (25% LTV * $0.45) | $13.70 ((25% LTV-$11.30) * $1.00) |
| 115% LTV to 105% LTV | $6.30 (10% LTV * $0.63) | $3.70 ((10% LTV-$6.30) * $1.00) |
| 105% LTV to 100% LTV | None (no credit below 105% LTV) | $5.00 (5% LTV * $1.00) |
| Total: | $28.10 | $46.90 |

Example 2: on a mortgage loan at 200% LTV, when a Servicer (in its capacity as an investor) extinguishes $100 of principal through a HAMP-PRA modification in order to bring the LTV down to 100%, if the Servicer receives $35.60 in PRA principal reduction incentive payments from Treasury for that extinguishment, then although the Servicer would have funded $64.40 in principal reduction on that loan, the Servicer may claim $55.70 of principal reduction for credit under these Consumer Relief Requirements:

| LTV Reduction Band: | HAMP-PRA Incentive Amount Received: | Allowable Settlement Credit: |
|---|---|---|
| 200% LTV to 175% LTV | $7.50 (25% LTV * $0.30) | $8.80 ((25% LTV-$7.50) * $0.50) |
| 175% LTV to 140% LTV | $10.50 (35% LTV * $0.30) | $24.50 ((35% LTV-$10.50) * $1.00) |
| 140% LTV to 115% LTV | $11.30 (25% LTV * $0.45) | $13.70 ((25% LTV-$11.30) * $1.00) |
| 115% LTV to 105% LTV | $6.30 (10% LTV * $0.63) | $3.70 ((10% LTV-$6.30) * $1.00) |
| 105% LTV to 100% LTV | None (no credit below 105% LTV) | $5.00 (5% LTV * $1.00) |
| Total: | $35.60 | $55.70 |

D-4

c.  Required Second Lien Modifications:

    i.  Servicer agrees that it must write down second liens consistent with the following program until its Consumer Relief Requirement credits are fulfilled:

        1.  A write-down of a second lien mortgage will be creditable where a successful first lien modification is completed by a Participating Servicer via a servicer's proprietary, non-HAMP modification process, in accordance with Section 1, with the first lien modification meeting the following criteria:

            a.  Minimum 10% payment reduction (principal and interest);

            b.  Income verified;

            c.  A UPB at or below the Applicable Limits; and

            d.  Post-modification DTI[5] between 25% and 31%.

        2.  If a Participating Servicer has completed a successful proprietary first lien modification and the second lien loan amount is greater than $5,000 UPB and the current monthly payment is greater than $100, then:

            a.  Servicer shall extinguish and receive credit in accordance with Table 1, Section 2.iii on any second lien that is greater than 180 days delinquent.

            b.  Otherwise, Servicer shall solve for a second lien payment utilizing the HAMP Second Lien Modification Program ("2MP") logic used as of January 26, 2012.

            c.  Servicer shall use the following payment waterfall:

                i.  Forgiveness equal to the lesser of (a) achieving 115% combined loan-to-value ratio ("CLTV") or (b) 30% UPB (subject to minimum forgiveness level); then

                ii.  Reduce rate until the 2MP payment required by 2MP logic as of January 26, 2012; then

---

[5]  Consistent with HAMP, DTI is based on first-lien mortgage debt only.  For non-owner-occupied properties, Servicer shall consider other appropriate measures of affordability.

D-5

           iii. Extend term to "2MP Term" (greater of modified first or remaining second).

    d. Servicer shall maintain an I/O product option consistent with 2MP protocols.

  d. Eligible second lien modifications include any modification that is made on or after Servicer's Start Date, including:

      i. Principal reduction or extinguishments through the Making Home Affordable Program (including 2MP), the FHA Short Refinance Second Lien ("FHA2LP") Program or the HFA Hardest Hit Fund (or any other federal program), except (to the extent) that state or federal funds are the source of a Servicer's credit claim.

      ii. Second lien write-downs or extinguishments completed under proprietary modification programs, are eligible, provided that such write-downs or extinguishments meet the guidelines as set forth herein.

  e. Extinguishing balances of second liens to support the future ability of individuals to become homeowners will be credited based on applicable credits in Table 1.

3. Enhanced Borrower Transitional Funds

    Servicer may receive credit, as described in Table 1, Section 3, for providing additional transitional funds to homeowners in connection with a short sale or deed-in-lieu of foreclosure to homeowners for the amount above $1,500.

4. Short Sales

  a. As described in the preceding paragraph, Servicer may receive credit for providing incentive payments for borrowers on or after Servicer's Start Date who are eligible and amenable to accepting such payments in return for a dignified exit from a Property via short sale or similar program. Credit shall be provided in accordance with Table 1, Section 3.i.

  b. To facilitate such short sales, Servicer may receive credit for extinguishing second liens on or after Servicer's Start Date under Table 1, Section 4.

  c. Short sales through the Home Affordable Foreclosure Alternatives (HAFA) Program or any HFA Hardest Hit Fund program or proprietary programs closed on or after Servicer's Start Date are eligible.

  d. Servicer shall be required to extinguish a second lien owned by Servicer behind a successful short sale/deed-in-lieu conducted by a Participating Servicer (provided that any Participating Servicer other than the five largest servicers shall be given a reasonable amount of time, as determined

D-6

by the Monitor, after their Start Date to make system changes necessary to participate in and implement this requirement) where the first lien is greater than 100% LTV and has a UPB at or below the Applicable Limits, until Servicer's Consumer Relief Requirement credits are fulfilled. The first lien holder would pay to the second lien holder 8% of UPB, subject to a $2,000 floor and an $8,500 ceiling. The second lien holder would then release the note or lien and waive the balance.

5. Deficiency Waivers

    a. Servicer may receive credit for waiving deficiency balances if not eligible for credit under some other provision, subject to the cap provided in the Table 1, Section 5.i.

    b. Credit for such waivers of any deficiency is only available where Servicer has a valid deficiency claim, meaning where Servicer can evidence to the Monitor that it had the ability to pursue a deficiency against the borrower but waived its right to do so after completion of the foreclosure sale.

6. Forbearance for Unemployed Borrowers

    a. Servicer may receive credit for forgiveness of payment of arrearages on behalf of an unemployed borrower in accordance with Table 1, Section 6.i.

    b. Servicer may receive credit under Table 1, Section 6.ii., for funds expended to finance principal forbearance solutions for unemployed borrowers as a means of keeping them in their homes until such time as the borrower can resume payments. Credit will only be provided beginning in the 7th month of the forbearance under Table 1, Section 6.ii.

7. Anti-Blight Provisions

    a. Servicer may receive credit for certain anti-blight activities in accordance with and subject to caps contained in Table 1, Section 7.

    b. Any Property value used to calculate credits for this provision shall have a property evaluation meeting the standards acceptable under the Making Home Affordable programs received within 3 months of the transaction.

