| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| B. Foreclosure Initiation Notifications | Notification sent to the customer supporting right to foreclose along with: Applicable information upon customers request, Account statement information, Ownership statement, and Loss Mitigation statement. Notifications required before 14 days prior to referral to foreclosure. | N/A | 5% | **Population Definition:** Loans with a Foreclosure referral date in the review period. **Error Definition:** # of Loans that were referred to foreclosure with an error in any one of the foreclosure initiation test questions. | 1. Were all the required notifications statements mailed no later than 14 days prior to first Legal Date (i) Account Statement; (ii) Ownership Statement; and (iii) Loss Mitigation Statement? 2. Did the Ownership Statement accurately reflect that the servicer or investor has the right to foreclose? 3. Was the Loss Mitigation Statement complete and did it accurately state that a) The borrower was ineligible (if applicable); or b) The borrower was solicited, was the subject of right party contact routines, and that any timely application submitted by the borrower was evaluated? |

E1-5

**4. Accuracy and Timeliness of Payment Application and Appropriateness of Fees**

| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[1] | Test Loan Population and Error Definition | Test Questions |
|---|---|---|---|---|---|
| A. Fees adhere to guidance (Preservation fees, Valuation fees and attorney's fees) | Services rendered, consistent with loan instrument, within applicable requirements. | Amounts over stated by the greater of $50 or 3% of the Total Default Related Fees Collected | 5% | **Population Definition:** Defaulted loans (60 +) with borrower payable default related fees* collected.<br><br>**Error Definition:** # of loans where the sum of default related fee errors exceeds the threshold.<br><br>* Default related fees are defined as any fee collected for a default-related service after the agreement date.[1] | For fees collected in the test period:<br><br>1. Was the frequency of the fees collected (in excess of what is consistent with state guidelines or fee provisions in servicing standards)*<br><br>2. Was amount of the fee collected higher than the amount allowable under the Servicer's Fee schedule and for which there was not a valid exception? |
| B. Adherence to customer payment processing | Payments posted timely (within 2 business days of receipt) and accurately. | Amounts understated by the greater $50.00 or 3% of the scheduled payment | 5% | **Population Definition:** All subject payments posted within review period.<br><br>**Error Definition:** # of loans with an error in any one of the payment application test questions. | 1. Were payments posted to the right account number?<br>2. Were payments posted in the right amount?<br>3. Were properly identified conforming payments posted within 2 business days of receipt and credited as of the date of receipt?<br>4. Did servicer accept payments within $50.00 of the scheduled payment, including principal and interest and where applicable taxes and insurance as required by the servicing standards?<br>5. Were partial payments credited to the borrower's account as of the date that the funds cover a full payment?<br>6. Were payments posted to principal interest and escrow before fees and expenses? |

E1-6

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error [1] | Threshold Error Rate [2] | Test Loan Population and Error Definition | Test Questions |
| C. Reconciliation of certain waived fees. (I.b.11.C) | Appropriately updating the Servicer's systems of record in connection with the reconciliation of payments as of the date of dismissal of a debtor's Chapter 13 bankruptcy case, entry of an order granting Servicer relief from the stay under Chapter 13, or entry of an order granting the debtor a discharge under Chapter 13, to reflect the waiver of any fee, expense or charge pursuant to paragraphs III.B.1.c.i or III.B.1.d of the Servicing Standards (within applicable tolerances). | Amounts over stated by the greater of $50 or 3 % of the correct reconciliation amount | 5% | **Population Definition:** All accounts where in-line reconciliation routine is completed within review period.<br><br>**Error Definition:** # of loans with an error in the reconciliation routine resulting in overstated amounts remaining on the borrower account. | 1. Were all required waivers of fees, expense or charges applied and/or corrected accurately as part of the reconciliation? |
| D. Late fees adhere to guidance | Late fees are collected only as permitted under the Servicing Standards (within applicable tolerances). | Y/N | 5% | **Population Definition:** All late fees collected within the review period.<br><br>**Error Definition:** # of loans with an error on any one of the test questions. | 1. Was a late fee collected with respect to a delinquency attributable solely to late fees or delinquency charges assessed on an earlier payment? |

E1-7

| METRIC | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
|---|---|---|---|---|---|
| | | **C** | **D** | **E** | **F** |
| **5. Policy/Process Implementation** | | | | | |
| A. Third Party Vendor Management | Is periodic third party review process in place? Is there evidence of remediation of identified issues? | Y/N | N | Quarterly review of a vendors providing Foreclosure Bankruptcy, Loss mitigation and other Mortgage services.<br><br>**Error Definition:** Failure on any one of the test questions for this metric. | 1. Is there evidence of documented oversight policies and procedures demonstrating compliance with vendor oversight provisions: (i) adequate due diligence procedures, (ii) adequate enforcement procedures (iii) adequate vendor performance evaluation procedures (iv) adequate remediation procedures?[3]<br>2. Is there evidence of periodic sampling and testing of foreclosure documents (including notices of default and letters of reinstatement) and bankruptcy documents prepared by vendors on behalf of the servicer?<br>3. Is there evidence of periodic sampling of fees and costs assessed by vendors to: (i) substantiate services were rendered (ii) fees are in compliance with servicer fee schedule (iii) Fees are compliant with state law and provisions of the servicing standards?<br>4. Is there evidence of vendor scorecards used to evaluate vendor performance that include quality metrics (error rate etc)?<br>5. Evidence of remediation for vendors who fail metrics set forth in vendor scorecards and/or QC sample tests consistent with the servicer policy and procedures? |
| B. Customer Portal | Implementation of a customer portal. | Y/N | N | A Quarterly testing review of Customer Portal. | 1. Does the portal provide loss mitigation status updates? |

E1-8

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error³ | Threshold Error Rate² | Test Loan Population and Error Definition | Test Questions |
| C. SPOC | Implement single point of contact ("SPOC"). | Y/N 5% for Question 4 | N For Question #4: 5% | Quarterly review of SPOC program per provisions in the servicing standard.<br><br>**Population Definition (for Question 4):** Potentially eligible borrowers who were identified as requesting loss mitigation assistance.<br><br>**Error Definition:** Failure on any one of the test questions for this metric. | **Test Questions**<br>1. Is there evidence of documented policies and procedures demonstrating compliance with SPOC program provisions?<br>2. Is there evidence that a single point of contact is available for applicable borrowers?<br>3. Is there evidence that relevant records relating to borrower's account are available to the borrower's SPOC?<br>4. Is there evidence that the SPOC has been identified to the borrower and the method the borrower may use to contact the SPOC has been communicated to the borrower? |
| D. Workforce Management | Training and staffing adequacy requirements. | Y/N | N | Loss mitigation, SPOC and Foreclosure Staff.<br><br>**Error Definition:** Failure on any one of the test questions for this metric. | 1. Is there evidence of documented oversight policies and procedures demonstrating effective forecasting, capacity planning, training and monitoring of staffing requirements for foreclosure operations?<br>2. Is there evidence of periodic training and certification of employees who prepare Affidavits sworn statements or declarations. |
| E. Affidavit of Indebtedness Integrity. | Affidavits of Indebtedness are signed by affiants who have personal knowledge of relevant facts and properly review the affidavit before signing it. | Y/N | N | Annual Review of Policy. | 1. Is there evidence of documented policies and procedures sufficient to provide reasonable assurance that affiants have personal knowledge of the matters covered by affidavits of indebtedness and have reviewed affidavit before signing it? |
| F. Account Status Activity. | System of record electronically documents key activity of a foreclosure, loan modification, or bankruptcy. | Y/N | N | Annual Review of Policy. | 1. Is there evidence of documented policies and procedures designed to ensure that the system of record contains documentation of key activities? |

E1-9

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[3] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| **6. Customer Experiences** | | | | | |
| **A. Complaint response timeliness** | Meet the requirements of Regulator complaint handling. | N/A | 5% | **Population Definition: Government** submitted complaints and inquiries from individual borrowers who are in default and/or have applied for loan modifications received during the three months prior to 40 days prior to the review period. (To allow for response period to expire).<br><br>**Error Definition:** # of loans that exceeded the required response timeline. | 1. Was written acknowledgment regarding complaint/inquiries sent within 10 business days of complaint/inquiry receipt?**<br><br>2. Was a written response ("Forward Progress") sent within 30 calendar days of complaint/inquiry receipt?**<br><br>**receipt= from the Attorney General, state financial regulators, the Executive Office for United States Trustees/regional offices of the United States Trustees, and the federal regulators and documented within the System of Record. |
| **B. Loss Mitigation** | | | | | |
| **i. Loan Modification document Collection timeline compliance** | | N/A | 5% | **Population Definition:** Loan modifications and loan modification requests (packages) that were missing documentation at receipt and received more than 40 days prior to the end of the review period.<br><br>**Error Definition:** The total # of loans processed outside the allowable timelines as defined under each timeline requirement tested. | 1. Did the Servicer notify borrower of any known deficiency in borrower's initial submission of information, no later than 5 business days after receipt, including any missing information or documentation?<br><br>2. Was the Borrower afforded 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination on whether or not to grant an initial loan modification? |

