42. Thereafter, the Plaintiff's FICO score climbed to 690 and the loan interest rate was not reduced and the home equity line of credit was not increased to $500,000.

43. On December 24, 2007 or shortly thereafter, the First Loan was removed from pledging at the FHLB_SF by WMB according to outside counsel for the FHLB_SF.

44. In late December or soon thereafter, the First Loan was sold or pledged in a pool of mortgages for a mortgage-backed security ("MBS").[5] Mortgage default insurance was sold by Washington Mutual Bank incident to the non-recourse sale of the loan.[6]

45. In March 2008, the initial payment was missed on the First Loan.

46. On April 5, 2008, WMB Collections Department sent a Debt Validation Notice. The notice makes the statement that WMB is the creditor[7] but may be acting for the holder:

> "The creditor to whom this amount is owed is Washington Mutual Bank. Please note that Washington Mutual Bank may be acting as a servicer for the holder of this loan."

The language used suggests that the first loan was pledged and that the Note was transferred to the Pledgee. Cal. Comm. Code 9313

47. The Note was held by the Owner/Pledgee on September 25, 2008 and could not have been transferred to Chase by the receiver.[8]

48. The Debt Validation notice states on page 2 that "you owe $23,237.34" as of April 5, 2008. The amount is false and overstated. The payment was one month overdue on April 5, 2008 per contract. Payment for the second month was not overdue until after April 15.

49. On June 30, 2008, QLSC caused a Notice of Default to be filed at the Recorder.

---

[5] "A transfer of financial assets in which the transferor surrenders control over those assets is accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange, FASB 140, September 2000
[6] Chase has not produced the pledging agreements for the First Loan.
[7] The creditor is Washington Mutual Bank, FA on the face of the First Loan documents not Washington Mutual Bank.
[8] "A transfer of financial assets in which the transferor surrenders control over those assets is accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange", Financial Accounting Standards Board 140, issued September 2000.

**Third Amended Adversary Complaint**         9         Adv. Case No. 10-05245

50. In July and August 2008, the Plaintiff, in order to avert a foreclosure, arranged an all cash sale of the property for $3,200,000. WMB failed to make any meaningful response to the all cash offer. WMB offered no explanation. The short sale was abandoned.[9]

51. On August 14, 2008, QLSC caused the Substitution of Trustee ("SOT") to be filed with the Santa Clara County Recorder. The SOT bore the forged signature of Matthew Allen Banaszewski.

52. Plaintiff filed a Chapter 11 bankruptcy case # 08-55305 ASW on September 19, 2008 when it became clear that the loan servicer WMB was not negotiating in good faith.

53. On September 25, 2008, the Office of Thrift Supervision (OTS) put WMB into receivership, named the FDIC as Receiver, and sold certain unspecified assets and liabilities to JPMorgan Chase Bank, NA (Chase) that same day.[10]

54. Washington Mutual Inc ("WMI") –the publicly traded non bank holding company– declared a chapter 11 bankruptcy in the Delaware federal court September 26, 2007.

55. On October 17, 2008, Lawrence J. Buckley, Esq.[11] filed Secured Proof of Claim 2 for $3,189,960.65 naming Chase as the creditor with the following inadequate attachments:

    a. Exhibit A-Itemization of Claim 2

    b. The Schoppe Affidavit

    c. An uncertified marked up copy of a Deed of Trust

    d. An uncertified marked up copy of an Adjustable Rate Rider

56. The documents attached to the Proof of Claim 2 do not establish Chase as the owner or holder of the First Loan. (For example, the Debt Validation Letter indicates that WMB was not the holder of the Note.)[12]

---

[9] WMB had sold the Note with credit default insurance and was reluctant to report the default.
[10] Purchase and Assumption Agreement Whole Bank among Federal Deposit Insurance corporation receiver of Washington mutual Bank, Henderson Nevada Federal Deposit Insurance Corporation and JPMorgan Chase Bank, National Association September 25, 2008.
[11] Lawrence J. Buckley Creditor's Authorized Agent P. O. 829009 Dallas, TX 75382-9009
[12] The Proof Claim (Form B-10) requires explanations for any documents that are not available. There are no explanations given for the missing Adjustable Rate Note or any other documents that might have showed a transfer of the First Loan to Chase.