8. Benefits for Servicemembers

    a. Short Sales

        i. Servicer shall, with respect to owned portfolio first liens, provide servicemembers who qualify for SCRA benefits ("Eligible Servicemembers") a short sale agreement containing a predetermined minimum net proceeds amount ("Minimum Net Proceeds") that Servicer will accept for short sale transaction upon receipt of the listing agreement and all required third-party approvals. The Minimum Net Proceeds may be expressed as a

fixed dollar amount, as a percentage of the current market value of the property, or as a percentage of the list price as approved by Servicer. After providing the Minimum Net Proceeds, Servicer may not increase the minimum net requirements above the Minimum Net Proceeds amount until the initial short sale agreement termination date is reached (not less than 120 calendar days from the date of the initial short sale agreement). Servicer must document subsequent changes to the Minimum Net Proceeds when the short sale agreement is extended.

ii.   Eligible Servicemembers shall be eligible for this short sale program if: (a) they are an active duty full-time status Eligible Servicemember; (b) the property securing the mortgage is not vacant or condemned; (c) the property securing the mortgage is the Eligible Servicemember's primary residence (or, the property was his or her principal residence immediately before he or she moved pursuant to a Permanent Change of Station ("PCS") order dated on or after October 1, 2010; (d) the Eligible Servicemember purchased the subject primary residence on or after July 1, 2006 and before December 31, 2008; and (e) the Eligible Servicemember relocates or has relocated from the subject property not more than 12 months prior to the date of the short sale agreement to a new duty station or home port outside a 50-mile radius of the Eligible Servicemember's former duty station or home port under a PCS. Eligible Servicemembers who have relocated may be eligible if the Eligible Servicemember provides documentation that the property was their principal residence prior to relocation or during the 12-month period prior to the date of the short sale agreement.

b.  Short Sale Waivers

i.   If an Eligible Servicemember qualifies for a short sale hereunder and sells his or her principal residence in a short sale conducted in accordance with Servicer's then customary short sale process, Servicer shall, in the case of an owned portfolio first lien, waive the additional amount owed by the Eligible Servicemember so long as it is less than $250,000.

ii.   Servicer shall receive credit under Table 1, Section 4, for mandatory waivers of amounts under this Section 8.b.

c.  With respect to the refinancing program described in Section 9 below, Servicer shall use reasonable efforts to identify active servicemembers in its owned portfolio who would qualify and to solicit those individuals for the refinancing program.

D-8

9. Refinancing Program

   a. Servicer shall create a refinancing program for current borrowers. Servicer shall provide notification to eligible borrowers indicating that they may refinance under the program described herein. The minimum occupied Property eligibility criteria for such a program shall be:

      i. The program shall apply only to Servicer-owned first lien mortgage loans.

      ii. Loan must be current with no delinquencies in past 12 months.

      iii. Fixed rate loans, ARMS, or I/Os are eligible if they have an initial period of 5 years or more.

      iv. Current LTV is greater than 100%.

      v. Loans must have been originated prior to January 1, 2009.

      vi. Loan must not have received any modification in the past 24 months.

      vii. Loan must have a current interest rate of at least 5.25 % or PMMS + 100 basis points, whichever is greater.

      viii. The minimum difference between the current interest rate and the offered interest rate under this program must be at least 25 basis points or there must be at least a $100 reduction in monthly payment.

      ix. Maximum UPB will be an amount at or below the Applicable Limits.

      x. The following types of loans are excluded from the program eligibility:

         1. FHA/VA

         2. Property outside the 50 States, DC, and Puerto Rico

         3. Loans on Manufactured Homes

         4. Loans for borrowers who have been in bankruptcy anytime within the prior 24 months

         5. Loans that have been in foreclosure within the prior 24 months

   b. The refinancing program shall be made available to all borrowers fitting the minimum eligibility criteria described above in 9.a. Servicer will be free to extend the program to other customers beyond the minimum eligibility criteria provided above and will receive credit under this Agreement for such refinancings, provided that such customers have an

LTV of over 80%, and would not have qualified for a refinance under Servicer's generally-available refinance programs as of September 30, 2011. Notwithstanding the foregoing, Servicer shall not be required to solicit or refinance borrowers who do not satisfy the eligibility criteria under 9.a above. In addition, Servicer shall not be required to refinance a loan under circumstances that, in the reasonable judgment of the Servicer, would result in Troubled Debt Restructuring ("TDR") treatment. A letter to the United States Securities and Exchange Commission regarding TDR treatment, dated November 22, 2011, shall be provided to the Monitor for review.

c. The structure of the refinanced loans shall be as follows:

    i. Servicer may offer refinanced loans with reduced rates either:

        1. For the life of the loan;

        2. For loans with current interest rates above 5.25% or PMMS + 100 basis points, whichever is greater, the interest rate may be reduced for 5 years. After the 5 year fixed interest rate period, the rate will return to the preexisting rate subject to a maximum rate increase of 0.5% annually; or

        3. For loans with an interest rate below 5.25% or PMMS + 100 basis points, whichever is greater, the interest rate may be reduced to obtain at least a 25 basis point interest rate reduction or $100 payment reduction in monthly payment, for a period of 5 years, followed by 0.5% annual interest rate increases with a maximum ending interest rate of 5.25% or PMMS + 100 basis points.

    ii. The original term of the loan may be changed.

    iii. Rate reduction could be done through a modification of the existing loan terms or refinance into a new loan.

    iv. New term of the loan has to be a fully amortizing product.

    v. The new interest rate will be capped at 100 basis points over the PMMS rate or 5.25%, whichever is greater, during the initial rate reduction period.

d. Banks fees and expenses shall not exceed the amount of fees charged by Banks under the current Home Affordable Refinance Program ("HARP") guidelines.

e. The program shall be credited under these Consumer Relief Requirements as follows:

     i. Credit will be calculated as the difference between the preexisting interest rate and the offered interest rate times UPB times a multiplier.

     ii. The multiplier shall be as follows:

          1. If the new rate applies for the life of the loan, the multiplier shall be 8 for loans with a remaining term greater than 15 years, 6 for loans with a remaining term between 10 and 15 years and 5 for loans with a remaining term less than 10 years.

          2. If the new rate applies for 5 years, the multiplier shall be 5.

  f. Additional dollars spent by each Servicer on the refinancing program beyond that Servicer's required commitment shall be credited 25% against that Servicer's first lien principal reduction obligation and 75% against that Servicer's second lien principal reduction obligation, up to the limits set forth in Table 1.

10. Timing, Incentives, and Payments

  a. For the consumer relief and refinancing activities imposed by this Agreement, Servicer shall be entitled to receive credit against Servicer's outstanding settlement commitments for activities taken on or after Servicer's start date, March 1, 2012 (such date, the "Start Date").

  b. Servicer shall receive an additional 25% credit against Servicer's outstanding settlement commitments for any first or second lien principal reduction and any amounts credited pursuant to the refinancing program within 12 months of Servicer's Start Date (e.g., a $1.00 credit for Servicer activity would count as $1.25).

  c. Servicer shall complete 75% of its Consumer Relief Requirement credits within two years of the Servicer's Start Date.

  d. If Servicer fails to meet the commitment set forth in these Consumer Relief Requirements within three years of Servicer's Start Date, Servicer shall pay an amount equal to 125% of the unmet commitment amount; except that if Servicer fails to meet the two year commitment noted above, and then fails to meet the three year commitment, the Servicer shall pay an amount equal to 140% of the unmet three-year commitment amount; provided, however, that if Servicer must pay any Participating State for failure to meet the obligations of a state-specific commitment to provide Consumer Relief pursuant to the terms of that commitment, then Servicer's obligation to pay under this provision shall be reduced by the amount that such a Participating State would have received under this provision and the Federal portion of the payment attributable to that

Case: 10-05245    Doc# 374-3    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 26 of 55

Participating State.  The purpose of the 125% and 140% amounts is to encourage Servicer to meet its commitments set forth in these Consumer Relief Requirements.