E1-10

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| ii. Loan Modification Decision/Notification timeline compliance | | | 10% | **Population Definition:** Loan modification requests (packages) that are denied or approved in the review period.<br><br>**Error Definition:** The total # of loans processed outside the allowable timelines as defined under each timeline requirement tested. | 1. Did the servicer respond to request for a modification within 30 days of receipt of all necessary documentation?<br>2. Denial Communication: Did the servicer notify customers within 10 days of denial decision? |
| iii. Loan Modification Appeal timeline compliance | | | 10% | **Population Definition:** Loan modification requests (packages) that are borrower appeals in the review period.<br><br>**Error Definition:** The total # of loans processed outside the allowable timeline tested. | 1. Did Servicer respond to a borrowers request for an appeal within 30 days of receipt? |
| iv. Short Sale Decision timeline compliance | | | 10% | **Population Definition:** Short sale requests (packages) that are complete in the three months prior to 30 days prior to the end of the review period. (to allow for short sale review to occur).<br><br>**Error Definition:** The total # of loans processed outside the allowable timeline tested. | 1. Was short sale reviewed and a decision communicated within 30 days of borrower submitting completed package? |

E1-11

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| Metric | | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| v. Short Sale Document Collection timeline compliance | | | | 5% | **Population Definition:** Short sale requests (packages) missing documentation that are received in the three months prior to 30 days prior to the end of the review period (to allow for short sale review to occur). **Error Definition:** The total # of loans processed outside the allowable timeline tested. | 1. Did the Servicer provide notice of missing documents within 30 days of the request for the short sale? |
| vi. Charge of application fees for loss mitigation | | | | 1% | **Population Definition:** loss mitigation requests (packages) that are incomplete, denied, approved and borrower appeals in the review period. (Same as 6.B.i) **Error Definition:** The # of loss mitigation applications where servicer collected a processing fee. | 1. Did the servicer assess a fee for processing a loss mitigation request? |
| vii. Short Sales a. Inclusion of notice of whether or not a deficiency will be required | | Provide information related to any required deficiency claim. | n/a | 5% | **Population Definition:** Short sales approved in the review period. **Error Definition:** The # of short sales that failed any one of the deficiency test questions. | 1. If the short sale was accepted, did borrower receive notification that deficiency or cash contribution will be needed? 2. Did borrower receive in this notification approximate amounts related to deficiency or cash contribution? |
| viii. Dual Track | | | | | | |

E1-12

| Metric | Measurements | Loan Level Tolerance for Error | Threshold Error Rate | Test Loan Population and Error Definition | Test Questions |
|---|---|---|---|---|---|
| a. Referred to foreclosure in violation of Dual Track Provisions | Loan was referred to foreclosure in error. | n/a | 5% | **Population Definition:** The # of loans with a first legal action date in the review period. **Error Definition:** The # of loans with a first legal filed in the review period that failed any one of the dual tracking test questions. | **Test Questions** 1. Was the first legal action taken while the servicer was in possession of an active, complete loan modification package (as defined by the Servicing Standards) that was not decisioned as required by the standards? 2. Was the first legal commenced while the borrower was approved for a loan modification but prior to the expiration of the borrower acceptance period, borrower decline of offer or while in an active trial period plan? |
| b. Failure to postpone foreclosure proceedings in violation of Dual Track Provisions | Foreclosure proceedings allowed to proceed in error. | n/a | 5% | **Population Definition:** Active foreclosures during review period. **Error Definition:** # of active foreclosures that went to judgment as a result of failure of any one on of the active foreclosure dual track test question. | 1. Did the servicer proceed to judgment or order of sale upon receipt of a complete loan modification package within 30 days of the Post-Referral to Foreclosure Solicitation Letter?** **Compliance of Dual tracking provisions for foreclosure sales are referenced in 1.A |
| **C. Forced Placed Insurance** | | | | | |
| i. Timeliness of notices | Notices sent timely with necessary information. | n/a | 5% | **Population Definition:** Loans with forced placed coverage initiated in review period. **Error Definition:** # of loans with active force place insurance resulting from an error in any one of the force-place insurance test questions. | 1. Did Servicer send all required notification letters (ref. V 3a i-vii) notifying the customer of lapse in insurance coverage? 2. Did the notification offer the customer the option to have the account escrowed to facilitate payment of all insurance premiums and any arrearage by the servicer prior to obtaining force place insurance? 3. Did the servicer assess forced place insurance when there was evidence of a valid policy? |
| ii Termination of Force place insurance | Timely termination of force placed insurance. | | 5% | **Population Definition:** Loans with forced placed coverage terminated in review period. **Error Definition:** # of loans terminated force place insurance with an error in any one of the force- place insurance test questions. | Did Servicer terminate FPI within 15 days of receipt of evidence of a borrower's existing insurance coverage and refund the pro-rated portion to the borrower's escrow account? |

E1-13

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |

[1] Loan Level Tolerance for Error:: This represents a threshold beyond which the variance between the actual outcome and the expected outcome on a single test case is deemed reportable

[2] Threshold Error Rate: For each metric or outcome tested if the total number of reportable errors as a percentage of the total number of cases tested exceeds this limit then the Servicer will be determined to have failed that metric for the reported period.

[3] For purposes of determining whether a proposed Metric and associated Threshold Error Rate is similar to those contained in this Schedule, this Metric 5.A shall be excluded from consideration and shall not be treated as representative.

E1-14

Case: 10-05149   Doc #: 374-4   Filed: 02/06/14   Entered: 02/07/14 12:52:43   Page 10 of 61

# EXHIBIT F

## FEDERAL RELEASE

This Federal Release ("Release") is entered into among the United States of America, its

agencies, and departments (collectively, "the United States"), acting through the United States

Department of Justice, and JPMorgan Chase & Co. (the "COMPANY") (hereafter the United

States and the COMPANY are collectively referred to as "the Parties"), through their authorized

representatives.

RECITALS

A.      The COMPANY is a Delaware corporation headquartered in New York, New

York.

B.      The COMPANY is a financial holding and a bank holding company.  The

COMPANY, either through its own operations or through the operations of its affiliates and

subsidiaries, serves, and during the relevant period served: (1) as a participant in the Direct

Endorsement Lender program of the Federal Housing Administration (FHA) within the United

States Department of Housing and Urban Development (HUD); (2) as a mortgagee or servicer

for mortgages insured or guaranteed by federal mortgage programs administered by agencies that

include FHA, the United States Department of Veterans Affairs (VA), and the United States

Department of Agriculture Rural Development; (3) as a participating servicer in the Making

Home Affordable Program (MHA) (including MHA's component program, the Home Affordable

Modification Program (HAMP)) of the United States Department of the Treasury (Treasury) and

HUD, and as a participant in various state programs of the Housing Finance Agency Innovation

Fund for the Hardest Hit Housing Markets (HHF); and (4) as an entity that litigates single-family

residential mortgage issues in U.S. Bankruptcy Courts in capacities that include commencing and pursuing or supporting litigation commenced against mortgagors and other debtors.

C.     The United States contends that it has certain civil claims based on conduct of the COMPANY and its affiliated entities in servicing of mortgage loans (the "Covered Servicing Conduct"). Such Covered Servicing Conduct encompasses all activities of the COMPANY, of any affiliated entity during or prior to such time as it was an affiliated entity, and all of the current or former officers, directors, employees and agents of any of the foregoing, directed toward servicing (including subservicing and master servicing), whether for their own account or for the account of others, of mortgage loans for single-family residential homeowners (which includes loans secured by one- to four-family residential properties, whether used for investor or consumer purposes), whether in the form of a mortgage, deed of trust or other security instrument creating a lien upon such property or any other property described therein that secures the related mortgage loan ("single-family residential mortgage loans") from and after the closing of a borrower's mortgage loan and includes, but is not limited to, the following conduct:

(1)     Deficiencies in performing loan modification and other loss mitigation activities, including extensions, forbearances, short sales and deeds in lieu of foreclosure, setting the qualifying criteria for any of the foregoing and/or setting the terms and conditions for any of the foregoing;

(2)     Deficiencies in foreclosing on single-family residential mortgage loans or acquiring title in lieu of foreclosure, including the designation and identity of the foreclosing party, the timing of foreclosures, transfer of legal or beneficial ownership to the mortgage loan

F-2

and/or the related servicing rights or obligations, the charging of any fees, the preparation,

contents, execution, notarization or presentation of any documents filed with or submitted to a

court or any government agency, or otherwise used as part of the foreclosure process (including,

but not limited to, affidavits, declarations, certifications, substitutions of trustees, and

assignments) and dual-tracking foreclosure and loan modification activities, and communications

with borrowers in respect of foreclosure;

        (3)     Other deficiencies in servicing single-family residential mortgage loans

relating to:

        (a)     Collections activity, including all contact with borrowers (e.g.,

telephone calls, letters, and in-person visits) in respect of such activities;

        (b)     Practices relating to paying or failing to pay taxes (including

property taxes), hazard insurance, forced-place insurance, and homeowner association dues or

other items provided for in a mortgage loan escrow arrangement (including making or failing to

make such payments), including obtaining or maintaining insurance and advancing funds to pay

therefor and the creation and maintenance of such escrow accounts;

        (c)     Use or supervision of vendors, agents and contract employees, and

their activities in connection with creation and recording of assignments, servicing, foreclosure,

and loss mitigation activities, including subservicers, foreclosure and bankruptcy attorneys, and

other default service providers, and pursuit of claims against vendors and other third parties for

failure of such third parties to comply with contractual or other obligations;

F-3

(d)     Activities related to the executing, notarizing, transferring or recording of mortgages; the obtaining, executing, notarizing, transferring or recording of assignments; or activities related to the use of any mortgage registry system, including MERS, and including the transferring of mortgages or assignments using MERS;

(e)     Account statements, disclosures, and/or other communications to borrowers; unintentional reporting errors regarding activities that, but for this Paragraph, would be Covered Servicing Conduct, and unintentional remittance errors that are cured;

(f)     Maintenance and placement of loan-level and pool-level mortgage insurance and guarantees, hazard insurance, flood insurance, title insurance, and other insurance related to mortgage loans and related properties, including claims activity;