57. On December 12, 2008, Maria Borresen of Moss Codilis filed a Secured Proof of Claim 3 for $253,884.38 naming JPMorgan Chase Bank, NA as the creditor with the following attachments [13]:

    a. Proof of Claim Worksheet

    b. An uncertified marked up copy of a Deed of Trust

58. The documents attached to Proof of Claim 3 do not establish that Chase is the loan servicer, or the owner of the Second Loan. [14]

59. In January 2009, Chase filed a motion to lift the stay of foreclosure. Chase attached a copy of a public version of the Purchase and Assumption Agreement ("P&A").[15] The P&A does not specify any loans that were transferred to Chase by the Receiver. The P&A sheds no light on the ownership or possession of the loans in question.

60. The P&A required Chase to pay the $0 book value for loans in default as follows:

> "Any asset of the Failed Bank subject to an option to purchase or any other asset purchased for which no purchase price is specified on Schedule 3.2 or otherwise herein shall be purchased at Book Value. Loans or other assets charged off the Accounting Records of the Failed Bank prior to Bank Closing shall be purchased at a price of zero."

61. The foregoing shows that Chase lacks constitutional standing because it states that (even if the loans were transferred) Chase would have paid $0. Chase has not suffered and cannot suffer injury by non-payment of loans it did not originate, did not fund, and did not purchase for value. The burden of proof is on Chase.

62. On August 24, 2009, Plaintiff rescinded the First Loan by letter. Chase did not respond to the rescission letter. The failure to respond to a rescission letter within 20 days is a TILA violation with statutory damages.

---

[13] Id.
[14] Moss Codilis has failed to respond to two Rule 45 subpoenas.
[15] As of November 2012, The FDIC Receiver has now declared that there are at least 5 different versions of the P&A after previously representing that there is only one version. The FDIC Receiver is involved in a multiple deceits in this case.

**Third Amended Adversary Complaint**      11      Adv. Case No. 10-05245

63. On September 1, 2009, the Motion to Lift the Stay of foreclosure came before this Court and Chase took the motion off calendar.

64. In early June 2010, a copy of some of the First Loan and Second Loan documents in Chase's possession were obtained pursuant to a Rule 2004 subpoena. These files are referred to herein as the Chase Rule 2004 Loan File.

65. On June 24, 2010, the Plaintiff timely rescinded the Second Loan by letter within the 3-year window based on the information contained in the Chase Rule 2004 Loan File. Chase did not respond to the rescission letter. The failure to respond to a rescission letter within 20 days is a TILA violation with statutory damages.

66. The information shows that the last Truth in Lending Disclosure Statement (TILDS) is dated 9/20/07 and the proper Expiration Date for Notice of Right to Cancel was no sooner than 9/24/07. Plaintiff never received the final TILDS disclosure statement. 226.23, 226.23 (a)(3)

67. On July 15, 2010, the Plaintiff brought the adversary action prior to the expiration three year Truth in Lending window for the First Loan. The adversary action was also brought within the one-year window for the two TILA violations.

68. On November 4, 2010, Plaintiff sent a Qualified Written Request (QWR) to Chase. Chase responded January 15, 2010 stating, "Chase is the servicer of this mortgage loan". Chase did not state the creditor's name. Chase failed to acknowledge in 5 days. Chase failed to respond substantively in 30 days. These are violations of RESPA under 12 USC 2605 and subject to statutory damages.