11. Applicable Requirements

The provision of consumer relief by the Servicer in accordance with this Agreement in connection with any residential mortgage loan is expressly subject to, and shall be interpreted in accordance with, as applicable, the terms and provisions of the Servicer Participation Agreement with the U.S. Department of Treasury, any servicing agreement, subservicing agreement under which Servicer services for others, special servicing agreement, mortgage or bond insurance policy or related agreement or requirements to which Servicer is a party and by which it or its servicing affiliates are bound pertaining to the servicing or ownership of the mortgage loans, including without limitation the requirements, binding directions, or investor guidelines of the applicable investor (such as Fannie Mae or Freddie Mac), mortgage or bond insurer, or credit enhancer, provided, however, that the inability of a Servicer to offer a type, form or feature of the consumer relief payments by virtue of an Applicable Requirement shall not relieve the Servicer of its aggregate consumer relief obligations imposed by this Agreement, i.e., the Servicer must satisfy such obligations through the offer of other types, forms or features of consumer relief payments that are not limited by such Applicable Requirement.

Case: 10-05245   Doc# 374-3   Filed: 02/06/14   Entered: 02/07/14 12:52:43   Page 27 of 55

# EXHIBIT D-1

**Table 1[1]**

| Menu Item<br>Consumer Relief Funds | Credit Towards Settlement | Credit Cap |
|---|---|---|
| **1. First Lien Mortgage Modification[2]** | | *Minimum 30% for First Lien Mods[3] (which can be reduced by 2.5% of overall consumer relief funds for excess refinancing program credits above the minimum amount required)* |
| <u>PORTFOLIO LOANS</u> | | |
| *i.* First lien principal forgiveness modification | LTV </= 175%: $1.00 Write-down=$1.00 Credit<br><br>LTV > 175%: $1.00 Write-down=$0.50 Credit (for only the portion of principal forgiven over 175%) | |
| *ii.* Forgiveness of forbearance amounts on existing modifications | $1.00 Write-down=$0.40 Credit | *Max 12.5%* |

---

[1] Where applicable, the number of days of delinquency will be determined by the number of days a loan is delinquent at the start of the earlier of the first or second lien modification process. For example, if a borrower applies for a first lien principal reduction on February 1, 2012, then any delinquency determination for a later second lien modification made pursuant to the terms of this Agreement will be based on the number of days the second lien was delinquent as of February 1, 2012.

[2] Credit for all modifications is determined from the date the modification is approved or communicated to the borrower. However, no credits shall be credited unless the payments on the modification are current as of 90 days following the implementation of the modification, including any trial period, except if the failure to make payments on the modification within the 90 day period is due to unemployment or reduced hours, in which case Servicer shall receive credit provided that Servicer has reduced the principal balance on the loan. Eligible Modifications will include any modification that is completed on or after the Start Date, as long as the loan is current 90 days after the modification is implemented.

[3] All minimum and maximum percentages refer to a percentage of total consumer relief funds.

| Menu Item | Credit Towards Settlement | Credit Cap |
|---|---|---|
| *iii.* Earned forgiveness over a period of no greater than 3 years – provided consistent with PRA | LTV </= 175%: $1.00 Write-down=$.85 Credit<br><br>LTV > 175%: $1.00 Write-down=$0.45 Credit (for only the portion of principal forgiven over 175%) | |

## SERVICE FOR OTHERS

| Menu Item | Credit Towards Settlement | Credit Cap |
|---|---|---|
| *iv.* First lien principal forgiveness modification on investor loans (forgiveness by investor) | $1.00 Write-down=$0.45 Credit | |
| *v.* Earned forgiveness over a period of no greater than 3 years – provided consistent with PRA | LTV </= 175%: $1.00 Write-down=$.40 Credit<br><br>LTV > 175%: $1.00 Write-down=$0.20 Credit (for only the portion of principal forgiven over 175%) | |
| **2.** ***Second Lien Portfolio Modifications*** | | *Minimum of 60% for 1st and 2nd Lien Mods (which can be reduced by 10% of overall consumer relief funds for excess refinancing program credits above the minimum amounts required)* |
| i.  Performing Second Liens (0-90 days delinquent) | $1.00 Write-down=$0.90 Credit | |

D1-2

| Menu Item | Credit Towards Settlement | Credit Cap |
|---|---|---|
| ii. Seriously Delinquent Second Liens (>90-179 days delinquent) | $1.00 Write-down=$0.50 Credit | |
| iii. Non-Performing Second Liens (180 or more days delinquent) | $1.00 Write-down=$0.10 Credit | |
| **3. Enhanced Borrower Transitional Funds** | | *Max 5%* |
| i. Servicer Makes Payment | $1.00 Payment=$1.00 Credit (for the amount over $1,500) | |
| ii. Investor Makes Payment (non-GSE) | $1.00 Payment=0.45 Credit (for the amount over the $1,500 average payment established by Fannie Mae and Freddie Mac) | |
| **4. Short Sales/Deeds in Lieu** | | |
| i. Servicer makes payment to unrelated 2nd lien holder for release of 2nd lien | $1.00 Payment=$1.00 Credit | |
| ii. Servicer forgives deficiency and releases lien on 1st lien Portfolio Loans | $1.00 Write-down=$0.45 Credit | |
| iii. Investor forgives deficiency and releases lien on 1st Lien investor loans | $1.00 Write-down=$0.20 Credit | |
| iv. Forgiveness of deficiency balance and release of lien on | | |

D1-3

| Menu Item | Credit Towards Settlement | Credit Cap |
|---|---|---|
| Portfolio Second Liens | | |
| Performing Second Liens (0-90 days delinquent) | $1.00 Write-down=$0.90 Credit | |
| Seriously Delinquent Second Liens (>90-179 days delinquent) | $1.00 Write-down=$0.50 Credit | |
| Non-Performing Second Liens (180 or more days delinquent) | $1.00 Write-down=$0.10 Credit | |

**5. *Deficiency Waivers***  *Max 10%*

   i.   Deficiency waived on 1st and 2nd liens loans    $1.00 Write-down=$0.10 Credit

**6. *Forbearance for unemployed homeowners***

   i.   Servicer forgives payment arrearages on behalf of borrower    $1.00 new forgiveness=$1.00 Credit

   ii.   Servicer facilitates traditional forbearance program    $1.00 new forbearance = $0.05 Credit

**7. *Anti-Blight Provisions***  *Max 12%*

   i.   Forgiveness of principal associated with a property where Servicer does not pursue foreclosure    $1.00 property value=$0.50 Credit

D1-4

| Menu Item | | Credit Towards Settlement | Credit Cap |
|---|---|---|---|
| ii. | Cash costs paid by Servicer for demolition of property | $1.00 Payment=$1.00 Credit | |
| iii. | REO properties donated to accepting municipalities or non-profits or to disabled servicemembers or relatives of deceased servicemembers | $1.00 property value=$1.00 Credit | |

Case: 10-05245    Doc# 374-3    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 33 of 55

# EXHIBIT E

## Enforcement Terms

**A.   Implementation Timeline.** Servicer anticipates that it will phase in the implementation of the Servicing Standards and Mandatory Relief Requirements (i) through (iv), as described in Section C.12, using a grid approach that prioritizes implementation based upon: (i) the importance of the Servicing Standard to the borrower; and (ii) the difficulty of implementing the Servicing Standard. In addition to the Servicing Standards and any Mandatory Relief Requirements that have been implemented upon entry of this Consent Judgment, the periods for implementation will be: (a) within 60 days of entry of this Consent Judgment; (b) within 90 days of entry of this Consent Judgment; and (c) within 180 days of entry of this Consent Judgment. Servicer will agree with the Monitor chosen pursuant to Section C, below, on the timetable in which the Servicing Standards and Mandatory Relief Requirements (i) through (iv) will be implemented. In the event that Servicer, using reasonable efforts, is unable to implement certain of the standards on the specified timetable, Servicer may apply to the Monitor for a reasonable extension of time to implement those standards or requirements.