(g)     Handling and resolution of inquiries, disputes and complaints by or on behalf of borrowers and frequency and adequacy of communications with borrowers;

(h)     Securing, inspecting, repairing, maintaining, or preserving properties both before and after foreclosure or other acquisition of title;

(i)     Adequacy of staffing, training, systems and processes, including maintenance and security of access to records relating to servicing, foreclosure, bankruptcy, property sale and management and activities related or ancillary thereto;

(j)     Determinations in respect of the appropriate actions of obtaining value for mortgage loans, including whether to pursue foreclosure on properties, whether to assert

F-4

or abandon liens and other claims and actions taken in respect thereof, and whether to pursue a

loan modification or any particular loan modification or other form of loss mitigation;

      (k)     Acceptance, rejection, application, or reporting of payments made

on behalf of borrowers, including the assessment of any fees and placement of the payment(s) in a

suspense account;

      (l)     Obtaining, securing, updating, transferring, or providing

promissory notes or endorsements of promissory notes through allonges or otherwise;

      (m)     Licensing or registration of employees, agents, or contractors, or

designation of employees as agents for another entity, through corporate resolutions or Powers of

Attorney or otherwise;

      (n)     Pursuing claims post foreclosure, including seeking deficiency

judgments;

      (o)     Eviction notices, registrations of vacant properties, and any activity

relating to the sale or disposition of foreclosed or acquired properties (including Real Estate

Owned properties), including management of such properties and proceedings related to such

properties;

      (p)     Executing, notarizing, or recording any documents related to the

sale of acquired properties, including the warranty deeds and closing documents;

F-5

(q)     Custodial and trustee functions related to the Covered Servicing Conduct;

(r)     Quality control, quality assurance or compliance or audit testing or oversight related to the Covered Servicing Conduct; for avoidance of doubt, quality control or compliance reviews associated with the origination, sale, or securitization of mortgage loans does not constitute Covered Servicing Conduct;

(s)     Reporting, certification or registration requirements related to any of the Covered Servicing Conduct; and

(t)     Communications with borrowers with respect to the Covered Servicing Conduct.

(4)     Deficiencies in the COMPANY's or any of its affiliates' participation in and implementation of the Hardest Hit Fund Program and Making Home Affordable Program, including all of its component programs (e.g., HAMP, 2MP, HAFA, UP, PRA-HAMP, FHA-HAMP, FHA2LP, and RD-HAMP).

D.     The United States further contends that it has certain civil claims based on the conduct of the COMPANY and its affiliated entities in originating mortgage loans (the "Covered Origination Conduct"). Such Covered Origination Conduct consists of all activities of the COMPANY, of any affiliated entity during or prior to such time as it was an affiliated entity, and all of the current or former officers, directors, employees, and agents of any of the foregoing, directed toward directly or indirectly originating, assisting in the origination of, or purchasing

F-6

single-family residential mortgage loans and excludes conduct occurring following the closing of

the borrower's mortgage loan that is otherwise covered as the Covered Servicing Conduct. Such

Covered Origination Conduct includes, but is not limited to, the following conduct:

(1)      Submitting loans for insurance endorsement and claims for insurance

benefits for FHA loans that the COMPANY or any affiliated entity during or prior to such time

as it was an affiliated entity endorsed or underwrote as a participant in the FHA's Direct

Endorsement Program that failed to meet any applicable underwriting requirements, including

those set forth in the applicable version of the HUD Handbook 4155.1, as supplemented by

relevant mortgagee letters, all as of the time of origination;

(2)      Submitting loans for insurance endorsement or claims for insurance

benefits for FHA loans that the COMPANY or any affiliated entity during or prior to such time

as it was an affiliated entity endorsed or underwrote as a participant in the FHA's Direct

Endorsement Program while failing to implement applicable quality control measures; and

(3)      Other deficiencies in originating single-family residential mortgage loans

relating to:

(a)      Processing, underwriting, closing, or funding of loans and the

terms and conditions of such loans;

(b)      Approving or denying loan applications;

F-7

Case: 10-05245     Doc# 374-4     Filed: 02/06/14     Entered: 02/07/14 12:52:43     Page 18 of 61

(c)      Pricing of loans, including the charging and splitting of any fee or discount points;

(d)      Recommendations of particular types of loan products, loan features or terms and conditions of any loan;

(e)      Valuing the properties used as collateral for such loans, including use of employee, independent and vendor management appraisers and alternative valuation methods such as AVMs and BPOs;

(f)      Use of vendors, including vendor management companies and other providers of real estate settlement services, whether affiliated or unaffiliated;

(g)      Payment of fees or other things of value in connection with the making or receiving of referrals of settlement and other services;

(h)      Conduct of any vendors used in connection with the origination of loans, including, but not limited to, closing agents, appraisers, real estate agents, title review, flood inspection, and mortgage brokers;

(i)      Drafting of loan documents and loan disclosures and the provision of such disclosures;

(j)      Obtaining and recording of collateral documents relating to loans, including, but not limited to, use of trustees or designees on mortgages or deeds of trust;

(k)      Advertising of loans and solicitation of borrowers;

F-8

(l) Licensing, registration, qualifications or approvals of employees in connection with the Covered Origination Conduct; and

(m) Quality control, quality assurance or compliance or audit testing or oversight related to the Covered Origination Conduct.

E. The United States further contends that it has certain civil claims based on the COMPANY's servicing, including servicing by any affiliated entity during or prior to such time as it was an affiliated entity, and by any of the COMPANY's or such affiliated entities' current or former officers, directors, employees, and agents, of loans of borrowers in bankruptcy (the "Covered Bankruptcy Conduct"). Such Covered Bankruptcy Conduct includes, but is not limited to, the following conduct:

(1) Deficiencies in servicing residential mortgage loans for borrowers in bankruptcy relating to:

(a) The preparation, prosecution, documentation, substantiation, or filing of proofs of claim, motions seeking relief from the automatic stay, objections to plan confirmation, motions to dismiss bankruptcy cases, and affidavits, declarations, and other mortgage-related documents in bankruptcy courts;

(b) Charging and timing of fees and expenses, including any fees or expenses assessed to the borrower due to delay while the bankruptcy court reviews a pending request for loan modification or delay by the Chapter 13 trustee to timely remit the borrower's payments;

F-9

(c)     Use or disclosure of escrow accounts, including any advances on borrower's behalf;

(d)     Account statements, disclosures, and/or other communications to borrowers, including: (i) assessing, imposing, posting, or collecting fees and charges; (ii) disclosure of fees and charges assessed, imposed or posted during the bankruptcy case; and (iii) collection of undisclosed post-petition fees and charges after the borrower receives a discharge, the COMPANY obtains relief from the automatic stay, or the bankruptcy case is dismissed;

(e)     Adequacy of staffing, training, systems, and processes relating to administering and servicing loans for borrowers in bankruptcy;

(f)     Use or supervision of vendors and contract employees, including Lender Processing Services, Inc., bankruptcy attorneys and other default service providers;

(g)     Pursuit of or failure to pursue claims against vendors and other third parties for failure of such third parties to comply with contractual or other obligations; and

(h)     Handling and resolution of inquiries, disputes or complaints by or on behalf of borrowers, and frequency and adequacy of communications with borrowers in bankruptcy.

(2)     Deficiencies in accounting for, processing, approving and administering loan modifications for borrowers in bankruptcy relating to:

F-10

(a)    Charging late fees or seeking arrearages while a trial period modification plan or permanent loan modification plan is in place and borrower is timely making payments under the terms of the loan modification plan;

(b)    Seeking relief from the automatic stay when the COMPANY has approved a trial period or permanent loan modification plan and borrower is timely making payments under the terms of the loan modification plan; and

(c)    Delays in approving or finalizing the documentation necessary to the approval of loan modifications for borrowers in bankruptcy.

F.    This Release is neither an admission of liability of the allegations of the Complaint or in cases settled pursuant to this Consent Judgment, nor a concession by the United States that its claims are not well-founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of the Consent Judgment, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

(1)    The COMPANY and/or its affiliated entities shall pay or cause to be paid, for the purposes specified in the Consent Judgment, the amount specified in Paragraph 3 of the Consent Judgment ("Direct Payment Settlement Amount") by electronic funds transfer no later than seven days after the United States District Court for the District of Columbia enters the final non-appealable Consent Judgment (the "Effective Date of the Consent Judgment") pursuant to

F-11

written instructions to be provided by the United States Department of Justice. The COMPANY

and/or its affiliated entities shall also undertake, for the purposes specified in the Consent

Judgment, certain consumer relief activities as set forth in Exhibit D to such Consent Judgment

and will be obligated to make certain payments (the "Consumer Relief Payments") in the event

that it does not or they do not complete the Consumer Relief Requirements set forth in Exhibit D

to the Consent Judgment. The releases contained in this Release shall become effective upon

payment of the Direct Payment Settlement Amount. The United States may declare this Release

null and void with respect to the United States if the COMPANY or its affiliated entities do not

make the Consumer Relief Payments required under this Consent Judgment and fails to cure

such non-payment within thirty days of written notice by the United States.

     (2)

       (a)    Subject to the exceptions in Paragraph 11 (concerning excluded

claims) below, the United States fully and finally releases the COMPANY and any current or

former affiliated entity (to the extent the COMPANY retains liabilities associated with such

former affiliated entity), and any of their respective successors or assigns, as well as any current

or former director, current or former officer, and current or former employee of any of the

foregoing, individually and collectively, from any civil or administrative claims the United States

has or may have, and from any civil or administrative remedies or penalties (expressly including

punitive or exemplary damages) it may seek or impose, based on the Covered Servicing Conduct

that has taken place as of 11:59 p.m., Eastern Standard Time, on February 8, 2012 (and, for the

avoidance of doubt, with respect to FHA-insured loans, whether or not a claim for mortgage

F-12

insurance benefits has been or is in the future submitted), under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), the False Claims Act, the Racketeer Influenced and Corrupt Organizations Act, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Truth in Lending Act, the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1691(d) ("Reason for Adverse Action") or § 1691(e) ("Appraisals"), sections 502 through 509 (15 U.S.C. § 6802-6809) of the Gramm-Leach Bliley Act except for section 505 (15 U.S.C. § 6805) as it applies to section 501(b) (15 U.S.C. § 6801(b)), or that the Civil Division of the United States Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. § 0.45.