69. In April 2011, the Joan Sorocco of the FDIC in response to a Rule 45 subpoena misrepresented in a letter to the Plaintiff that the FDIC had no files regarding the Plaintiff's loans. Joan Sorocco refused to make this statement under oath.

70. In May 2011, the Plaintiff discovered that his First Loan was listed in Exhibit C of a complaint filed by the Receiver against LSI Appraisal, LLP. The suit claims appraisal

**Third Amended Adversary Complaint**        12        Adv. Case No. 10-05245

negligence. The complaint claims a direct and actual loss of $436,502.26 on the First Loan. The suit shows that the Sorocco (FDIC) was not telling the truth.

71. On May 2011, the Plaintiff issued a subpoena to the FDIC asking for the information upon which the Receiver based its claim of the $436,502.26 loss.

72. In August 2011, the Receiver through its outside law firm (Nossaman LLP) admitted that it had the Plaintiff's loan file.

73. On November 11, 2011, the Plaintiff sent Ms. Julie Moulteni, Esq. at QLSC an email with a demand letter dated November 7, 2011 attached. The letter demands that QLSC rescind the NOD and SOT and that QLSC step down from claiming that it is the trustee. QLSC did not respond to the letter.

74. On January 26, 2012, five days before discovery cutoff, Chase through Alvarado Smith, PC (Thomas Van) sent to the Plaintiff by email scanned digital color copies of the purported original First loan Collateral File, to wit, the Adjustable Rate Note, The Adjustable Rate Rider, the Prepayment Fee and the Deed of Trust.

75. On January 27, 2012, Chase filed for a protective order on behalf of the Receiver to prevent production of the Receiver Loan File. The Court denied this motion.

76. On March 6, 2012, Dr. Hoeltzel's forgery declaration was filed. The declaration states that the Adjustable Rate Note submitted by Chase (Mr. Van) on January 27, 2012 is a forgery. Other collateral file documents also show extensive "colorization" of black and white signatures and initials.

77. On April 4, 2012, the Court granted Plaintiff's motion to compel the Receiver to produce a "unredacted", "true and correct" copy of the loan file.

78. In May 2012, the Plaintiff determined that the Loan File that the Receiver produced was not a true a correct copy. The Plaintiff filed a second Motion to Compel the Receiver to produce the withheld documents.

79. On May 15, 2012, the Plaintiff stipulated to a protective order with the Federal Home Loan Bank of San Francisco regarding production of the records that show that the First

**Third Amended Adversary Complaint**     13     Adv. Case No. 10-05245

1. Loan was pledged to the Federal Home Loan Bank between August 2007 and mid December 2007.

80. On May 29, 2012, the Plaintiff filed the declaration of forensic expert Dr. Hoeltzel that the purported signature of the notary Matthew Allan Banaszewski on the Substitution of Trustee document is a forgery.

81. On July 2, 2012, The Plaintiff sent two Qualified Written Requests ("QWR") for name, address, telephone number of the owner of the First and Second Loans to Chase Home Finance LLC under RESPA 6(e) and 6(k) and USC 1641(f)(2) of the Truth in Lending Act. Chase did not acknowledge the request in 5 days in violation of RESPA.

82. On August 1, 2012, Chase, through its outside attorneys, responded to the First Loan QWR with a letter and a printed paper copy of the first loan collateral file matching the forged documents sent on January 27, 2012. 12 U.S.C. § 2605

83. Chase did not respond to the Second Loan QWR at all. Chase is subject to statutory damages under RESPA for failure to respond. 12 U.S.C. § 2605

84. On September 21, 2012, the Chase was ordered to produce all the loan files including the original paper files and to allow the Plaintiff to inspect the purported original loan collateral files for the first and second loan at the Alvarado Smith PC office in Santa Ana within 30 days.

85. Chase claimed that it had the Second Loan collateral file and would produce it on October 18, 2012. Chase did not produce the Second Loan collateral file on October 18 and has signaled its continuing intention not to produce it.[16] On October 18, 2012, Plaintiff inspected and scanned the purported First Loan collateral file in Santa Ana California.