**B.   Monitoring Committee.** A committee comprising representatives of the state Attorneys General, State Financial Regulators, the U.S. Department of Justice, and the U.S. Department of Housing and Urban Development shall monitor Servicer's compliance with this Consent Judgment (the "Monitoring Committee"). The Monitoring Committee may substitute representation, as necessary. Subject to Section F, the Monitoring Committee may share all Monitor Reports, as that term is defined in Section D.2 below, with any releasing party.

**C.   Monitor**

*Retention and Qualifications and Standard of Conduct*

1.   Pursuant to an agreement of the parties, Joseph A. Smith Jr. is appointed to the position of Monitor under this Consent Judgment. If the Monitor is at any time unable to complete his or her duties under this Consent Judgment, Servicer and the Monitoring Committee shall mutually agree upon a replacement in accordance with the process and standards set forth in Section C of this Consent Judgment.

2.   Such Monitor shall be highly competent and highly respected, with a reputation that will garner public confidence in his or her ability to perform the tasks required under this Consent Judgment. The Monitor shall have the right to employ an accounting firm or firms or other firm(s) with similar capabilities to support the Monitor in carrying out his or her duties under this Consent Judgment. Monitor and Servicer shall agree on the selection of a "Primary Professional Firm," which must have adequate capacity and resources to perform the work required under this agreement.

The Monitor shall also have the right to engage one or more attorneys or other professional persons to represent or assist the Monitor in carrying out the Monitor's duties under this Consent Judgment (each such individual, along with each individual deployed to the engagement by the Primary Professional Firm, shall be defined as a "Professional"). The Monitor and Professionals will collectively possess expertise in the areas of mortgage servicing, loss mitigation, business operations, compliance, internal controls, accounting, and foreclosure and bankruptcy law and practice. The Monitor and Professionals shall at all times act in good faith and with integrity and fairness towards all the Parties.

3.     The Monitor and Professionals shall not have any prior relationships with the Parties that would undermine public confidence in the objectivity of their work and, subject to Section C.3(e), below, shall not have any conflicts of interest with any Party.

    (a)     The Monitor and Professionals will disclose, and will make a reasonable inquiry to discover, any known current or prior relationships to, or conflicts with, any Party, any Party's holding company, any subsidiaries of the Party or its holding company, directors, officers, and law firms.

    (b)     The Monitor and Professionals shall make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a conflict of interest for the Monitor or Professionals. The Monitor and Professionals shall disclose any conflict of interest with respect to any Party.

    (c)     The duty to disclose a conflict of interest or relationship pursuant to this Section C.3 shall remain ongoing throughout the course of the Monitor's and Professionals' work in connection with this Consent Judgment.

    (d)     All Professionals shall comply with all applicable standards of professional conduct, including ethics rules and rules pertaining to conflicts of interest.

    (e)     To the extent permitted under prevailing professional standards, a Professional's conflict of interest may be waived by written agreement of the Monitor and Servicer.

    (f)     Servicer or the Monitoring Committee may move the Court for an order disqualifying any Professionals on the grounds that such Professional has a conflict of interest that has inhibited or could inhibit the Professional's ability to act in good faith and with integrity and fairness towards all Parties.

E-2

4.    The Monitor must agree not to be retained by any Party, or its successors or assigns, for a period of 2 years after the conclusion of the terms of the engagement.  Any Professionals who work on the engagement must agree not to work on behalf of Servicer, or its successor or assigns, for a period of 1 year after the conclusion of the term of the engagement (the "Professional Exclusion Period").  Any Firm that performs work with respect to Servicer on the engagement must agree not to perform work on behalf of Servicer, or its successor or assigns, that consists of advising Servicer on a response to the Monitor's review during the engagement and for a period of six months after the conclusion of the term of the engagement (the "Firm Exclusion Period").  The Professional Exclusion Period and Firm Exclusion Period, and terms of exclusion may be altered on a case-by-case basis upon written agreement of Servicer and the Monitor.  The Monitor shall organize the work of any Firms so as to minimize the potential for any appearance of, or actual, conflicts.

*Monitor's Responsibilities*

5.    It shall be the responsibility of the Monitor to determine whether Servicer is in compliance with the Servicing Standards and the Mandatory Relief Requirements (as defined in Section C.12) and whether Servicer has satisfied the Consumer Relief Requirements, in accordance with the authorities provided herein and to report his or her findings as provided in Section D.3, below.

6.    The manner in which the Monitor will carry out his or her compliance responsibilities under this Consent Judgment and, where applicable, the methodologies to be utilized shall be set forth in a work plan agreed upon by Servicer and the Monitor, and not objected to by the Monitoring Committee (the "Work Plan").

*Internal Review Group*

7.    Servicer will designate an internal quality control group that is independent from the line of business whose performance is being measured (the "Internal Review Group") to perform compliance reviews each calendar quarter ("Quarter") in accordance with the terms and conditions of the Work Plan (the "Compliance Reviews") and satisfaction of the Consumer Relief Requirements after the (A) end of each calendar year (and, in the discretion of the Servicer, any Quarter) and (B) earlier of the Servicer assertion that it has satisfied its obligations thereunder and the third anniversary of the Start Date (the "Satisfaction Review").  For the purposes of this provision, a group that is independent from the line of business shall be one that does not perform operational work on mortgage servicing, and ultimately reports to a Chief Risk Officer, Chief Audit

E-3

Executive, Chief Compliance Officer, or another employee or manager who has no direct operational responsibility for mortgage servicing.

8. The Internal Review Group shall have the appropriate authority, privileges, and knowledge to effectively implement and conduct the reviews and metric assessments contemplated herein and under the terms and conditions of the Work Plan.

9. The Internal Review Group shall have personnel skilled at evaluating and validating processes, decisions, and documentation utilized through the implementation of the Servicing Standards. The Internal Review Group may include non-employee consultants or contractors working at Servicer's direction.

10. The qualifications and performance of the Internal Review Group will be subject to ongoing review by the Monitor. Servicer will appropriately remediate the reasonable concerns of the Monitor as to the qualifications or performance of the Internal Review Group.

*Work Plan*

11. Servicer's compliance with the Servicing Standards shall be assessed via metrics identified and defined in Schedule E-1 hereto (as supplemented from time to time in accordance with Sections C.12 and C.23, below, the "Metrics"). The threshold error rates for the Metrics are set forth in Schedule E-1 (as supplemented from time to time in accordance with Sections C.12 and C.23, below, the "Threshold Error Rates"). The Internal Review Group shall perform test work to compute the Metrics each Quarter, and report the results of that analysis via the Compliance Reviews. The Internal Review Group shall perform test work to assess the satisfaction of the Consumer Relief Requirements within 45 days after the (A) end of each calendar year (and, in the discretion of the Servicer, any Quarter) and (B) earlier of (i) the end of the Quarter in which Servicer asserts that it has satisfied its obligations under the Consumer Relief Provisions and (ii) the Quarter during which the third anniversary of the Start Date occurs, and report that analysis via the Satisfaction Review.