(b)     Subject to the exceptions in Paragraph 11 (concerning excluded claims) below, the United States fully and finally releases the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, or current or former employee of any of the foregoing, individually and collectively, from any civil or administrative claims the United States has or may have, and from any civil or administrative remedies or penalties (expressly including punitive or exemplary damages) it may seek or impose, based on the Covered Origination Conduct that has taken place as of 11:59 p.m., Eastern Standard Time, on February 8, 2012, under the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Truth in Lending Act, 15 U.S.C. § 1691(d) ("Reason for Adverse Action") or § 1691(e) ("Appraisals"), or the Interstate Land Sales Full Disclosure Act.

F-13

(c)     Subject to the exceptions in Paragraph 11 (concerning excluded claims) below, the United States fully and finally releases the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liability associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, from any civil or administrative claims the United States has or may have, and from any civil or administrative remedies or penalties (expressly including punitive or exemplary damages) it may seek to impose under FIRREA based on the Covered Origination Conduct only to the extent that:

(i)     such claim is (A) based upon false, misleading or fraudulent representations (or a scheme to defraud consisting solely of such a false, misleading or fraudulent representation) made by the COMPANY or affiliated entity as of 11:59 p.m., Eastern Standard Time, on February 8, 2012, to a borrower in connection with the COMPANY's or affiliated entity's making of a residential mortgage loan to such borrower; or (B) an action pursuant to 12 U.S.C. § 1833a(c)(2) in which the action is consisting solely of the allegation that the COMPANY or one of its affiliated entities made a false statement or misrepresentation (or engaged in a scheme to defraud based solely upon such a false statement or misrepresentation) to the COMPANY or another affiliated entity, as of 11:59 p.m., Eastern Standard Time, on February 8, 2012, in connection with the COMPANY's or affiliated entity's making of a residential mortgage loan to a borrower; and

F-14

(ii)     (A) the only federally insured financial institution that was affected by the statement or misrepresentation (or scheme), or by actions based on, incorporating, or omitting the statement or misrepresentation (or scheme) was the COMPANY or an affiliated entity; (B) the false statement or misrepresentation (or scheme) was not made to, directed at, or part of a scheme to defraud, any person or entity other than or in addition to the borrower and/or the COMPANY or an affiliated entity, including, but not limited to, any other financial institution (as defined in 18 U.S.C. § 20), investors, and governmental entities; (C) the false statement or misrepresentation (or scheme), or actions based on, incorporating, or omitting the statement or misrepresentation (or scheme) did not harm any other financial institution (as defined in 18 U.S.C. § 20), investors, governmental entities, or any other entities other than the COMPANY or an affiliated entity; and (D) there was no material monetary effect on an agency of the United States.

(3)

(a)     Subject to the exceptions in Paragraph 11 (concerning excluded claims) below, the United States Department of Housing and Urban Development fully and finally releases the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively,

F-15

from any civil or administrative claims it has or may have, and from any civil or administrative

remedies or penalties (expressly including punitive or exemplary damages) it may seek or impose,

based on the Covered Servicing Conduct with respect to FHA loans that has taken place as of

11:59 p.m., Eastern Standard Time, on February 8, 2012 (and, for the avoidance of doubt, with

respect to FHA-insured loans, whether or not a claim for mortgage insurance benefits has been or

is in the future submitted). Notwithstanding the foregoing, in no instance shall this Release

relieve the COMPANY or any affiliated entity from the obligation to remedy, upon identification,

defects of title or such other problems caused by the acts or omissions of the COMPANY or any

affiliated entity that may preclude FHA from accepting assignment or paying a claim for which

FHA lacks statutory authority pursuant to 12 U.S.C. § 1707(a) and § 1710(a)(1)(B), in which case

FHA shall reconvey the property back to the COMPANY or the affiliated entity to remedy the

defect in title or such other problem and the COMPANY or the affiliated entity shall convey the

property back to FHA once the defect or problem is cured. Further, nothing in this Release shall

relieve COMPANY or affiliated entity of any obligation to provide FHA with any and all

mortgage insurance premium payments that have been or should have been collected, plus

interest, if any. Notwithstanding any other provision of this Release, FHA shall calculate the

payment of insurance benefits for any insured mortgage in accordance with its regulations.

      (b)    Subject to the exceptions in Paragraph 11 (concerning excluded

claims) below, the United States fully and finally releases the COMPANY and any current or

former affiliated entity (to the extent the COMPANY retains liabilities associated with such

former affiliated entity), and any of their respective successors or assigns, as well as any current

or former director, current or former officer, and current or former employee of any of the

F-16

foregoing, individually and collectively, from any civil or administrative claims it has or may have and from any civil or administrative remedies or penalties (expressly including punitive or exemplary damages) it may seek or impose under FIRREA, the False Claims Act, and the Program Fraud Civil Remedies Act where the sole basis for such claim or claims is that the COMPANY or any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity) or any of their respective successors or assigns, submitted to HUD-FHA prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012 a false or fraudulent annual certification that the mortgagee had "conform[ed] to all HUD-FHA regulations necessary to maintain its HUD-FHA approval" (including, but not limited to, the requirement that the mortgagee implement and maintain a quality control program that conforms to HUD-FHA requirements), or "complied with and agree[d] to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with the Department under HUD's Direct Endorsement Program."  For avoidance of doubt, this Paragraph means that the United States is barred from asserting that a false annual certification renders the COMPANY or any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity) liable under the False Claims Act and the other laws cited above for loans endorsed by the COMPANY or its affiliated entity for FHA insurance during the period of time applicable to the annual certification without regard to whether any such loans contain material violations of HUD-FHA requirements, or that a false individual loan certification that "this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program" renders the COMPANY or any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such

F-17

former affiliated entity) liable under the False Claims Act for any individual loan that does not

contain a material violation of HUD-FHA requirements.  However, this Paragraph does not (i)

release, bar or otherwise preclude the right of the United States to pursue any civil or

administrative claims or remedies it has or may have, or release or preclude under res judicata or

collateral estoppel theories any civil or administrative remedies or penalties it may seek or

impose, against the COMPANY, any current or former affiliated entity (to the extent the

COMPANY retains liabilities associated with such former affiliated entity), and any of their

respective successors or assigns, for conduct with respect to the insurance of residential mortgage

loans that violates any laws, regulations or other HUD-FHA requirements applicable to the

insurance of residential mortgage loans by HUD, including, but not limited to, material violations

of any applicable HUD-FHA requirements with respect to an individual loan or loans, except if

and to the extent such claim, remedy or penalty is based solely on such entity's failure to provide

HUD with an accurate annual certification as described above; (ii) release or otherwise bar the

United States from introducing evidence of any alleged failure to comply with applicable HUD-

FHA requirements, including, but not limited to, sufficient quality control, underwriting or due

diligence programs, in any way (including, but not limited to, for the purpose of proving intent) in

connection with any claim that there was a material violation(s) of applicable HUD-FHA

requirements with respect to an individual loan or loans that would subject the COMPANY or an

affiliated entity to liability under the False Claims Act or any other federal statutory or common

law administrative or judicial claim; or (iii) permit the COMPANY or its affiliates to offset or

otherwise reduce any potential liability for such claims or remedies by any amount paid under the

Consent Judgment.  The parties agree that the issue of whether and to what extent the United

F-18

States may use statistical sampling of individual loans or similar techniques for calculating damages or proving material violations of HUD-FHA underwriting requirements with respect to a pool of loans is not addressed by the Consent Judgment and shall be governed by the law of the relevant administrative or judicial forum of any future dispute.  Notwithstanding the foregoing, in no instance shall this Release relieve the COMPANY or any affiliated entity from the obligation to remedy, upon identification, defects of title or such other problems caused by the acts or omissions of the COMPANY or an affiliated entity that may preclude FHA from accepting assignment or paying a claim for which FHA lacks statutory authority pursuant to 12 U.S.C. § 1707(a) and § 1710(a)(1)(B), in which case FHA shall reconvey the property back to the COMPANY or affiliated entity to remedy the defect in title or such other problem and the COMPANY or affiliated entity shall convey the property back to FHA once the defect or problem is cured.