---

[16] Mr. Van states that it is not important.

**Third Amended Adversary Complaint**      14      Adv. Case No. 10-05245

86. On October 18, 2012, after several hours delay, Chase produced purported original loan origination files for the First and Second Loans. These files did not contain any collateral file loan documents. Plaintiff scanned signature pages of the documents.

87. Chase did not produce the complete loan files that include the electronic database reports on the Loans.[17]

88. Plaintiff will show at trial that the purported First Loan collateral file contains forgeries based on the January 2012 forgeries. Plaintiff alleges that Chase cannot or will not produce the original collateral Loan files because WMB intentionally destroyed them.

89. On November 5, 2012, the Receiver through Nossaman, LLC produced 5 different versions of the P&A. The production of five different versions of the P&A shows that the Receiver has not been telling the truth the truth in Courtrooms throughout the country. Moreover, the Receiver adopted a narrow interpretation of the Court order and restricted its response to "executed copies of the P&A". The receiver failed to produce an unredacted copy of the "WaMuclosing.txt" version of the P&A and failed to produce a copy of the "Thorne " version of the P&A. The Receiver did not issue a declaration with respect to either of the documents.

90. On November 5, 2012, the Receiver produced a privilege log but did not produce the information that forms the factual basis of its $436,502.26 loss claim. The Receiver continues to refuse to produce this essential information.[18]

**ADDITIONAL FACTUAL ALLEGATIONS**

91. On July 26, 2007, Stewart Title of California did not execute the Lender's Closing Instructions. The Commitment Letter and the Loan Approval Letter were not produced in escrow. The two documents were required to be signed. Stewart Title failed to perform its

---

[17] Mr. Van, without submitting a privilege log, stated the electronic files would not be produced without a protective order.

[18] The information will show that the First Loan was sold/pledged with credit default insurance and was non-recourse.

**Third Amended Adversary Complaint**     15     Adv. Case No. 10-05245

job. As a consequence, Stewart Title of California's charges are not bona fide and should be included in the finance charge. The First Loan should not have closed on July 26.

92. The underwriting documents show that Loan Approval and the Loan Commitment Letters were not ordered by Silva presumably to hide the fact that terms and conditions did not require a 2% prepayment penalty. CCC 1550(2)

93. On July 26, 2008, Jennifer Adams signed off on the Settlement Agent Instructions Sheet knowing that all required documents had not been signed and sent the original executed loan documents to the Wholesale Lending Loan Fulfillment Center in Pleasanton. This is consistent with the NAMCO disclosure and confirms that the First Loan was placed though Wholesale Lending.

94. On July 26, 2007, WMBFA failed to disclose that the interest rate overcharges would split between Mr. Helmonds and his employer. WMBFA and Helmonds systematically deceived the Plaintiff by burying loan origination fees in an excessive Margin (3.788 %).[19] 226.8(b)(5), 226.6(c)

95. On August 1, 2007, Stewart Title wired payment for the old WMBFA Loan. The Loan was paid on August 1, 2007 but the Plaintiff was charged interest through August 3, 2007. This increased the cost of the financing by $1,065.24, and the amount should have been subtracted from the Amount Financed. 229.10 (a)

96. On August 1, 2007, Stewart Title paid the Countrywide Loan by wire but charged the Plaintiff interest through August 3, 2007. This increased the cost of the financing to the Plaintiff by $ 230.08, and this amount should have been subtracted from the Amount Financed. 229.10 (a)

97. The Interest Rate and Loan Fee Policy (Form 1764) dated July 9, 2007, failed to disclose the APR as required but disclosed a 1% Loan fee like the GFE. The Form 1764

---

[19] Plaintiff margin on his existing WMBFA loan was 2.7%.