12. In addition to the process provided under Sections C.23 and 24, at any time after the Monitor is selected, the Monitor may add up to three additional Metrics and associated Threshold Error Rates, all of which (a) must be similar to the Metrics and associated Threshold Error Rates contained in Schedule E-1, (b) must relate to material terms of the Servicing Standards, or the following obligations of Servicer: (i) after the Servicer asserts that it has satisfied its obligation to provide a refinancing program under the framework of the Consumer Relief Requirements ("Framework"), to provide notification to eligible borrowers indicating

E-4

that such borrowers may refinance under the refinancing program described in the Framework, (ii) to make the Refinancing Program available to all borrowers fitting the minimum eligibility criteria described in 9.a of the Framework, (iii) when the Servicer owns the second lien mortgage, to modify the second lien mortgage when a Participating Servicer (as defined in the Framework) reduces principal on the related first lien mortgage, as described in the Framework, (iv) with regard to servicer-owned first liens, to waive the deficiency amounts less than $250,000 if an Eligible Servicemember qualifies for a short sale under the Framework and sells his or her principal residence in a short sale conducted in accordance with Servicer's then customary short sale process, or (v) without prejudice to the implementation of pilot programs in particular geographic areas, to implement the Framework requirements through policies that are not intended to disfavor a specific geography within or among states that are a party to the Consent Judgment or discriminate against any protected class of borrowers (collectively, the obligations described in (i) through (v) are hereinafter referred to as the "Mandatory Relief Requirements"), (c) must either (i) be outcomes-based (but no outcome-based Metric shall be added with respect to any Mandatory Relief Requirement) or (ii) require the existence of policies and procedures implementing any of the Mandatory Relief Requirements or any material term of the Servicing Standards, in a manner similar to Metrics 5.B-E, and (d) must be distinct from, and not overlap with, any other Metric or Metrics. In consultation with Servicer and the Monitoring Committee, Schedule E-1 shall be amended by the Monitor to include the additional Metrics and Threshold Error Rates as provided for herein, and an appropriate timeline for implementation of the Metric shall be determined.

13.  Servicer and the Monitor shall reach agreement on the terms of the Work Plan within 90 days of the Monitor's appointment, which time can be extended for good cause by agreement of Servicer and the Monitor. If such Work Plan is not objected to by the Monitoring Committee within 20 days, the Monitor shall proceed to implement the Work Plan. In the event that Servicer and the Monitor cannot agree on the terms of the Work Plan within 90 days or the agreed upon terms are not acceptable to the Monitoring Committee, Servicer and Monitoring Committee or the Monitor shall jointly petition the Court to resolve any disputes. If the Court does not resolve such disputes, then the Parties shall submit all remaining disputes to binding arbitration before a panel of three arbitrators. Each of Servicer and the Monitoring Committee shall appoint one arbitrator, and those two arbitrators shall appoint a third.

E-5

14.  The Work Plan may be modified from time to time by agreement of the Monitor and Servicer. If such amendment to the Work Plan is not objected to by the Monitoring Committee within 20 days, the Monitor shall proceed to implement the amendment to the Work Plan. To the extent possible, the Monitor shall endeavor to apply the Servicing Standards uniformly across all Servicers.

15.  The following general principles shall provide a framework for the formulation of the Work Plan:

(a)  The Work Plan will set forth the testing methods and agreed procedures that will be used by the Internal Review Group to perform the test work and compute the Metrics for each Quarter.

(b)  The Work Plan will set forth the testing methods and agreed procedures that will be used by Servicer to report on its compliance with the Consumer Relief Requirements of this Consent Judgment, including, incidental to any other testing, confirmation of state-identifying information used by Servicer to compile state-level Consumer Relief information as required by Section D.2.

(c)  The Work Plan will set forth the testing methods and procedures that the Monitor will use to assess Servicer's reporting on its compliance with the Consumer Relief Requirements of this Consent Judgment.

(d)  The Work Plan will set forth the methodology and procedures the Monitor will utilize to review the testing work performed by the Internal Review Group.

(e)  The Compliance Reviews and the Satisfaction Review may include a variety of audit techniques that are based on an appropriate sampling process and random and risk-based selection criteria, as appropriate and as set forth in the Work Plan.

(f)  In formulating, implementing, and amending the Work Plan, Servicer and the Monitor may consider any relevant information relating to patterns in complaints by borrowers, issues or deficiencies reported to the Monitor with respect to the Servicing Standards, and the results of prior Compliance Reviews.

(g)  The Work Plan should ensure that Compliance Reviews are commensurate with the size, complexity, and risk associated with the Servicing Standard being evaluated by the Metric.

E-6

(h)     Following implementation of the Work Plan, Servicer shall be required to compile each Metric beginning in the first full Quarter after the period for implementing the Servicing Standards associated with the Metric, or any extension approved by the Monitor in accordance with Section A, has run.

*Monitor's Access to Information*

16.     So that the Monitor may determine whether Servicer is in compliance with the Servicing Standards and Mandatory Relief Requirements, Servicer shall provide the Monitor with its regularly prepared business reports analyzing Executive Office servicing complaints (or the equivalent); access to all Executive Office servicing complaints (or the equivalent) (with appropriate redactions of borrower information other than borrower name and contact information to comply with privacy requirements); and, if Servicer tracks additional servicing complaints, quarterly information identifying the three most common servicing complaints received outside of the Executive Office complaint process (or the equivalent).  In the event that Servicer substantially changes its escalation standards or process for receiving Executive Office servicing complaints (or the equivalent), Servicer shall ensure that the Monitor has access to comparable information.

17.     So that the Monitor may determine whether Servicer is in compliance with the Servicing Standards and Mandatory Relief Requirements, Servicer shall notify the Monitor promptly if Servicer becomes aware of reliable information indicating Servicer is engaged in a significant pattern or practice of noncompliance with a material aspect of the Servicing Standards or Mandatory Relief Requirements.

18.     Servicer shall provide the Monitor with access to all work papers prepared by the Internal Review Group in connection with determining compliance with the Metrics or satisfaction of the Consumer Relief Requirements in accordance with the Work Plan.

19.     If the Monitor becomes aware of facts or information that lead the Monitor to reasonably conclude that Servicer may be engaged in a pattern of noncompliance with a material term of the Servicing Standards that is reasonably likely to cause harm to borrowers or with any of the Mandatory Relief Requirements, the Monitor shall engage Servicer in a review to determine if the facts are accurate or the information is correct.

20.     Where reasonably necessary in fulfilling the Monitor's responsibilities under the Work Plan to assess compliance with the Metrics or the satisfaction of the Consumer Relief Requirements, the Monitor may request information from Servicer in addition to that provided under

E-7

Sections C.16-19. Servicer shall provide the requested information in a format agreed upon between Servicer and the Monitor.

21. Where reasonably necessary in fulfilling the Monitor's responsibilities under the Work Plan to assess compliance with the Metrics or the satisfaction of the Consumer Relief Requirements, the Monitor may interview Servicer's employees and agents, provided that the interviews shall be limited to matters related to Servicer's compliance with the Metrics or the Consumer Relief Requirements, and that Servicer shall be given reasonable notice of such interviews.

*Monitor's Powers*

22. Where the Monitor reasonably determines that the Internal Review Group's work cannot be relied upon or that the Internal Review Group did not correctly implement the Work Plan in some material respect, the Monitor may direct that the work on the Metrics (or parts thereof) be reviewed by Professionals or a third party other than the Internal Review Group, and that supplemental work be performed as necessary.

23. If the Monitor becomes aware of facts or information that lead the Monitor to reasonably conclude that Servicer may be engaged in a pattern of noncompliance with a material term of the Servicing Standards that is reasonably likely to cause harm to borrowers or tenants residing in foreclosed properties or with any of the Mandatory Relief Requirements, the Monitor shall engage Servicer in a review to determine if the facts are accurate or the information is correct. If after that review, the Monitor reasonably concludes that such a pattern exists and is reasonably likely to cause material harm to borrowers or tenants residing in foreclosed properties, the Monitor may propose an additional Metric and associated Threshold Error Rate relating to Servicer's compliance with the associated term or requirement. Any additional Metrics and associated Threshold Error Rates (a) must be similar to the Metrics and associated Threshold Error Rates contained in Schedule E-1, (b) must relate to material terms of the Servicing Standards or one of the Mandatory Relief Requirements, (c) must either (i) be outcomes-based (but no outcome-based Metric shall be added with respect to any Mandatory Relief Requirement) or (ii) require the existence of policies and procedures required by the Servicing Standards or the Mandatory Relief Requirements, in a manner similar to Metrics 5.B-E, and (d) must be distinct from, and not overlap with, any other Metric or Metrics. Notwithstanding the foregoing, the Monitor may add a Metric that satisfies (a)-(c) but does not satisfy (d) of the preceding sentence if the Monitor first asks the Servicer to propose, and then implement, a Corrective Action Plan, as defined below, for the material

E-8

term of the Servicing Standards with which there is a pattern of noncompliance and that is reasonably likely to cause material harm to borrowers or tenants residing in foreclosed properties, and the Servicer fails to implement the Corrective Action Plan according to the timeline agreed to with the Monitor.