(4)     Subject to the exceptions in Paragraph 11 (concerning excluded claims) below, for loans that closed before the date of this Agreement and are guaranteed by the Department of Veterans Affairs (VA), the United States fully and finally releases the COMPANY and any current or former affiliated entity (to the extent COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, current or former employee of any of the foregoing, individually and collectively, from any civil or administrative claims it has or may have based on Covered Origination Conduct that arises under the Financial Institutions Reform, Recovery and Enforcement Act, the False Claims Act, or the Program Fraud Civil Remedies Act to the extent such claims are based on:  (i) fees, charges, or monies paid by

F-19

borrowers in connection with the closing of Interest Rate Reduction Refinancing Loans other than those expressly permitted under 38 C.F.R. § 36.4313(a), (d) or (e) (formerly 36 C.F.R. § 36.4312(a), (d) or (e)), (ii) the conduct alleged in *United States ex rel. Bibby, et al. v. Wells Fargo, et al.* No. 1:06-cv-0547-AT (N.D. Ga. filed March 8, 2006) relating to fees charged to borrowers in connection with Interest Rate Reduction Refinancing Loans, or (iii) any failure by the COMPANY or any current or former affiliated entity to conform to all VA regulations necessary to maintain the authority of the COMPANY or any current or former affiliated entity to close VA-guaranteed loans on an automatic basis. Nothing in the foregoing subparagraphs (i) and (ii) shall be interpreted to release any rights of borrowers to pursue recovery of fees or charges for Interest Rate Reduction Refinancing Loans, or of VA, acting in its oversight role of the Veterans Home Loan Guaranty Program or on behalf of such borrowers, to require Bank to reimburse borrowers for such fees or charges, and nothing in the foregoing subparagraph (iii) shall be interpreted to release the right of the United States to pursue any civil or administrative claims it has or may have, or to release any civil or administrative remedies or penalties it may seek or impose, against the COMPANY, any current or former affiliated entity (to the extent that COMPANY retains liabilities for such former affiliated entity), and any of their respective successors or assigns, based on Covered Origination Conduct that violates the laws or regulations applicable to the guarantee of residential mortgage loans by VA with respect to any residential mortgage loan or loans, except if and to the extent such claim, remedy or penalty is based either on the conduct described in subparagraphs (i) and (ii), on such entity's failure to provide VA with an accurate general program compliance certification, to implement an effective quality control plan, or on such entity's failure to conform to all VA regulations

F-20

necessary to maintain the authority of the COMPANY or any current or former affiliated entity to close VA-guaranteed loans on an automatic basis.

       (5)     Subject to the exceptions in Paragraph 11 (concerning excluded claims) below, for loans that closed before 11:59 p.m., Eastern Standard Time, on February 8, 2012 and are guaranteed by the Department of Agriculture (USDA), the United States fully and finally releases the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, from any civil or administrative claims it has or may have against the COMPANY and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, based on Covered Origination Conduct that arises under FIRREA, the False Claims Act, or the Program Fraud Civil Remedies Act to the extent that they are based on statements made in the COMPANY's or current or former affiliated entity's application for approved lender status in the Single Family Housing Guaranteed Loan Program. Nothing in the foregoing shall be interpreted to release the right of the United States to pursue any civil or administrative claims it has or may have, or to release any civil or administrative remedies or penalties it may seek or impose, against the COMPANY, any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, based on Covered Origination Conduct that violates the laws or regulations applicable to the guaranty of residential mortgage loans by USDA with respect to any

F-21

residential mortgage loan or loans, except if and to the extent such claim, remedy or penalty is based on such entity's failure to provide USDA with an accurate general program compliance certification, to implement an effective quality control plan, or on statements made in the COMPANY's or current or former affiliated entity's application for approved lender status in the Single Family Housing Guaranteed Loan Program.

(6)     Subject to the exceptions described in this Paragraph 6 and in Paragraph 11 (concerning excluded claims) below, the United States Department of the Treasury ("Treasury") fully and finally releases the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, and will refrain from instituting, directing, or maintaining any civil or administrative claims the Treasury has or may have, and from any civil remedies or penalties (expressly including punitive or exemplary damages) it may seek or impose against the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, based on the Covered Servicing Conduct that has taken place as of 11:59 p.m., Eastern Standard Time, on February 8, 2012; furthermore, as of February 8, 2012, Treasury is withholding Making Home Affordable servicer incentive payments from the COMPANY or any current or former affiliated entity, and, upon the immediately succeeding Making Home Affordable Program incentive payment date, Treasury

F-22

shall release and remit to the COMPANY and any current or former affiliated entity all

outstanding Making Home Affordable Program servicer incentive payments previously withheld

by Treasury.  Notwithstanding the foregoing, Treasury, in connection with the Making Home

Affordable Program, reserves the right to continue to perform compliance reviews on the

COMPANY's Making Home Affordable Program activities occurring prior to February 8, 2012,

to require non-financial remedies with respect to such activities, and to publicly release servicer

assessments with respect thereto.  If, as the result of any such compliance review occurring after

February 8, 2012, Treasury determines that the COMPANY or any of its affiliated entities have

not adequately corrected identified instances of noncompliance that occurred prior to the date

specified in the first sentence of this Paragraph and were communicated to COMPANY or any of

its affiliated entities by Treasury in a letter dated March 9, 2012, Treasury reserves the right to

adjust any Making Home Affordable Program incentive payments made or owed to the

COMPANY or any of its affiliated entities with respect to those identified instances of

noncompliance.  In addition, with respect to instances of noncompliance that occur after

February 8, 2012, Treasury reserves the right to exercise all available remedies, both financial

and non-financial, under the Making Home Affordable Program Commitment to Purchase

Financial Instrument and Servicer Participation Agreement, as amended, between Treasury and

COMPANY or any of its affiliated entities ("the SPA").

      (7)    Subject to the exceptions in Paragraph 11 (concerning excluded claims)

below, the Bureau of Consumer Financial Protection ("CFPB") fully and finally releases the

COMPANY and any current or former affiliated entity (to the extent such COMPANY retains

liabilities associated with such former affiliated entity), and any of their respective successors or

assigns as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, and will refrain from instituting, directing, or maintaining any civil or administrative claims the CFPB has or may have, and from any civil remedies or penalties (expressly including punitive or exemplary damages) it may seek or impose against the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, or current or former employee of any of the foregoing, individually and collectively, based on Covered Servicing Conduct or Covered Origination Conduct that has taken place prior to July 21, 2011. Notwithstanding the foregoing, the CFPB reserves the right to obtain information related to conduct that occurred prior to July 21, 2011 under its authority granted by Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

(8)      Subject to the exceptions in Paragraph 11 (concerning excluded claims) below, and conditioned upon the full payment of the Direct Payment Settlement Amount, the Federal Trade Commission fully and finally releases the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, from any civil or administrative claim the Federal Trade Commission has or may have, or civil or administrative remedies or penalties (expressly including punitive or exemplary damages) it may seek or impose, based on the Covered Origination Conduct that has taken place as of 11:59 p.m., Eastern Standard Time, on February

F-24

8, 2012, or based on the Covered Servicing Conduct that has taken place as of 11:59 p.m.,
Eastern Standard Time, on February 8, 2012, provided, however, that nothing in this Paragraph
or Release shall be interpreted to release any liability to the Federal Trade Commission relating
to the Covered Servicing Conduct or Covered Origination Conduct of any affiliated entity that
the COMPANY has acquired on or after November 30, 2011, or, notwithstanding Section C.3.i
of this Release, any conduct or claims involving the privacy, security, or confidentiality of
consumer information.

      (9)    Subject to the exceptions in Paragraph 11 (concerning excluded claims)
below:

      (a)    Upon the Effective Date of the Consent Judgment, the Executive
Office for United States Trustees ("EOUST") and the United States Trustees and Acting United
States Trustees for Regions 1 through 21 (collectively, with the EOUST, "the United States
Trustees") will consent to and agree to take such steps as may be reasonably necessary to fully
and finally withdraw or facilitate the dismissal with prejudice of pending objections and other
actions by the United States Trustees, including all related discovery requests, whether formal or
informal, and requests for examination under Fed. R. Bankr. P. 2004 (collectively, "the Discovery
Requests") and subpoenas or subpoenas duces tecum (collectively, "the Subpoenas"), directed to
or filed against the COMPANY, its affiliates, and employees and officers of the COMPANY and
its affiliates, pertaining to the COMPANY's or its affiliates' mortgage-related claims filed in a
bankruptcy case prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012 and based on
the Covered Bankruptcy Conduct.  The United States Trustees further agree not to take any action

Case: 10-05245    Doc# 374-4    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 36 of 61

to obtain discovery from the COMPANY or any affiliated entity pursuant to any court order granting such Discovery Requests or with respect to enforcing related Subpoenas pending as of 11:59 p.m., Eastern Standard Time, on February 8, 2012.  Upon the Effective Date of the Consent Judgment, the United States Trustees further agree to take such steps as may be reasonably necessary to fully and finally withdraw or facilitate the dismissal with prejudice of Discovery Requests and Subpoenas directed to or filed against any other party where the discovery was sought for the purpose of obtaining relief against the COMPANY, its affiliates, or employees and officers of the COMPANY or its affiliates, and pertains to the COMPANY's or its affiliates' mortgage-related claims filed in a bankruptcy case prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012 and based on the Covered Bankruptcy Conduct, except that nothing in this Paragraph requires the United States Trustee to withdraw or facilitate the dismissal of Discovery Requests and Subpoenas to the extent that relief against another party, other than the COMPANY, its affiliates, or employees and officers of the COMPANY or its affiliates, is the purpose of such discovery.

(b)     Upon the Effective Date of the Consent Judgment, the COMPANY and its affiliated entities will consent to and agrees to take such steps as may be reasonably necessary to fully and finally withdraw or facilitate the dismissal with prejudice of pending adversary proceedings, contested matters, appeals, and other actions filed by the COMPANY or its affiliated entities, including all Discovery Requests and Subpoenas directed to or filed against any United States Trustee, relating to objections and other actions by the United States Trustees, including Discovery Requests and Subpoenas, directed to or filed against the COMPANY, its affiliated entities, or employees and officers of the COMPANY or its affiliated entities pertaining

F-26

to the COMPANY's or its affiliated entities' mortgage-related claims filed in a bankruptcy case prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012 and based on the Covered Bankruptcy Conduct. The COMPANY and its affiliated entities further agree not to take any action to obtain discovery from the United States Trustees pursuant to any court order granting such Discovery Requests or with respect to enforcing related Subpoenas pending as of 11:59 p.m., Eastern Standard Time, on February 8, 2012.