**Third Amended Adversary Complaint**    16    Adv. Case No. 10-05245

1 deceptively discloses a Margin of 0% deceptively implying that the interest rate was
2 4.293 %.[20][21] 226.17, 226.8(b)(5), 226.6(c)
3 98. The Property Tax and Insurance Escrow did not pay the minimum 2% simple interest
4 on tax and insurance fund collected and impounded as required by California Civil Code
5 2954.8 and Cal. Fin. Code 22200.
6 99. The HUD-1 amounts at line numbers 104 and 105 are objectively false because the
7 amounts $2,525,758.26 and $407,497.50 are based on an 8/3/2007 payoff date when in
8 fact the loans were paid off on 8/1/2007 by wire.[22]
9 100.   The LSI Appraisal charges are not bona fide and should be included in the
10 Finance Charge because the appraiser used poor or improper comparables, did not use the
11 cost approach, and the appraiser reported the market as stable when it was not.[23] In
12 addition, the underwriting documents show that the Plaintiff was overcharged for the
13 appraisal and that WMBFA and Helmonds knew this.
14 101.   By reason of the foregoing overcharges and non bona fide charges, the Finance
15 Charge[24] for the First Loan is understated and the Amount Financed is overstated by
16 more than $35. This is a TILA disclosure violation giving rise to the extended 3 year
17 right of rescission. § 1640(a)(3), Reg. Z 226.23 (h)(2)(i).
18 102.   Summary of Estimated Finance charge understatements:

---

[20] This is evidence of "bait and switch" fraud in loan origination.
[21] Typical Margin in May 2007 was 1.95% for loans with a FICO score 660 or greater.
[22] The "California's good funds laws, Section 12413.1 of the California Insurance Code, requires that an escrow company and title company have in possession sufficient good funds in order to close the transaction.
[23] These are the reasons stated by the FDIC Receiver in its lawsuit against the appraiser.
[24] Charges imposed by third parties are finance charges if the bank requires use of the third party.

**Third Amended Adversary Complaint**      17                    Adv. Case No. 10-05245

**FINANCE CHARGE UNDERSTATEMENTS**

| | |
|---|---|
| Initial Interest rate overcharge | $516.97 |
| Stewart Title Fees | $250.00 |
| WMBFA HUD-1 false Payoff date | $1,065.24 |
| Countrywide HUD-1 false payoff date | $230.08 |
| Non Bona Fide Appraisal | $895.00 |
| Yield Spread Premium (minimum 1.7%) | $51,466.96 |
| Over Escrow of Impounds | $303.16 |
| Failure to Pay Interest on Payoff Escrow | 494.91 |
| Overstatement of Principal amount due | $17,432.95 |
| **Total Understatement (estimated)** | **$72,655.27** |

103. On or about 9/12/07, Helmonds for WMB initiated a second version of the Home Equity Line of Credit (the Second Loan).

104. The Signing Instructions (Form 31583) for the Second Loan dated 9/17/07 states that the documents listed must have the correct signing date, that there must be no alterations to the documents, and that the documents must be signed in the specified order. Rosalie Silva violated each of these imperatives.

105. On September 18, 2007, Rosalie Silva closed the Second Loan.

106. The Plaintiff was given gave two Notices of Right to Cancel that contain the wrong expiration date (9/22/07).

107. Plaintiff was given a large envelope sometime after close, which contained some original loan documents including the Deed of Trust bearing the original signature ("James M. Kelley") of the Plaintiff. Plaintiff put the envelope in a drawer without notice at the time.

108. On September 20, 2007, WMB printed a new set of loan documents because Silva had violated the Signing Instructions and the FITILD had been changed.

109. The Plaintiff never received the corrected FITILD and Notice of Right to Cancel forms. The correct date for expiration of the rescission period is September 24, 2007.