24. If Monitor proposes an additional Metric and associated Threshold Error Rate pursuant to Section C.23, above, Monitor, the Monitoring Committee, and Servicer shall agree on amendments to Schedule E-1 to include the additional Metrics and Threshold Error Rates provided for in Section C.23, above, and an appropriate timeline for implementation of the Metric. If Servicer does not timely agree to such additions, any associated amendments to the Work Plan, or the implementation schedule, the Monitor may petition the court for such additions.

25. Any additional Metric proposed by the Monitor pursuant to the processes in Sections C.12, C.23, or C.24 and relating to provision VIII.B.1 of the Servicing Standards shall be limited to Servicer's performance of its obligations to comply with (1) the federal Protecting Tenants at Foreclosure Act and state laws that provide comparable protections to tenants of foreclosed properties; (2) state laws that govern relocation assistance payments to tenants ("cash for keys"); and (3) state laws that govern the return of security deposits to tenants.

## D. Reporting

### *Quarterly Reports*

1. Following the end of each Quarter, Servicer will report the results of its Compliance Reviews for that Quarter (the "Quarterly Report"). The Quarterly Report shall include: (i) the Metrics for that Quarter; (ii) Servicer's progress toward meeting its payment obligations under this Consent Judgment; (iii) general statistical data on Servicer's overall servicing performance described in Schedule Y. Except where an extension is granted by the Monitor, Quarterly Reports shall be due no later than 45 days following the end of the Quarter and shall be provided to: (1) the Monitor, and (2) the Board of Servicer or a committee of the Board designated by Servicer. The first Quarterly Report shall cover the first full Quarter after this Consent Judgment is entered.

2. Following the end of each Quarter, Servicer will transmit to each state a report (the "State Report") including general statistical data on Servicer's servicing performance, such as aggregate and state-specific information regarding the number of borrowers assisted and credited activities conducted pursuant to the Consumer Relief Requirements, as described in Schedule Y. The State Report will be delivered simultaneous with the

Case: 10-05245   Doc# 374-3   Filed: 02/06/14   Entered: 02/07/14 12:52:43   Page 43 of 55

submission of the Quarterly Report to the Monitor.  Servicer shall provide copies of such State Reports to the Monitor and Monitoring Committee.

*Monitor Reports*

3.    The Monitor shall report on Servicer's compliance with this Consent Judgment in periodic reports setting forth his or her findings (the "Monitor Reports").  The first three Monitor Reports will each cover two Quarterly Reports.  If the first three Monitor Reports do not find Potential Violations (as defined in Section E.1, below), each successive Monitor Report will cover four Quarterly Reports, unless and until a Quarterly Report reveals a Potential Violation (as defined in Section E.1, below).  In the case of a Potential Violation, the Monitor may (but retains the discretion not to) submit a Monitor Report after the filing of each of the next two Quarterly Reports, provided, however, that such additional Monitor Report(s) shall be limited in scope to the Metric or Metrics as to which a Potential Violation has occurred.

4.    Prior to issuing any Monitor Report, the Monitor shall confer with Servicer and the Monitoring Committee regarding its preliminary findings and the reasons for those findings.  Servicer shall have the right to submit written comments to the Monitor, which shall be appended to the final version of the Monitor Report.  Final versions of each Monitor Report shall be provided simultaneously to the Monitoring Committee and Servicers within a reasonable time after conferring regarding the Monitor's findings.  The Monitor Reports shall be filed with the Court overseeing this Consent Judgment and shall also be provided to the Board of Servicer or a committee of the Board designated by Servicer.

5.    The Monitor Report shall: (i) describe the work performed by the Monitor and any findings made by the Monitor's during the relevant period, (ii) list the Metrics and Threshold Error Rates, (iii) list the Metrics, if any, where the Threshold Error Rates have been exceeded, (iv) state whether a Potential Violation has occurred and explain the nature of the Potential Violation, and (v) state whether any Potential Violation has been cured.  In addition, following each Satisfaction Review, the Monitor Report shall report on the Servicer's satisfaction of the Consumer Relief Requirements, including regarding the number of borrowers assisted and credited activities conducted pursuant to the Consumer Relief Requirements, and identify any material inaccuracies identified in prior State Reports.  Except as otherwise provided herein, the Monitor Report may be used in any court hearing, trial, or other proceeding brought pursuant to this Consent Judgment pursuant to Section J, below, and shall be admissible in evidence in a proceeding brought under this Consent Judgment pursuant to Section J, below.  Such admissibility shall not prejudice Servicer's right

E-10

and ability to challenge the findings and/or the statements in the Monitor Report as flawed, lacking in probative value or otherwise. The Monitor Report with respect to a particular Potential Violation shall not be admissible or used for any purpose if Servicer cures the Potential Violation pursuant to Section E, below.

*Satisfaction of Payment Obligations*

6.      Upon the satisfaction of any category of payment obligation under this Consent Judgment, Servicer, at its discretion, may request that the Monitor certify that Servicer has discharged such obligation. Provided that the Monitor is satisfied that Servicer has met the obligation, the Monitor may not withhold and must provide the requested certification. Any subsequent Monitor Report shall not include a review of Servicer's compliance with that category of payment obligation.

*Compensation*

7.      Within 120 days of entry of this Consent Judgment, the Monitor shall, in consultation with the Monitoring Committee and Servicer, prepare and present to Monitoring Committee and Servicer an annual budget providing its reasonable best estimate of all fees and expenses of the Monitor to be incurred during the first year of the term of this Consent Judgment, including the fees and expenses of Professionals and support staff (the "Monitoring Budget"). On a yearly basis thereafter, the Monitor shall prepare an updated Monitoring Budget providing its reasonable best estimate of all fees and expenses to be incurred during that year. Absent an objection within 20 days, a Monitoring Budget or updated Monitoring Budget shall be implemented. Consistent with the Monitoring Budget, Servicer shall pay all fees and expenses of the Monitor, including the fees and expenses of Professionals and support staff. The fees, expenses, and costs of the Monitor, Professionals, and support staff shall be reasonable. Servicer may apply to the Court to reduce or disallow fees, expenses, or costs that are unreasonable.

**E. Potential Violations and Right to Cure**

1.      A "Potential Violation" of this Consent Judgment occurs if the Servicer has exceeded the Threshold Error Rate set for a Metric in a given Quarter. In the event of a Potential Violation, Servicer shall meet and confer with the Monitoring Committee within 15 days of the Quarterly Report or Monitor Report indicating such Potential Violation.