(c)     The United States Trustees fully and finally release any claims, and will refrain from instituting, directing or maintaining any action or participating in any action by a third party (except that the United States Trustees may participate in an action to the extent ordered by a court provided that the United States Trustees may not seek such a court order formally or informally), against the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, pertaining to the COMPANY's or its affiliated entities' mortgage-related claims filed in a bankruptcy case prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012 and based on the Covered Bankruptcy Conduct. The United States Trustees shall refrain from sharing information obtained via the Discovery Requests and Subpoenas outside the federal government (unless required to do so under applicable law or pursuant to a court order) in support of any action, against the COMPANY, or any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former

F-27

officer, and current or former employee of any of the foregoing, individually and collectively, pertaining to the COMPANY's or its affiliates' mortgage-related claims filed in a bankruptcy case prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012 and based on the Covered Bankruptcy Conduct. Except as otherwise provided in the Enforcement Terms in Exhibit E of the Consent Judgment, the United States Trustees further agree to refrain from seeking to invalidate the COMPANY's or its affiliates' lien on residential real property, including in an adversary proceeding pursuant to Fed. R. Bank. P. 7001(2) and 11 U.S.C. § 506, or to impose monetary sanctions or other punitive relief against the COMPANY, and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, pertaining to the COMPANY's or its affiliated entities' mortgage-related claims filed in a bankruptcy case after 11:59 p.m., Eastern Standard Time, on February 8, 2012 and based on the Covered Bankruptcy Conduct where the Covered Bankruptcy Conduct occurred before 11:59 p.m., Eastern Standard Time, on February 8, 2012.

(d)     Notwithstanding the foregoing, nothing in this Paragraph shall be construed to be (1) a waiver of any defenses or claims of the COMPANY, its affiliates, or employees and officers of the COMPANY or its affiliates, against any other party, or a dismissal of any pending adversary proceedings, contested matters, appeals, and other actions filed by the COMPANY, its affiliates, or employees and officers of the COMPANY or its affiliates, against any other party, wherein the United States Trustee is a party or otherwise involved; (2) a waiver of any defenses or claims of the United States Trustee against any other party, or a dismissal of

F-28

any pending adversary proceedings, contested matters, appeals, and other actions filed by the United States Trustee against any other party wherein the COMPANY, its affiliates, or employees and officers of the COMPANY or its affiliates, is a party or otherwise involved; or (3) a waiver of, or restriction or prohibition on, the United States Trustees' ability, to the extent permitted by law, informally or formally, in individual bankruptcy cases, to seek a cure of material inaccuracies in the COMPANY's or its affiliates' mortgage-related claims filed in a bankruptcy case and based on the Covered Bankruptcy Conduct, but not to impose monetary sanctions or other punitive relief against the COMPANY or its affiliates in addition to such cure; provided, however, that this provision shall not constitute a waiver of, or restriction or prohibition on, the COMPANY's or its affiliates' ability to dispute whether the United States Trustees have authority or ability to seek such a cure.

(10)     For the purposes of this Release, the term "affiliated entity" shall mean entities that are directly or indirectly controlled by, or control, or are under common control with, the COMPANY as of or prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012. The term "control" with respect to an entity means the beneficial ownership (as defined in Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended) of 50 percent or more of the voting interest in such entity.

(11)     Notwithstanding any other term of this Release, the following claims of the United States are specifically reserved and are not released:

(a)     Any liability arising under Title 26, United States Code (Internal Revenue Code);

F-29

(b)     Any liability of individuals (including current or former directors, officers, and employees of the COMPANY or any affiliated entity) who have received or receive in the future notification that they are the target of a criminal investigation (as defined in the United States Attorneys' Manual); have been or are indicted or charged; or have entered or in the future enter into a plea agreement, based on the Covered Servicing Conduct, the Covered Origination Conduct, and the Covered Bankruptcy Conduct (collectively, the "Covered Conduct");

(c)     Any criminal liability;

(d)     Any liability to the United States for any conduct other than the Covered Conduct, or any liability for any Covered Conduct that is not expressly released herein;

(e)     Any and all claims whether legal or equitable, in connection with investors or purchasers in or of securities or based on the sale, transfer or assignment of any interest in a loan, mortgage, or security to, into, or for the benefit of a mortgage-backed security, trust, special purpose entity, financial institution, investor, or other entity, including but not limited to in the context of a mortgage securitization or whole loan sale to such entities ("Securitization/Investment Claims").  Securitization/Investment Claims include, but are not limited to, claims based on the following, all in connection with investors or purchasers in or of securities or in connection with a sale, transfer, or assignment of any interest in loan, mortgage or security to, into, or for the benefit of a mortgage-backed security, trust, special purpose entity, financial institution, investor, or other entity:

F-30

(i)     The United States' capacity as an owner, purchaser, or holder of whole loans, securities, derivatives, or other similar investments, including without limitation, mortgage backed securities, collateralized debt obligations, or structured investment vehicles.

(ii)     The creation, formation, solicitation, marketing, assignment, transfer, valuation, appraisal, underwriting, offer, sale, substitution, of or issuance of any interest in such whole loans, mortgages, securities, derivatives, or other similar investments.

(iii)     Claims that the COMPANY or an affiliated entity made false or misleading statements or omissions, or engaged in other misconduct in connection with the sale, transfer or assignment of any interest in a loan, mortgage, or security or in connection with investors or purchasers in or of such loans, mortgages, or securities, including but not limited to conduct that affected a federally insured financial institution or violated a legal duty to a mortgage-backed security, trust, special purpose entity, financial institution, or investor (including the United States), or governmental agency and/or that subjects the COMPANY or an affiliated entity to a civil penalty or other remedy under 12 U.S.C. § 1833a.

(iv)     Representations, warranties, certifications, statements, or claims made regarding such whole loans, securities, derivatives or other similar

F-31

Case: 10-05245     Doc# 374-4     Filed: 02/06/14     Entered: 02/07/14 12:52:43     Page 42 of 61

investments, including representations, warranties, certifications or claims

regarding the eligibility, characteristics, or quality of mortgages or mortgagors;

(v)     Activities related to the executing, notarizing, transferring

or recording of mortgages; the endorsement or transfer of a loan; and the

obtaining, executing, notarizing, transferring or recording of assignments;

(vi)     Obtaining, securing, updating, transferring, or providing

promissory notes or endorsements of promissory notes through alonges or

otherwise;

(vii)     Custodial and trustee functions;

(viii)     Intentional or fraudulent failure to pay investors sums owed

with respect to any security, derivatives, or similar investment;

(ix)     Contractual covenants, agreements, obligations and legal

duties to a mortgage-backed security, trust, special purpose entity, financial

institution, investor, or other entity (including the United States);

(x)     Covered Origination Conduct (except to the extent such

conduct is released in Paragraphs 3.b, 4 or 5); and

(xi)     Covered Servicing Conduct to the extent the COMPANY

or any affiliated entity engaged in the Covered Servicing Conduct in question not

in its capacity as servicer, subservicer or master servicer, but in its capacity as the

F-32

originator of a mortgage loan or as seller, depositor, guarantor, sponsor, securitization trustee, securities underwriter, document custodian or any other capacity.

The exclusion set forth above in this Paragraph shall not apply to Securitization/Investment Claims based on the following conduct, and such claims are included in what is being released:

Securitization/Investment Claims based on Covered Servicing Conduct by the COMPANY or any current or former affiliated entity where: (1) such conduct was performed by the COMPANY or any affiliated entity in its capacity as the loan servicer, master servicer or subservicer, whether conducted for its own account or pursuant to a third party servicing agreement or similar agreement, and not in its capacity as loan originator, seller, depositor, guarantor, sponsor, securitization trustee, securities underwriter, or any other capacity; and (2) such conduct was not in connection with (x) the creation, formation, solicitation, marketing, sale, assignment, transfer, offer, sale, substitution, underwriting, or issuance of any interest in securities, derivatives or other similar investments or (y) the sale or transfer of mortgage loans.  The claims addressed in this sub-paragraph include, without limitation, Securitization and Investment Claims that the party seeking to enforce a mortgage loan against a borrower and homeowner in respect of that borrower's default did not have a documented enforceable interest in the promissory note and mortgage or deed of trust under applicable state law or is otherwise not a proper party to the foreclosure or bankruptcy action or claims

F-33

based on such party's attempts to obtain such a documented enforceable interest or become such a proper party.