This is a TILA violation extending the right of rescission to 3 years. 226.15 (a)(3), 226.23 (b)(1)(v), 226.15 (b)(5)

110. The Plaintiff's signatures were altered on the Second Loan documents to "James Kelley" after the Plaintiff signed the original documents to make them comply with the SIGNING INSTRUCTIONS. The loan documents were not filled in completely at the time of closing and were completed thereafter by Silva.

111. Silva did not notarize at loan documents at close. Silva claims that she lost her Notary Journal. This prevents verification that the documents were properly notarized.

112. The Deed of Trust (Form 4360) for the Second Loan purports to have Plaintiff's signature and a date of 9/18/07. An examination of a Loan File copy of Form 4360 (page 6) shows that someone other than the Plaintiff wrote in the date and that the signature has been altered. Silva has admitted to altering dates on the Plaintiff's Second Loan documents that were in her possession during her deposition.

113. The FDIC has admitted with the William Terry Declaration in this case that it does not know what loans were transferred to Chase on September 25, 2008.[25]

114. Paragraph 1 of the Adjustable Rate Note states that

> "The Lender or <u>anyone who takes this Note</u> by transfer <u>and who is entitled to receive payments</u> under this Note <u>is called the Note Holder</u>." [emphasis added]

A person who holds the Note may not be the person entitled to receive payments under the Note and if not would not be the Note Holder. It is necessary to determine who is entitled to receive payments or the borrower may not receive credit for payment and remain liable. Chase is not the Note holder. Chase is not the lender or the Creditor, the owner, the Pledgor or the Pledgee and is not entitled to receive payments under the Note.

---

[25] Dkt. #123, filed 12/7/2011, "The Electronic database referenced in Article 8 of the P&A would have been created only pursuant to a request from the FDIC to Chase. The FDIC has a mutual understanding that production of this electronic database would be burdensome to the WAMU Receivership. Accordingly, I have not been able to locate any request from the FDIC to Chase for this electronic database. As such, the FDIC has concluded that this electronic database does not exist."

1 Chase is not a holder in due course. Chase has not demonstrated the fact and the purpose
2 of any purported delivery. The Receiver cannot deliver to Chase what it does not own.[26]
3 115.  The purported First Loan collateral file produced by Chase in January 2012 has
4 the purported blank endorsement stamp of Cynthia Riley acting as an agent of WMBFA.
5 This is impossible. WMBFA could not authorize Cynthia Riley to blank endorse anything
6 because it did not exist.
7 116.  For the Adjustable Rate Note to be considered "bearer paper" the Note would
8 have to be endorsed in blank. Riley would have had to endorse or authorize the
9 endorsement Note between July 31, 2007 and June 30, 2008. This is impossible because
10 Cynthia Riley was not an employee of Washington Mutual Bank after November 2006
11 117.  Cynthia Riley was an employee of Chase beginning in 2009. Any endorsement
12 made after June 30, 2008 renders the foreclosure process void for fraud.
13 118.  The Adjustable Rate Note is non negotiable under California Commercial Code
14 3104 (3) as follows:

> Paragraph 5 of the Adjustable Rate Note states
>
> "When I make a Prepayment, I will tell the Note Holder in writing that I am doing so"

Paragraph 5 expressly violates the Cal. Com. Code 3104 (3) requirement to "not state any other undertaking or instruction by the person promising or ordering payment <u>to do any act</u> in addition to the payment of money." The additional duty of creating and delivering a writing in addition the payment of a sum certain on a date certain renders the Note non negotiable.

119.  Further, a payment is required by the Deed of Trust that is not specified in the Adjustable Rate Note. This payment is incorporated into the Adjustable Rate Note by the inclusion of Definition J and Section 3 of the Deed of Trust which orders the Borrower to

---

[26] In re: Veal v. AHMS & Well Fargo Bank, Opinion, Ninth Circuit Bkr. Appellate Panel, June 10, 2011

**Third Amended Adversary Complaint**      20      Adv. Case No. 10-05245