2.      Servicer shall have a right to cure any Potential Violation.

3.      Subject to Section E.4, a Potential Violation is cured if (a) a corrective action plan approved by the Monitor (the "Corrective Action Plan") is determined by the Monitor to have been satisfactorily completed in

E-11

accordance with the terms thereof; and (b) a Quarterly Report covering the Cure Period reflects that the Threshold Error Rate has not been exceeded with respect to the same Metric and the Monitor confirms the accuracy of said report using his or her ordinary testing procedures. The Cure Period shall be the first full quarter after completion of the Corrective Action Plan or, if the completion of the Corrective Action Plan occurs within the first month of a Quarter and if the Monitor determines that there is sufficient time remaining, the period between completion of the Corrective Action Plan and the end of that Quarter.

4.    If after Servicer cures a Potential Violation pursuant to the previous section, another violation occurs with respect to the same Metric, then the second Potential Violation shall immediately constitute an uncured violation for purposes of Section J.3, provided, however, that such second Potential Violation occurs in either the Cure Period or the quarter immediately following the Cure Period.

5.    In addition to the Servicer's obligation to cure a Potential Violation through the Corrective Action Plan, Servicer must remediate any material harm to particular borrowers identified through work conducted under the Work Plan. In the event that a Servicer has a Potential Violation that so far exceeds the Threshold Error Rate for a metric that the Monitor concludes that the error is widespread, Servicer shall, under the supervision of the Monitor, identify other borrowers who may have been harmed by such noncompliance and remediate all such harms to the extent that the harm has not been otherwise remediated.

6.    In the event a Potential Violation is cured as provided in Sections E.3, above, then no Party shall have any remedy under this Consent Judgment (other than the remedies in Section E.5) with respect to such Potential Violation.

**F.  Confidentiality**

1.    These provisions shall govern the use and disclosure of any and all information designated as "CONFIDENTIAL," as set forth below, in documents (including email), magnetic media, or other tangible things provided by the Servicer to the Monitor in this case, including the subsequent disclosure by the Monitor to the Monitoring Committee of such information. In addition, it shall also govern the use and disclosure of such information when and if provided to the participating state parties or the participating agency or department of the United States whose claims are released through this settlement ("participating state or federal agency whose claims are released through this settlement").

E-12

2.     The Monitor may, at his discretion, provide to the Monitoring Committee or to a participating state or federal agency whose claims are released through this settlement any documents or information received from the Servicer related to a Potential Violation or related to the review described in Section C.19; provided, however, that any such documents or information so provided shall be subject to the terms and conditions of these provisions. Nothing herein shall be construed to prevent the Monitor from providing documents received from the Servicer and not designated as "CONFIDENTIAL" to a participating state or federal agency whose claims are released through this settlement.

3.     The Servicer shall designate as "CONFIDENTIAL" that information, document or portion of a document or other tangible thing provided by the Servicer to the Monitor, the Monitoring Committee or to any other participating state or federal agency whose claims are released through this settlement that Servicer believes contains a trade secret or confidential research, development, or commercial information subject to protection under applicable state or federal laws (collectively, "Confidential Information"). These provisions shall apply to the treatment of Confidential Information so designated.

4.     Except as provided by these provisions, all information designated as "CONFIDENTIAL" shall not be shown, disclosed or distributed to any person or entity other than those authorized by these provisions. Participating states and federal agencies whose claims are released through this settlement agree to protect Confidential Information to the extent permitted by law.

5.     This agreement shall not prevent or in any way limit the ability of a participating state or federal agency whose claims are released through this settlement to comply with any subpoena, Congressional demand for documents or information, court order, request under the Right of Financial Privacy Act, or a state or federal public records or state or federal freedom of information act request; provided, however, that in the event that a participating state or federal agency whose claims are released through this settlement receives such a subpoena, Congressional demand, court order or other request for the production of any Confidential Information covered by this Order, the state or federal agency shall, unless prohibited under applicable law or the unless the state or federal agency would violate or be in contempt of the subpoena, Congressional demand, or court order, (1) notify the Servicer of such request as soon as practicable and in no event more than ten (10) calendar days of its receipt or three calendar days before the return date of the request, whichever is sooner, and (2) allow the Servicer ten (10) calendar days from the receipt of the notice to obtain a protective order or stay of production for the

E-13

Case: 10-05245    Doc# 374-3    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 47 of 55

documents or information sought, or to otherwise resolve the issue, before the state or federal agency discloses such documents or information. In all cases covered by this Section, the state or federal agency shall inform the requesting party that the documents or information sought were produced subject to the terms of these provisions.

**G.** **Dispute Resolution Procedures.** Servicer, the Monitor, and the Monitoring Committee will engage in good faith efforts to reach agreement on the proper resolution of any dispute concerning any issue arising under this Consent Judgment, including any dispute or disagreement related to the withholding of consent, the exercise of discretion, or the denial of any application. Subject to Section J, below, in the event that a dispute cannot be resolved, Servicer, the Monitor, or the Monitoring Committee may petition the Court for resolution of the dispute. Where a provision of this agreement requires agreement, consent of, or approval of any application or action by a Party or the Monitor, such agreement, consent or approval shall not be unreasonably withheld.

**H.** **Consumer Complaints.** Nothing in this Consent Judgment shall be deemed to interfere with existing consumer complaint resolution processes, and the Parties are free to bring consumer complaints to the attention of Servicer for resolution outside the monitoring process. In addition, Servicer will continue to respond in good faith to individual consumer complaints provided to it by State Attorneys General or State Financial Regulators in accordance with the routine and practice existing prior to the entry of this Consent Judgment, whether or not such complaints relate to Covered Conduct released herein.

**I.** **Relationship to Other Enforcement Actions.** Nothing in this Consent Judgment shall affect requirements imposed on the Servicer pursuant to Consent Orders issued by the appropriate Federal Banking Agency (FBA), as defined in 12 U.S.C. § 1813(q), against the Servicer. In conducting their activities under this Consent Judgment, the Monitor and Monitoring Committee shall not impede or otherwise interfere with the Servicer's compliance with the requirements imposed pursuant to such Orders or with oversight and enforcement of such compliance by the FBA.

**J.** **Enforcement**

1.  **Consent Judgment.** This Consent Judgment shall be filed in the U.S. District Court for the District of Columbia (the "Court") and shall be enforceable therein. Servicer and the Releasing Parties shall waive their rights to seek judicial review or otherwise challenge or contest in any court the validity or effectiveness of this Consent Judgment. Servicer and the Releasing Parties agree not to contest any jurisdictional facts, including the Court's authority to enter this Consent Judgment.

2.  **Enforcing Authorities.** Servicer's obligations under this Consent Judgment shall be enforceable solely in the U.S. District Court for the

District of Columbia. An enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee. Monitor Report(s) and Quarterly Report(s) shall not be admissible into evidence by a Party to this Consent Judgment except in an action in the Court to enforce this Consent Judgment. In addition, unless immediate action is necessary in order to prevent irreparable and immediate harm, prior to commencing any enforcement action, a Party must provide notice to the Monitoring Committee of its intent to bring an action to enforce this Consent Judgment. The members of the Monitoring Committee shall have no more than 21 days to determine whether to bring an enforcement action. If the members of the Monitoring Committee decline to bring an enforcement action, the Party must wait 21 additional days after such a determination by the members of the Monitoring Committee before commencing an enforcement action.

3.   **Enforcement Action.**  In the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation for which Servicer's time to cure has expired, the sole relief available in such an action will be:

  (a)   Equitable Relief. An order directing non-monetary equitable relief, including injunctive relief, directing specific performance under the terms of this Consent Judgment, or other non-monetary corrective action.

  (b)   Civil Penalties. The Court may award as civil penalties an amount not more than $1 million per uncured Potential Violation; or, in the event of a second uncured Potential Violation of Metrics 1.a, 1.b, or 2.a (*i.e.,* a Servicer fails the specific Metric in a Quarter, then fails to cure that Potential Violation, and then in subsequent Quarters, fails the same Metric again in a Quarter and fails to cure that Potential Violation again in a subsequent Quarter), where the final uncured Potential Violation involves widespread noncompliance with that Metric, the Court may award as civil penalties an amount not more than $5 million for the second uncured Potential Violation.