(f)     Any liability arising under Section 8 of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607, relating to private mortgage insurance, with respect to claims brought by the CFPB;

(g)     Except with respect to claims related to the delivery of initial or annual privacy notices, requirements with respect to the communication of non-public personal information to non-affiliated third parties, or other conduct required by Sections 502 through 509 of the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6802-6809), any claims or conduct involving the obligation of a financial institution under Section 501(b) of the Gramm-Leach-Bliley Act (15 U.S.C. s. 6801(b)) and its implementing regulations to maintain administrative, technical, and physical information security safeguards;

(h)     Any liability arising under the Fair Housing Act; any provision of the Equal Credit Opportunity Act that is not expressly released in Paragraph 2 of this Release, including any provision prohibiting discriminatory conduct; the Home Mortgage Disclosure Act; or any other statute or law that prohibits discrimination of persons based on race, color, national origin, gender, disability, or any other protected status;

(i)     Administrative claims, proceedings, or actions brought by HUD against any current or former director, officer, or employee for suspension, debarment or exclusion from any HUD program;

F-34

(j)     Any liability arising under the federal environmental laws;

(k)     Any liability to or claims brought by (i) the Federal Housing Finance Agency; (ii) any Government Sponsored Enterprise, including the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (except where the Government Sponsored Enterprise seeks to impose such liability or pursue such claims in its capacity as an administrator of the Making Home Affordable Program of Treasury); (iii) the Federal Deposit Insurance Corporation (whether in its capacity as a Corporation, Receiver, or Conservator); (iv) the Government National Mortgage Association ("Ginnie Mae") arising out of COMPANY's contractual obligations related to serving as Master Subservicer on defaulted Ginnie Mae portfolios, including claims for breach of such obligations; (v) the CFPB with respect to claims within its authority as of the designated transfer date of July 21, 2011 that are not expressly released in Paragraph 7; (vi) the National Credit Union Administration, whether in its capacity as a Federal agency, Liquidating Agent, or Conservator; (vii) the Securities and Exchange Commission; (viii) the Federal Reserve Board and its member institutions; (ix) Maiden Lane LLC, Maiden Lane II LLC, Maiden Lane III LLC, entities that are consolidated for accounting purposes on the financial statements of the Federal Reserve Bank of New York, and the Federal Reserve Bank of New York; (x) the Office of the Comptroller of the Currency; (xi) the USDA (except to the extent claims are released in Paragraph 5); (xii) the VA (except to the extent claims are released in Paragraph 4); (xiii) the Commodity Futures Trading Commission; and (xvi) the Inspectors General of such entities;

F-35

(l)     Any liability to the United States for the following claims alleged against J.P. Morgan Chase & Company or any of its current or former subsidiaries, affiliates, officers, directors, employees or agents, including but not limited to Chase Home Finance, LLC, EMC Mortgage, and JPMorgan Chase Bank, National Association, or any other entity or person:

(i)     All claims or allegations based on any conduct alleged in United States ex rel. [Under Seal] v. [Under Seal], 2:11-cv-00535-RLH-RJJ (D. Nev.); and

(ii)     All claims or allegations based on any conduct alleged in United States ex rel. Szymoniak v. [Under Seal], Civ. No. 0:10-cv-01465 (D.S.C.) or in United States ex rel. Szymoniak v. [Under Seal], Civ. No. 3:10-cv-575 (W.D.N.C.), except any such claims that are encompassed by the releases described in paragraphs 2 to 9, above, and not otherwise reserved from these releases in this agreement.

(m)     Any action that may be taken by the appropriate Federal Banking Agency (FBA), as defined in 12 U.S.C. § 1813(q), against COMPANY, any of its affiliated entities, and/or any institution-affiliated party of COMPANY, as defined in 12 U.S.C. § 1813(u), pursuant to 12 U.S.C. § 1818, and any action by the FBA to enforce the Consent Order issued against the COMPANY by the FBA on April 13, 2011;

(n)     Any liability based upon obligations created by this Consent Judgment;

F-36

(o)     The parties agree that notwithstanding any other provision of this Release, the United States retains the right to investigate and sue the COMPANY and any affiliated entity under FIRREA for any conduct, statements or omissions that are:

(i)     Made or undertaken in connection with either (a) the creation, formation, transfer, sale, conveyance, or securitization of mortgage-backed securities, derivatives, collateralized debt obligations and credit default swaps, or other similar securities or (b) the sale or transfer of mortgage loans;

(ii)     Made or undertaken by the COMPANY or an affiliated entity in its capacity as loan originator, seller, depositor, guarantor, sponsor, securitization trustee, securities underwriter, or any capacity other than as loan servicer, master servicer or subservicer, in connection with the origination (including Covered Origination Conduct), underwriting, due diligence, quality control, valuation, appraisal, pledging, substitution, recording, assignment, or securitization of mortgages, whole loans, mortgage-backed securities, derivatives, collateralized debt obligations and credit default swaps, or other similar securities (except to the extent such conduct is released in Paragraphs 2.c, 3.b, 4 or 5 and not excluded from this Release in Subsections (a)-(n) of this Paragraph 11);

(iii)     Made to or directed at federal governmental entities (except to the extent such conduct is released in Paragraphs 2.a, 3.a, 3.b, 4 or 5 and not excluded from this Release in Subsections (a)-(n) of this Paragraph 11); or

F-37

(iv)     Based on (A) the failure by the COMPANY or affiliated entity to pay investors or trustees any sums received by the COMPANY or affiliated entity and owed to the investors and trustees with respect to any security, derivatives, or similar investment; (B) the failure by the COMPANY or affiliated entity to disclose that it failed to pay investors or trustees any sums received by the COMPANY or affiliated entity and owed to investors or trustees with respect to any security, derivatives, or similar investment; (C) the collection by the COMPANY or affiliated entity of money or other consideration from loan sellers with respect to loans that the COMPANY or an affiliated entity had sold to others or packaged into a security for sale to others; or (D) the failure by the COMPANY or affiliated entity to repurchase loans to the extent that it had a contractual obligation to repurchase.

The COMPANY and its affiliated entities agree that they have not been released from any liability under FIRREA for such conduct or statements. To the extent that this reservation of FIRREA claims is inconsistent with any other provision of this Release, the reservation of FIRREA claims shall control.  This reservation of FIRREA Claims shall not be construed to otherwise limit any other claim that the United States has against the COMPANY or its affiliated entities, to alter the requirements of FIRREA, or to waive any defense available to the COMPANY or its affiliated entities under existing law.

(12)     For avoidance of doubt, this Release shall not preclude a claim by any private individual or entity for harm to that private individual or entity, except for a claim

Case: 10-05245    Doc# 374-4    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 49 of 61

asserted by a private individual or entity under 31 U.S.C. § 3730(b) that is subject to this Release and not excluded by Paragraph 11.

(13)   The COMPANY and its affiliated entities waive and shall not assert any defenses they may have to any criminal prosecution or administrative action based on the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Release bars a remedy sought in such criminal prosecution or administrative action.  Nothing in this Paragraph or any other provision of this Consent Judgment constitutes an agreement by the United States concerning the characterization of the Federal Settlement Amount for purposes of Title 26, United States Code (Internal Revenue Code).

(14)   The COMPANY and any current or former affiliated entity, as well as any current or former director, current or former officer, or current or former employee of any of the foregoing, but only to the extent that the COMPANY and any current or former affiliated entity possesses the ability to release claims on behalf of such individuals or entities, fully and finally releases the United States and its employees from any claims based on the Covered Conduct to the extent, and only to the extent, that such individual or entity is released from claims based on that Covered Conduct under Paragraphs 2 through 9 of this Release and such claim is not excluded under Paragraph 11 of this Release (including, for the avoidance of doubt, claims by the entities listed in Paragraph 11(k)), as well as claims under the Equal Access to Justice Act, 28 U.S.C. § 2412 based on the United States' investigation and prosecution of the foregoing

F-39

released claims. Nothing herein is intended to release claims for mortgage insurance or mortgage guaranty payments or claims for payment for goods and services, such as incentive payments under HAMP.

(15)

(a)  Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulations, 48 C.F.R. § 31.205-47) incurred by or on behalf of the COMPANY and any current or former affiliated entity (to the extent the COMPANY retains liabilities associated with such former affiliated entity), any successor or assign, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively, in connection with:

(1)  the matters covered by the Consent Judgment;

(2)  the United States' audits and civil investigations of the matters covered by the Consent Judgment;

(3)  the COMPANY's and its affiliated entities' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by the Consent Judgment (including attorney's fees);

F-40

(4)    the negotiation and performance of the Consent Judgment; and

(5)    the payments made to the United States or others pursuant to the Consent Judgment,

are unallowable costs for government contracting purposes ("Unallowable Costs").

(b)    Future Treatment of Unallowable Costs: Unallowable Costs will be separately determined and accounted for by the COMPANY and its affiliated entities, and the COMPANY and its affiliated entities shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

(c)    Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of the Consent Judgment, the COMPANY and its affiliated entities shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by the COMPANY or any of its affiliated entities from the United States. The COMPANY and its affiliated entities agree that the United States, at a minimum, shall be entitled to recoup from any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States reserves its rights to audit, examine, or re-examine the COMPANY's or its affiliated entities' books and records and to disagree with any calculations submitted by the COMPANY or any of its affiliated entities regarding any

F-41

Unallowable Costs included in payments previously sought by the COMPANY or its affiliated

entities, or the effect of any such Unallowable Costs on the amount of such payments.

(16)    The COMPANY and its affiliated entities agree to cooperate fully and

truthfully with the United States' investigation of individuals and entities not released in this

Release.  Upon reasonable notice, the COMPANY shall encourage, and agrees not to impair, the

reasonable cooperation of its directors, officers and employees, and shall use its reasonable

efforts to make available and encourage the cooperation of former directors, officers, and

employees for interviews and testimony, consistent with the rights and privileges of such

individuals.

(17)    This Release is intended to be and shall be for the benefit only of the

Parties and entities and individuals identified in this Release, and no other party or entity shall

have any rights or benefits hereunder.

(18)    Each party shall bear its own legal and other costs incurred in connection

with this matter, including the preparation and performance of this Consent Judgment.

(19)    Each party and signatory to this Consent Judgment represents that it freely

and voluntarily enters into the Consent Judgment without any degree of duress or compulsion.

(20)    This Release is governed by the laws of the United States.  The exclusive

jurisdiction and venue for any dispute arising out of matters covered by this Release is the United

States District Court for the District of Columbia.  For purposes of construing this Release, this

F-42

Release shall be deemed to have been drafted by all the Parties and shall not, therefore, be construed against any party for that reason in any subsequent dispute.

(21)    The Consent Judgment constitutes the complete agreement between the Parties as to the matters addressed herein.  The Consent Judgment may not be amended except by written consent of the Parties.