Nothing in this Section shall limit the availability of remedial compensation to harmed borrowers as provided in Section E.5.

  (c)   Any penalty or payment owed by Servicer pursuant to the Consent Judgment shall be paid to the clerk of the Court or as otherwise agreed by the Monitor and the Servicer and distributed by the Monitor as follows:

E-15

1.    In the event of a penalty based on a violation of a term of the Servicing Standards that is not specifically related to conduct in bankruptcy, the penalty shall be allocated, first, to cover the costs incurred by any state or states in prosecuting the violation, and second, among the participating states according to the same allocation as the State Payment Settlement Amount.

2.    In the event of a penalty based on a violation of a term of the Servicing Standards that is specifically related to conduct in bankruptcy, the penalty shall be allocated to the United States or as otherwise directed by the Director of the United States Trustee Program.

3.    In the event of a payment due under Paragraph 10.d of the Consumer Relief requirements, 50% of the payment shall be allocated to the United States, and 50% shall be allocated to the State Parties to the Consent Judgment, divided among them in a manner consistent with the allocation in Exhibit B of the Consent Judgment.

**K.**    **Sunset.** This Consent Judgment and all Exhibits shall retain full force and effect for three and one-half years from the date it is entered (the "Term"), unless otherwise specified in the Exhibit. Servicer shall submit a final Quarterly Report for the last quarter or portion thereof falling within the Term, and shall cooperate with the Monitor's review of said report, which shall be concluded no later than six months following the end of the Term, after which time Servicer shall have no further obligations under this Consent Judgment.

# EXHIBIT E-1

# Servicing Standards Quarterly Compliance Metrics

## Executive Summary

**Sampling:** (a) A random selection of the greater of 100 loans and a statistically significant sample. (b) Sample will be selected from the population as defined in column E.

**Review and Reporting Period:** Results will be reported Quarterly and 45 days after the end of the quarter.

**Error Definition:** An error is a measurement in response to a test question related to the Servicing Standards that results in the failure of the specified outcome. Errors in response to multiple questions with respect to a single outcome would be treated as only a single error.

## Metrics Tested

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[3] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| **1. Outcome Creates Significant Negative Customer Impact** | | | | | |
| A. Foreclosure sale in error | Customer is in default, legal standing to foreclose, and the loan is not subject to active trial, or BK. | n/a | 1% | **Population Definition:** Foreclosure Sales that occurred in the review period. <br><br> A. **Sample** #of Foreclosure Sales in the review period that were tested. <br><br> B. **Error Definition:** # of loans that went to foreclosure sale in error due to failure of any one of the test questions for this metric. <br><br> Error Rate = B/A | 1. Did the foreclosing party have legal standing to foreclose? <br> 2. Was the borrower in an active trial period plan (unless the servicer took appropriate steps to postpone sale)? <br> 3. Was the borrower offered a loan modification fewer than 14 days before the foreclosure sale date (unless the borrower declined the offer or the servicer took appropriate steps to postpone the sale)? <br> 4. Was the borrower not in default (unless the default is cured to the satisfaction of the Servicer or investor within 10 days before the foreclosure sale date and the Servicer took appropriate steps to postpone sale)? <br> 5. Was the borrower protected from foreclosure by Bankruptcy (unless Servicer had notice of such protection fewer than 10 days before the foreclosure sale date and Servicer took appropriate steps to postpone sale)? |

E1-1

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | Metric | Measurements | Loan Level Tolerance for Error | Threshold Error Rate | Test Loan Population and Error Definition | Test Questions |
| | 3. Incorrect Mod denial | Program eligibility, all documentation received, DTI test, NPV test. | 5% On income errors | 5% | **Population Definition:** Modification Denied in the Review Period. **Error Definition:** # of loans that were denied a modification as a result of failure of anyone of the test questions for this metric. | 1. Was the evaluation of eligibility inaccurate ( as per HAMP, Fannie, Freddie or proprietary modification criteria)? 2. Was the income calculation inaccurate? 3. Were the inputs used in the decision tool (NPV and Waterfall test) entered in error or inconsistent with company policy? 4. Was the loan NPV positive? 5. Was there an inaccurate determination that the documents received were incomplete? 6. Was the trial inappropriately failed? |

**2. Integrity of Critical Sworn Documents**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | A. Was AOI properly prepared | Based upon personal knowledge, properly notarized, amounts agree to system of record within tolerance if overstated. | Question 1, Y/N; Question 2, Amounts overstated (or, for question on Escrow Amounts, understated) by the greater of $99 or 1% of the Total Indebtedness Amount | 5% | **Population Definition:** Affidavits of Indebtedness filed in the review period. **Error Definition:** for question 1, yes; for question 2, the # of Loans where the sum of errors exceeds the allowable threshold. | 1. Taken as a whole and accounting for contrary evidence provided by the Servicer, does the sample indicate systemic issues with either affiants lacking personal knowledge or improper notarization? 2. Verify all the amounts outlined below against the system of record a. Was the correct principal balance used Was the correct interest amount (and per diem) used? b. Was the escrow balance correct? c. Were correct other fees used? d. Was the correct corporate advance balance used? e. Was the correct late charge balance used? f. Was the suspense balance correct? g. Was the total indebtedness amount on the Affidavit correct? |

E1-2

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| B. POC | Accurate statement of pre-petition arrearage to system of record. | Amounts over stated by the greater of $50 or 3% of the correct Pre-Petition Arrearage | 5% | **Population Definition:** POCs filed in the review period.<br><br>**Error Definition:** # of Loans where sum of errors exceeds the allowable threshold. | 1) Are the correct amounts set forth in the form, with respect to pre-petition missed payments, fees, expenses charges, and escrow shortages or deficiencies? |
| C. MRS Affidavits | Customer is in default and amount of arrearage is within tolerance. | Amounts overstated (or for escrows amounts, understated) by the greater of $50 or 3% of the correct Post Petition Total Balance | 5% | **Population Definition:** Affidavits supporting MRS's filed in the review period<br><br>**Error Definition:** # of Loans where the sum of errors exceeds the allowable threshold. | 1. Verify against the system of record, within tolerance if overstated:<br>   a. the post-petition default amount;<br>   b. the amount of fees or charges applied to such pre-petition default amount or post-petition amount since the later of the date of the petition or the preceding statement; and<br>   c. escrow shortages or deficiencies. |

E1-3

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| **Pre-foreclosure initiation** | | | | | |
| A. Pre-Foreclosure Initiation | Accuracy of Account information. | Amounts over stated by the greater of $99 or 1% of the Total balance | 5% | **Population Definition:** Loans with a Foreclosure referral date in the review period.<br><br>**Error Definition:** # of Loans that were referred to foreclosure with an error in any one of the foreclosure initiation test questions. | ** Verify all the amounts outlined below against the system of record.<br><br>1. Was the loan delinquent as of the date the first legal action was filed?<br>2. Was information contained in the Account Statement completed accurately?<br>a) The total amount needed to reinstate or bring the account current, and the amount of the principal;<br>b) The date through which the borrower's obligation is paid;<br>c) The date of the last full payment;<br>d) The current interest rate in effect for the loan;<br>e) The date on which the interest rate may next reset or adjust;<br>f) The amount of any prepayment fee to be charged, if any;<br>g) A description of any late payment fees; and<br>h) a telephone number or electronic mail address that may be used by the obligor to obtain information regarding the mortgage. |

E1-4