(22)    The undersigned represent and warrant that they are fully authorized to execute the Consent Judgment on behalf of the Parties indicated below.

(23)    The Consent Judgment may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Consent Judgment.

(24)    This Release is binding on, and inures to the benefit of, the COMPANY's and affiliated entities' successors, heirs, and assigns.

(25)    The Parties may disclose this Release, and information about this Release, to the public at their discretion.

(26)    Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Release.

(27)    Whenever the words "include," "includes," or "including" are used in this Release, they shall be deemed to be followed by the words "without limitation."

F-43

# EXHIBIT G

## State Release

### I.   Covered Conduct

For purposes of this Release, the term "Covered Conduct" means residential mortgage loan servicing, residential foreclosure services, and residential mortgage loan origination services.  For purposes of this Release, the term "Bank" means JPMorgan Chase & Co., as well as its current and former parent corporations or other forms of legal entities, direct and indirect subsidiaries, brother or sister corporations or other forms of legal entities, divisions or affiliates, and the predecessors, successors, and assigns of any of them, as well as the current and former directors, officers, and employees of any of the foregoing.  For purposes of this Section I only, the term "Bank" includes agents (including, without limitation, third-party vendors) of the Bank and the Bank is released from liability for the covered conduct acts of its agents (including, without limitation, third-party vendors).  This Release does not release the agents (including, without limitation, third-party vendors) themselves for any of their conduct.  For purposes of this Release, the term "residential mortgage loans" means loans secured by one- to four-family residential properties, irrespective of usage, whether in the form of a mortgage, deed of trust, or other security interest creating a lien upon such property or any other property described therein that secures the related mortgage note.

For purposes of this Release, the term "residential mortgage loan servicing" means all actions, errors or omissions of the Bank, arising out of or relating to servicing (including subservicing and master servicing) of residential mortgage loans from and after the closing of such loans, whether for the Bank's account or for the account of others, including, but not limited to, the following:  (1) Loan modification and other loss mitigation activities, including, without limitation, extensions, forbearances, payment plans, short sales and deeds in lieu of

foreclosure, and evaluation, approval, denial, and implementation of the terms and conditions of any of the foregoing; (2) Communications with borrowers relating to borrower accounts, including, without limitation, account statements and disclosures provided to borrowers; (3) Handling and resolution of inquiries, disputes or complaints by or on behalf of borrowers; (4) Collection activity related to delinquent borrower accounts; (5) Acceptance, rejection, application or posting of payments made by or on behalf of borrowers, including, without limitation, assessment and collection of fees or charges, placement of payments in suspense accounts and credit reporting; (6) Maintenance, placement or payment (or failure to make payment) of any type of insurance or insurance premiums, or claims activity with respect to any such insurance; (7) Payment of taxes, homeowner association dues, or other borrower escrow obligations, and creation and maintenance of escrow accounts; (8) Use, conduct or supervision of vendors, agents and contract employees, whether affiliated or unaffiliated, including, without limitation, subservicers and foreclosure and bankruptcy attorneys, in connection with servicing, loss mitigation, and foreclosure activities; (9) Adequacy of staffing, training, systems, data integrity or security of data that is unrelated to privacy issues, quality control, quality assurance, auditing and processes relating to the servicing of residential mortgage loans, foreclosure, bankruptcy, and property sale and management services; (10) Securing, inspecting, repairing, maintaining, or preserving properties before and after foreclosure or acquisition or transfer of title; (11) Servicing of residential mortgage loans involved in bankruptcy proceedings; (12) Obtaining, executing, notarizing, endorsing, recording, providing, maintaining, registering (including in a registry system), and transferring promissory notes, mortgages, or mortgage assignments or other similar documents, or transferring interests in such documents among and between servicers and owners, and custodial functions or appointment of officers relating to such

G-2

documents; (13) Decisions on disposition of residential mortgage loans, including, without limitation, whether to pursue foreclosure on properties, whether to assert or abandon liens and other claims and actions taken in respect thereof, and whether to pursue any particular loan modification or other form of loss mitigation; (14) Servicing of residential mortgage loans of borrowers who are covered by federal or state protections due to military status; (15) Licensing or registration of employees, agents, vendors or contractors, or designation of employees as agents of another entity; (16) Quality control, quality assurance, compliance, audit testing, oversight, reporting, or certification or registration requirements related to the foregoing; and (17) Trustee functions related to the servicing of residential mortgage loans.

For purposes of this Release, the term "residential foreclosure services" means all actions, errors or omissions of the Bank arising out of or relating to foreclosures on residential mortgage loans, whether for the Bank's own account or for the account of others, including, but not limited to, the following: (1) Evaluation of accounts for modification or foreclosure referral; (2) Maintenance, assignment, recovery and preparation of documents that have been filed or otherwise used to initiate or pursue foreclosures, and custodial actions related thereto; (3) Drafting, review, execution and notarization of documents (including, but not limited to, affidavits, notices, certificates, substitutions of trustees, and assignments) prepared or filed in connection with foreclosures or sales of acquired properties, or in connection with remediation of improperly filed documents; (4) Commencement, advancement and finality of foreclosures, including, without limitation, any issues relating to standing, fees, or notices; (5) Acquisition of title post-foreclosure or in lieu of foreclosure; (6) Pursuit of pre- and post-foreclosure claims by the Bank, including, without limitation, the seeking of deficiency judgments when permitted by law, acts or omissions regarding lien releases, and evictions and eviction proceedings; (7)

G-3

Case: 10-05245    Doc# 374-4    Filed: 02/06/14    Entered: 02/07/14 12:52:43    Page 58 of 61

Management, maintenance, and disposition of properties in default or properties owned or controlled by the Bank, whether prior to or during the foreclosure process or after foreclosure, and executing, notarizing, or recording any documents related to the sale of acquired properties; and (8) Trustee functions related to the foreclosure of residential mortgage loans.

For purposes of this Release, the term "residential mortgage loan origination services" means all actions, errors or omissions of the Bank arising out of or relating to the origination of, or the assistance in the origination of, residential mortgage loans, or the purchasing of residential mortgage whole loans, including, but not limited to, the following:  (1) Advertising, solicitation, disclosure, processing, review, underwriting, closing and funding of borrower residential mortgage loans or lending services, including, without limitation, the charges, terms, pricing, and conditions of such loans or lending services; (2) Approving or denying loan applications; (3) Recommendation, offering or provision of loan products, including, without limitation, whether such products' features or terms and conditions were appropriate for a particular borrower; (4) Valuation of the properties used as collateral for such loans, including, without limitation, use of employees, independent and vendor management appraisers, and alternative valuation methods such as AVMs and BPOs; (5) Use, referral, conduct or supervision of, or payment of fees or other forms of consideration to, vendors, agents or contract employees, whether affiliated or unaffiliated, and whether retained by the Bank, borrower or otherwise, including, without limitation, closing agents, appraisers, real estate agents, mortgage brokers, and providers of real estate settlement services; (6) Drafting and execution of residential mortgage loan documents and disclosures and the provision of such disclosures; (7) Obtaining or recording of collateral documents relating to the origination of residential mortgage loans, including, without limitation, use of trustees or designees on mortgages or deeds of trust; (8) Licensing and registration of

G-4

employees in connection with origination of residential mortgage loans; (9) Quality control,

quality assurance, or compliance audit testing, or oversight related to the origination of

residential mortgage loans; and (10) Communications with borrowers related to the origination

of residential mortgage loans.

## II.    Release of Covered Conduct

By their execution of this Consent Judgment, the Attorneys General and state mortgage

regulators ("Regulators") that are parties to this Consent Judgment release and forever discharge

the Bank from the following: any civil or administrative claim, of any kind whatsoever, direct or

indirect, that an Attorney General or Regulator, respectively, has or may have or assert,

including, without limitation, claims for damages, fines, injunctive relief, remedies, sanctions, or

penalties of any kind whatsoever based on, arising out of, or resulting from the Covered Conduct

on or before the Effective Date, or any examination (or penalties arising from such an

examination) relating to the Covered Conduct on or before the Effective Date, except for claims

and the other actions set forth in Section IV, below (collectively, the "Released Claims").

This Release does not release any claims against any entity other than the Bank as

defined in Section I above.

## III.    Covenants by the Bank

1.    The Bank waives and shall not assert any defenses the Bank may have to any

criminal prosecution based on the Covered Conduct that may be based in whole or in part on a

contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution or

under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Release bars

a remedy sought in such criminal prosecution.

G-5

2.      The Bank agrees to cooperate with an Attorney General's criminal investigation of individuals and entities not released in this Release.  For purposes of this covenant, cooperation shall not include any requirement that the Bank waive the attorney-client privilege or any other applicable privileges or protection, included but not limited to the attorney work product doctrine.  Upon reasonable notice, the Bank agrees not to impair the reasonable cooperation of its directors, officers and employees, and shall use its reasonable efforts to make available and encourage the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals.

**IV.     Claims and Other Actions Exempted from Release**

Notwithstanding the foregoing and any other term of this Consent Judgment, the following claims are hereby not released and are specifically reserved:

1.      Securities and securitization claims based on the offer, sale, or purchase of securities, or other conduct in connection with investors or purchasers in or of securities, regardless of the factual basis of the claim, including such claims of the state or state entities as an owner, purchaser, or holder of whole loans, securities, derivatives or similar investments, including, without limitation, mortgage backed securities, collateralized debt obligations or structured investment vehicles, and including, but not limited to, such claims based on the following:

(a) the creation, formation, solicitation, marketing, assignment, transfer, offer, sale or substitution of securities, derivatives, or other similar investments, including, without limitation, mortgage backed securities, collateralized debt obligations, collateralized loan obligations, or structured investment vehicles;

G-6